## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEPHEN AND JUNE VITIELLO, Individually and On Behalf of All Others Similarly Situated, | No. 2:20-cv-04240-MCA-MAH |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| BED BATH & BEYOND, INC., MARK J. TRITTON, MARY A. WINSTON, AND ROBYN M. D'ELIA, | |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Kavin Bakhda ("Lead Plaintiff"), and additional named plaintiff Richard Lipka (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, undersigned counsel's investigation, which includes, without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, conference call transcripts, and interviews with former Bed Bath & Beyond Inc. ("BBBY" or the "Company") employees.  Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     BBBY is a retailer of a wide variety of domestic merchandise and home furnishings and is widely known for its coupon discounts.  BBBY operates under many brand names, including Christmas Tree Shops, Harmon, buybuy BABY, and Cost Plus World Market.

2.     After a major management shakeup, BBBY's new management – led by the Individual Defendants (defined *infra*) – announced in September 2019 that the Company would rid itself of $1 billion in excess inventory in eighteen months (the "Program").  Specifically, Defendants represented that the Program targeted aged and lower-margin inventory through promotions and markdowns; refocused BBBY on profits and selling higher-margin goods; and paved the way for a successful 2019 holiday season, which was "critical" to BBBY.

3.     At all times relevant, investors were led to believe that the Program was the product of adequate and careful planning by BBBY.  Defendants also emphasized that BBBY had meaningful oversight on the Program, and, in particular, that BBBY safeguarded against the Program causing adverse effects, such as margin erosion and sales cannibalization.  To eliminate

these risks, Defendants assured investors that BBBY, among other things, employed highly functional industry software that tracked the Program's progress in real time.

4.      As detailed *infra*, Defendants' representations were materially false and misleading when made, *inter alia*, because Defendants knew or recklessly disregarded that the Program was not the product of adequate and careful planning by BBBY; BBBY's management overhaul (which continued through 2020) left the Company without key personnel to properly execute and oversee the Program; and the Program was causing precisely the adverse consequences Defendants assured investors it would not cause – aggressive erosion of BBBY's margins and cannibalization of BBBY's 2019 holiday sales.

5.      In January 2020, BBBY shocked the market by pulling its previously announced financial guidance completely and reporting that its gross margins had dropped by 80 basis points. One month later, in February 2020, BBBY revealed the full truth when it announced preliminary results for 4Q19 and disclosed that BBBY's inventory management – *i.e.* the personnel, planning, and tools for the Program – was in a shambles, BBBY's gross margins had plummeted by 300 basis points, and the Program had not only cannibalized BBBY's sales, but also led to empty and minimally stocked shelves of higher margin products needed to ensure a successful 2019 holiday season.   As a result, BBBY stated it was "immediately reforming its internal planning and inventory management procedures to master the fundamentals."   Defendants only belatedly conceded that these failures were, in fact, largely "self-inflicted".

6.      This is a class action on behalf of all persons and entities that purchased or otherwise acquired BBBY securities between September 4, 2019 and February 11, 2020, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the

"Exchange Act").  BBBY's alleged fraud caused investors to suffer hundreds of millions of dollars in damages.

7.     Prior to the start of the Class Period, in March 2019, three activist investors (Legion Partners Asset Management, Macellum Advisors, and Ancora Advisors (the "Activist Investors")) demanded that BBBY address its stagnant inventory and weak margins, restructure its board of directors, and appoint a new CEO to replace then-current CEO Steven Temares.  The Activist Investors got their wish.  BBBY's board was restructured to include Defendant Mary Winston and, on May 10, 2019, Temares resigned as BBBY CEO and director.  Defendant Winston was named interim CEO while BBBY looked for a permanent replacement.  Defendants Winston and then-current CFO Robyn D'Elia (who has since resigned from BBBY) were keen to address the Activist Investors' concerns about stagnant inventory and ailing margins.

8.     On the first day of the Class Period, September 4, 2019, Defendant Winston issued a letter to BBBY shareholders announcing the Program.  The letter stated that the Program was designed to "reduc[e] up to $1 billion of inventory" over the next 18 months, including removing excess aged inventory to "quickly reset inventory levels in both our stores and distribution centers" and provide for "higher-margin products, all in an effort to drive customer traffic and support top-line performance" ahead of the 2019 holiday season.  The letter did not disclose *any* risks related to the Program.

9.     Throughout an October 2, 2019 conference call, Defendants continued to tout the Program to investors.  Importantly, Defendant D'Elia also assured investors that due to thoughtful and diligent management, the Program safeguarded against harming BBBY's margins or "cannibaliz[ing] sales during the holiday period" – which were material concerns for BBBY

investors.  On the same call, Defendant Winston echoed that BBBY was managing the Program "thoughtfully to prevent cannibalization of sales."[1]

10.     These assurances were material to investors.   Margins were of particular importance to BBBY because, as the Activist Investors pointed out, the Company's margins had been badly suffering for years.  Unloading aged inventory in a manner that would further harm BBBY's margins was counterproductive.  Investors were thus soothed by assurances made by Defendants D'Elia and Winston that the Program expressly protected BBBY against this risk.

11.     BBBY also announced on October 2, 2019 that it planned to remove $350 million in inventory by end-of-year for the holiday season through various markdowns.[2] These markdowns were a departure from BBBY's traditional coupon-centered marketing.  Markdowns were a new strategy for BBBY and important to the Program because, as Defendants represented, BBBY could markdown targeted aged inventory in one fell swoop, and, purportedly, without harming higher-margin products in the process.

12.     At all times relevant, Defendants represented to investors that BBBY properly planned for the Program, and had the requisite personnel and tools in place to execute the Program,

---

[1] Cannibalization of sales is broadly defined as a loss in sales caused by a company's introduction of a new product that displaces one of its own older products. Promotions can cause cannibalization of sales by causing customers to buy lower-margin goods instead of higher-margin goods. https://www.investopedia.com/terms/m/marketcannibilization.asp

[2] Markdowns are broadly defined as the difference between the original retail sales price and the actual selling price. Markdowns reduce prices on certain goods across-the-board. https://www.thebalancesmb.com/retail-markdowns-2890140#:~:text=Read%20The%20The%20Balance's%20editorial%20policies,ended%20up%20selling%20it%20for.  In contrast, a coupon, or discount, is a reduction in the price of an item or transaction based upon the customer making the purchase. Coupons reduce prices on any non-exempt purchase(s) when the coupon is redeemed.          https://retailminded.com/markdowns-vs-discounts-whats-the-difference-2/#.X4DGedBKiUk.

including to manage inventory, to strategically deploy markdowns, and to ensure the Program was achieving its goals without ill effects.

13.     In that regard, Defendant Winston assured investors during the October 2, 2019 call that "[t]o optimize this inventory off-load the company is [among other things] employing 'markdown optimization software' to speed the process."  This software, as well as other inventory management software utilized by BBBY, purportedly provided up-to-date, in-depth, and real-time data about inventory, allowing the Company, among other things, to optimize reductions in selling price by recommending the best timing and depth of markdowns.  Indeed, the software took each product's stock levels, shelf-life, current pricing, lifecycle, and seasonality trends into account to allow BBBY to, as Defendants D'Elia and Winston stated, "thoughtfully" and "mindfully" decrease aged and excess inventory, which guarding against margin erosion and sales cannibalization risk.  This software was critical because it kept Defendants apprised of the Program's progress in real time, from day one.

14.     BBBY utilized software supplied by, among others, Revionics.  Revionics' software included weekly reports containing data about pricing, sales and margins.  A former senior BBBY employee (CW-1) reported that BBBY senior management, including Defendants D'Elia and Winston, received these weekly inventory reports and likewise participated in weekly meetings together.  Defendants also had access to extensive, real-time information about the Program through the software.  BBBY stated that it "heavily" relied on its software to "manage inventory replenishment, summarize results and control distribution of products."

15.     On October 2, 2019, BBBY slightly lowered its FY2019 earnings per diluted share guidance to between $2.08 and $2.13.[3]

16.     One week later, on October 9, 2019, BBBY named Defendant Mark Tritton as BBBY's new CEO, replacing Defendant Winston.  For time served (about six months), Defendant Winston received a salary of $550,000, and an additional $1.9 million in BBBY stock on November 4, 2019, which is when Defendant Tritton took the helm.  As the new CEO of BBBY, Defendant Tritton adopted the Program put in place by Defendant Winston.

17.     In December 2019, there was another major shakeup in BBBY's C-suite. Specifically, on December 17, 2019, BBBY announced that Defendant Tritton had fired the Company's Chief Merchandising Officer, Marketing Officer, Digital Officer, General Counsel and Chief Administrative Officer.  The Company's Chief Brand Officer resigned the prior week.

18.     On January 8, 2020, the truth about the Program began to come to light.  On that date, BBBY withdrew its FY2019 guidance completely and disclosed plummeting margins. Pulling guidance is a rare and draconian step; executives often revise guidance when warranted, but withdrawing it completely is highly unusual.[4]  BBBY also reported a 3Q2019 adjusted net loss of earnings per diluted share of $.38 – far short of the $.02 profit consensus projected by analysts, and an 8.3% plunge in comparable sales that also widely missed expectations.  For the three and nine months ending in Q319, BBBY revealed that its gross margins had declined by 80 and 250 basis points, respectively.

---

[3] BBBY first announced FY2019 earnings per diluted share guidance of $2.11 to $2.20 in April 2019.

[4] *See, e.g.*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3077262 at 22 (withdrawing financial guidance is "rare").

19.     Defendant Tritton admitted during a January 8, 2020 conference call that BBBY's "performance was impacted to some extent by self-inflicted issues, like poor inventory management", but he did not disclose the full extent of BBBY's inventory management problems or the ill effects of the Program on BBBY, which Defendants were privy to in real time.

20.     On this news, BBBY's share price plummeted almost 20%, falling $3.20 to close at $13.40 per share on January 9, 2020.

21.     The other shoe dropped on February 11, 2020.  On that date, BBBY issued a press release entitled "Bed Bath & Beyond Inc. Provides Update on Fourth Quarter Financial Performance"  announcing preliminary 4Q19 financial results – with gross margins declining by 300 basis points – and disclosing "a 5.4% decline in comparable sales driven primarily by store traffic declines ***combined with inventory management issues***" including that "***inventory within certain key categories in the [BBBY] assortment [were] too low or out-of-stock during the period***."  Thus, the Program had eroded margins and cannibalized sales, precisely what Defendants D'Elia and Winston said the Program guarded against due to diligent planning, management oversight, and real-time access to data.  BBBY also stated that it was "immediately reforming its internal planning and inventory management procedures to master the fundamentals."  The fact that BBBY had to now "master the fundamentals" shows how profound the failures in the Company's inventory management were.

22.     On this news, BBBY's share price plummeted again – this time by over 20% – to close at $11.79 per share on February 12, 2020, on unusually heavy trading volume.

23.     On February 18, 2020 – more than a week after the Company's February 11, 2020 revelations – Defendant Tritton admitted that BBBY's inventory management was fatally flawed since the start of the Class Period:  "We're going to have price management floated properly,

*which we didn't have coming into the third and fourth quarter*." BBBY's third quarter began on September 1, 2019, three days before the Class Period started.

24.     On April 15, 2020, BBBY announced FY2019 earnings per diluted share of $.46 – radically lower than the Company's earlier expectations of $2.08 to $2.13.[5]  Defendant Tritton admitted on a conference call that day that "*[w]e knew we were plagued by issues in December and January*,…[and] [s]ome of it was self-inflicted[,]" and that "customers were coming in, and they just couldn't find the product in stock[.]"  Defendant Tritton also noted during the call that BBBY was watching inventory issues "*hour by hour*" in late November 2019 (at "Thanksgiving time").  In fact, Defendants knew or recklessly disregarded the serious issues plaguing the Program in real-time thanks to BBBY's use of the industry software they touted – Defendants Winston and D'Elia since the start of the Class Period and Defendant Tritton since November 2019 when he joined the Company.

25.     Defendant Tritton also confessed on the April 15 call that – contrary to prior representations – "*we really didn't lay down the plans [on the Program] in the right way*" and, thus, "*burn[ed] the margin and [] burn[ed] a lot of inventory[,]*" and that "[w]e really saw some pain points there based on the promotional activity and how we managed it."

26.     Two weeks later, on April 30, 2020, BBBY announced that Defendant D'Elia had resigned.

27.     On July 14, 2020, BBBY stated that it "expect[ed] further improvement in working capital through the removal of about $1 billion of inventory at retail from [BBBY] stores over the

---

[5] The FY2019 earnings per diluted share of $.46 excluded non-cash impairment charges related to goodwill, tradenames, and certain store level assets, severance costs, shareholder activity costs, an incremental charge for markdowns associated with the Company's inventory reduction initiative, and a loss on a sale-leaseback transaction.

next 24 months."  In other words, the Program would take twice as long as claimed back in September – lasting until July 2022 (36 months) rather than April 2021.

28.     BBBY investors paid the price for Defendants' misstatements and omissions of material fact about the Program – suffering hundreds of millions of dollars in losses as the truth was disclosed.

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.  The Company's headquarters, as well as some of its stores, are in this District.  While employed by BBBY, Defendants worked in this District.

32.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

33.     Lead Plaintiff Kavin Bakhda, as set forth in the certification submitted herewith, purchased BBBY securities during the Class Period and suffered damages as a result of the federal

securities law violations and false and/or misleading statements and/or material omissions alleged herein.

34.     Additional named plaintiff Richard Lipka, as set forth in the certification submitted herewith, purchased BBBY securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

35.     Defendant Bed Bath & Beyond is incorporated under the laws of Delaware with its principal executive offices located in Union, New Jersey.   BBBY's common stock trades on the NASDAQ exchange under the symbol "BBBY."

36.     Defendant Mary A. Winston ("Winston") was the Company's Interim CEO from May 2019 to November 2019.  Defendant Winston received compensation of approximately $550,000 for serving as BBBY's Interim CEO for less than six months.  Defendant Winston also received a $1.9 million BBBY stock grant on November 4, 2019.

37.     Defendant Robyn M. D'Elia ("D'Elia") was the Company's Chief Financial Officer ("CFO") at all relevant times.  Defendant D'Elia resigned from the Company on May 4, 2020. Defendant D'Elia received $1.55 million in BBBY stock and was paid $750,000 per year in salary during the Class Period.

38.     Defendant Mark J. Tritton ("Tritton") has been the Company's Chief Executive Officer ("CEO") since November 2019.  Defendant Tritton receives approximately $11,250,000 annually consisting of a $1.2 million annual base salary, a $750,000 opportunity at target to be earned by developing and delivering to the Board a short-term strategic and business stabilization plan, a $1.125 million payment based on the Compensation Committee's assessment that Defendant Tritton exceeded objectives set for him, a $500,000 one-time sign-on cash award of

time-vesting RSUs that will vest on November 4, 2020, subject to Defendant Tritton's remaining with the Company through that date, a $750,000 make-whole cash bonus, and a $6.9 million make-whole RSU award.

39.     Defendants Winston, D'Elia, and Tritton (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

40.     The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

41.     Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. As alleged herein, the Individual Defendants had access to, and received, among other things, weekly inventory report through Revionics that reflected the progress of the Program in real time.

42.     The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### A.     BACKGROUND ABOUT BBBY

43.     BBBY sells a wide variety of domestic merchandise and home furnishings and is widely-known for its coupon discounts.  BBBY operates under many brand names including Christmas Tree Shops, Harmon, buybuy BABY, and Cost Plus World Market.  Holiday sales are a key revenue driver for, and of singular importance to, BBBY.  Indeed, Defendant Winston stated on October 2, 2019 that holiday sales were "critical" to the Company.

44.     BBBY performed poorly between 2014 and 2019, with its stock price dropping from the mid-$60 range in 2014 to approximately $15 during mid-2019.  Part of the problem was BBBY's coupon campaign.  For decades, BBBY relied heavily on coupon mailers to attract consumers, but the Company failed to evolve its business beyond that strategy.  An April 26, 2019 *Washington Post* article entitled "Your love of Bed Bath & Beyond coupons could be killing the retailer," by Abha Bhattarai stated:

> [BBBY] has built a business on coupons. The housewares chain began mailing out 20 percent off "Big Blue" coupons nearly 30 years ago, at a time when sweeping discounts were a novelty. The idea was that the coupons would draw shoppers into the store, where they would then buy other items at full price. For many years, it worked.

> But now, after years of stalled sales and declining profits, the New Jersey-based retailer is pulling back on coupons in a broad effort to turn around its business.

45.     Even after "years of stalled sales and declining profits", it was only under pressure from the Activist Investors in early 2019 that the Company began to move away from its traditional coupon merchandising to try a different strategy: promotions and markdowns.

### B.     BBBY RELIES ON INVENTORY SOFTWARE

46.     Both before and during the Class Period, BBBY used industry software from, among others, Revionics.  This software was key to BBBY's inventory management because it enabled management to quickly make complex decisions about inventory across the Company's fleet of stores and distribution centers.  A statement by BBBY's Chief Value Optimization Officer Barrie Carmel demonstrates the huge scale of BBBY's business and the accompanying need for inventory management software:

> We have more than 1,000 stores in our fleet, which gives us tremendous leverage, scope and reach to the customer, but it's very different when we are competing against a digital-only presence," said Carmel. "A digital [seller] can change price by pushing a button, and the price changes instantaneously. I push a button, and 1,000 people need to make 1,000 changes in the stores. That is a very realistic thing for us.

See, Mark Hamstra, "Bed Bath & Beyond Tackles Heightened Pricing Competition Amid Quicksilver Online Sellers" (Mar. 3, 2020), https://www.uschamber.com/co/good-company/launch-pad/bed-bath-beyond-pricing-strategy?utm_content=bufferc3acc&utm_medium=social&utm_source=facebook.com&utm_campaign=buffer

47.    At all times relevant, BBBY utilized inventory management software supplied by Revionics, among others.  Revionics' website emphasizes the "real-time" speed with which companies can access information through its software, stating that "data-driven retailers who turn to AI to *gather and evaluate real-time insights* will be the winners this holiday season."[6]

48.    Without utilizing inventory software, BBBY could not compete effectively.  That is why BBBY discussed its use of such software with analysts.  *See* ¶¶82, 147.

49.    In a January 9, 2019 conference call, then-CEO Temares specifically trumpeted BBBY's use of Revionics' software for "inventory optimization":

> We continue to focus on *inventory optimization strategies*…. [including] our enterprise order management system, our human capital management system, *we talked about the things we're doing with Revionics and our value optimization group, rolling out the point of sale, the workforce management*. There are so many things that we put into place that now we're starting to see and we're getting the cadence of when we're going to get these benefits, so it allows us to be we're closer to that timeframe, it allows us to have greater visibility and so that's a shorter term, so that's where we're at.

### C.    THE ACTIVIST INVESTORS DEMAND CHANGE AT BBBY

50.    In April 2019, after years of disappointing financial performance by BBBY, the Activist Investors strenuously pushed for top-down changes at the Company.  Specifically, the Activist Investors argued that BBBY shareholders should elect their slate of board nominees, portraying BBBY's current leadership as unable to keep up in an evolving consumer landscape.

51.    The Activist Investors were successful and BBBY's board was restructured in May 2019.  This restructuring included appointing Defendant Winston to the BBBY board.

---

[6] Aditya Rastogi, "Leveraging Customer Insights to Avoid Product Cannibalization in Retail, (Mar. 31, 2020), https://revionics.com/article/revamping-your-pricing-strategy-as-retail-reopens/

52.     On May 10, 2019, the Activist Investors filed a proxy statement with the SEC outlining additional changes they still deemed necessary at BBBY:

> Our slate of director nominees is committed to executing on a comprehensive strategic plan that we released, which includes a quantified time and action plan that prioritizes the following initiatives: …***addressing the Company's weak sales, improving gross margins, [and] optimizing inventory levels***. (Emphasis added).

53.     The proxy repeatedly noted that BBBY's "inventory turns are very low and likely lead to more clearance" and emphasized the need to "improve inventory by increasing inventory turns".  The proxy also stated that BBBY had to "increase inventory turns which would result in a substantial release of cash tied up in slow moving goods."

54.     In addition, the Activist Investors stressed that the board changes were not enough:

> Not until faced with stockholder pressure, did the Board take steps to change its composition. We do not believe the recent Board changes go far enough to address the prolonged underperformance of the Company and destruction of shareholder value.

55.     Apparently in response, on May 13, 2019, BBBY's long-term CEO Temares resigned and Defendant Winston became Interim CEO, effective immediately.  In her new role as Interim CEO, Defendant Winston, along with Defendant D'Elia, was keen to address the Activist Investors' concerns related to inventory management.

### D.     BBBY ISSUES AND REITERATES FY2019 GUIDANCE

56.     On April 10, 2019, BBBY issued FY2019 net earnings per diluted share of $2.11 to $2.20.

57.     On July 10, 2019, BBBY reiterated such guidance and estimated it to be toward the lower end of the range.

### E.     BBBY ANNOUNCES THE $1 BILLION PROGRAM

58.     On September 4, 2019, the first day of the Class Period, Defendant Winston issued a letter to shareholders that, among other things, addressed the Activist Investors' concerns over inventory and margins.  In that letter, which unveiled the Program, Defendant Winston stated that BBBY was "reduc[ing] up to $1 billion of inventory" over the next 18 months, including removing

excess aged inventory before the critical 2019 holiday season.  Defendant Winston stressed that the Program prioritized sales of higher-margin goods, stating that "[t]his effort should allow us to quickly reset inventory levels in both our stores and distribution centers, as well as refresh our assortment, ***providing for newness and higher-margin products***, all in an effort to drive customer traffic and support top-line performance."  The letter did not identify or address any risks associated with the Program.

59.     The market viewed BBBY's Program as central to the Company's turnaround.  After BBBY's September 4, 2019 letter (which was issued after market close), BBBY's stock price jumped 7% to close at $9.64 per share on September 5, 2019, after closing on September 4, 2019 at $9.01 per share.

60.     Thereafter, the market continued to be buoyed by news of the Program.  On September 30, 2019, Wedbush Securities analysts Seth Basham and Nathan Friedman noted that the Company "has formulated a plan to reduce inventory by -$1b (~35%) [and] is rapidly refreshing stores to improve the shopping experience ahead of the holiday selling period."  In light of the foregoing, Wedbush raised its rating to "outperform" with a 12-month target of $16.

### F.     BBBY SLIGHTLY LOWERS FY2019 GUIDANCE

61.     On October 2, 2019, BBBY slightly lowered its FY2019 net earnings per share guidance to between $2.08 and $2.13.  BBBY also announced, as part of the Program, that it was removing $350 million in inventory by end-of-year for the holiday season.

### G.     BBBY RELIES ON KEY SOFTWARE TO FACILITATE THE PROGRAM'S SUCCESS

62.     During an October 2, 2019 conference call, BBBY updated investors with more details about the Program.  In particular, Defendant Winston stated that "[t]o optimize this inventory off-load the company is employing markdown optimization software to facilitate and manage the inventory reduction process."  This software was critical to the success of the Program, *inter alia*, because it tracked the Program in real time and ensured goals were achieved (Defendants

claimed) without harming BBBY, *i.e.*, by further reducing BBBY's already suffering margins or by cannibalizing sales. This software was also critical to the success of the Program because BBBY had traditionally been a coupon-centered company, not a markdown-centered company. Thus, the Program and its focus on markdowns was a departure from the Company's past practice and BBBY needed inventory software to closely monitor the Program.

63. During the October 2 call, Defendants also stressed that they were ahead of the risk of the Program eating into margins and cannibalizing sales. Defendants D'Elia and Winston claimed they had the necessary tools to address those risks – among them, this key software – and that they also had adequate oversight in place (*i.e.*, personnel and planning).

64. Markdown optimization software manages and monitors inventory, allowing companies to optimize the reduction in selling price by recommending the best timing and depth of markdowns. Retailers apply markdown optimization methods to have an optimal inventory in line with consumer demand, thus ensuring the highest margins. Markdown optimization software takes into account each product's stock levels, shelf-life, current pricing, lifecycle, and seasonality trends for the purpose of decreasing excess inventory. The software also analyzes changing product life-cycles, seasonal demand, different assortments of goods, varieties in the customer base, new stores, price competition, and any other factors that may change after the initial decision-making point. Markdown optimization software also allows companies to avoid selling products too cheaply and, thus, cannibalizing sales of other higher-margin goods.

65. As noted *supra*, Revionics is one of the companies that provides software to BBBY. Revionics' website discusses cannibalization and emphasizes that even promotions can cannibalize revenues:

> Product cannibalization, also known as demand substitution, happens when similar products compete against each other for the same sales. People most often think of cannibalization in the context of a new product being introduced and taking sales away from an older item in the same portfolio. ***However, this isn't the only case. Product cannibalization in retail can occur from other events, including promotions and discounts….***

> Typically, product cannibalization in retail is considered a negative outcome. And you

can see why; if one product merely takes all the sales of another, you now have more inventory but the same amount of sales and revenue.[7]

66.      More specifically, promotions can cannibalize revenues and sales by affecting shopping behavior.  If two products are almost perfect substitutes for each other, and one of the products is on substantial discount because of an ongoing sales promotion, customers commonly buy the promoted product instead of the one sold at a normal price.  Consequently, the sales promotion of one product decreases, or cannibalizes, the sales of similar products.

67.      BBBY continued to use software, including software supplied by Revionics, during the Class Period, but began to focus on utilizing that software to manage markdowns and track the Program's progress in addition to utilizing it for inventory management.  A January 6, 2020 news article on *businessinsider.com* entitled "NRF 2020: Revionics to Host Panel with Bed Bath & Beyond, DICK'S Sporting Goods & Leroy Merlin Brazil on Pricing for the Multichannel Retailer" discussed a January 13, 2020 Revionics panel moderated by, among others, BBBY's Chief Value Optimization Officer Barrie Carmel.  Among other things, the article stated that Revionics' software enabled companies like BBBY to improve margins and avoid cannibalization of sales – precisely what Defendants E'Elia and Winston claimed the Program would avoid – and maximize inventory returns through markdowns:

Revionics' top executives and technical experts will be available at their exhibit to show retailers why pricing smarter doesn't have to be harder with Revionics AI and science-based solutions, which include:

Pricing: As the top priority of shoppers, retailers' prices must take into account current market, competitive and shopper conditions across all channels. This means providing carefully crafted AI-powered pricing that delivers a win-win: providing shoppers with prices they love on the products they care most about, while ensuring retailers capture overall margins that enable them to sustain a healthy business in the long run.

**Promotion: Promotion analytics and optimization enable retailers to break the cycle of ineffective promotions and the race to the bottom with in-depth insights into consumer buying influences, cannibalization and halo effects, and identifying the most compelling vehicles and offers for different types of shoppers.**

---

[7] https://revionics.com/article/avoid-product-cannibalization/

***Markdown:*** *With AI-based markdowns designed to maximize return on inventory, margins and sell-through, retailers can deliver the discounts that customers want, where they want them, and when they want them.*

Dynamic Pricing: Revionics enables retailers to leverage machine learning science and competitive and shopper insights to price the right items at the right time, against the right competitors and in the right channels.

Competitive Insights: Retailers can better serve customers, exploit hidden opportunities, and achieve a higher ROI with real-time competitive insights.[8]

68.     A March 3, 2020 article by Mark Hamstra entitled "Bed Bath & Beyond Tackles Heightened Pricing Competition Amid Quicksilver Online Sellers", (available at https://www.uschamber.com/co/good-company/launch-pad/bed-bath-beyond-pricing-strategy?utm_content=bufferc3acc&utm_medium=social&utm_source=facebook.com&utm_campaign=buffer) also discussed BBBY's use of Revionics' software.  That article quoted BBBY's Carmel and stated that Revionics' software helped every aspect of BBBY's inventory management:

**Home retail chain Bed Bath & Beyond discusses its pricing strategy as it relates to technology and its competition against digital retailers within the industry….**

"We have more than 1,000 stores in our fleet, which gives us tremendous leverage, scope and reach to the customer, but it's very different when we are competing against a digital-only presence," said Carmel. "A digital [seller] can change price by pushing a button, and the price changes instantaneously. I push a button, and 1,000 people need to make 1,000 changes in the stores. That is a very realistic thing for us."

***Bed Bath & Beyond, which uses price optimization technology from Revionics, is coping with those challenges by fostering collaboration among its merchandisers and data scientists and looking beyond having the lowest prices to communicate an overall impression of value, she said***….

At Bed Bath & Beyond, changing the price of an item not only affects the physical shelf tags in the stores, but it can also impact several other consumer communication vehicles, including social media posts, email marketing messages and other digital advertising. These must all be positioned not only to convey the accurate pricing and appropriate value messaging, but also to drive traffic to the stores, Carmel explained.

---

[8] A "halo effect" is when buying one product leads to buying a separate product.

Bed Bath & Beyond seeks to create a strong value impression right from the start of the customer's journey online, she said, which is also where the challenge of integrating the brand's coupon strategy comes into play. Consumers, particularly younger shoppers, who are comparing prices online might not be aware that a coupon is available that would make an item more price-competitive, Carmel said.

### H.   A FORMER SENIOR BBBY EMPLOYEE REPORTS THAT SENIOR MANAGEMENT, INCLUDING DEFENDANTS D'ELIA AND WINSTON, RECEIVED WEEKLY REVIONICS REPORTS, WHICH INCLUDED DETAILED INVENTORY AND MARGIN DATA

69.     CW-1 is a former senior BBBY employee.  CW-1 worked as a divisional merchandise manager for BBBY from summer 2017 to July 2019.  CW-1 was based at BBBY headquarters in Union, New Jersey.  CW-1 reported to Vice President of General Merchandise and Manager Dave Eckert.

70.     As a divisional merchandise manager for BBBY, CW-1 guided a 12-person team in the merchandising division. CW-1 was hired to help reverse sales decline and stabilize a division with $400 million in annual revenue.  CW-1 reengineered product offerings, eliminated job redundancies, and established accountability practices.

71.     CW-1 stated that BBBY had a lack of clear merchandising direction after BBBY President Art Stark left the Company in May 2018.  CW-1 stated that Stark's exit left the Company with inadequate merchant expertise in the ranks of upper management.  Similarly, CW-1 stated that Chief Merchandise Officer Todd Johnson was "in over his head".  Johnson left BBBY in December 2019, three months into the Program.  As set forth *infra*, the Chief Merchandise Officer was a key position whose role was fundamentally important to inventory management and, relatedly, the Program.

72.     CW-1 stated that in 2019, BBBY was in the process of culling the number of items its stores carried in each category as part of an SKU (stock keeping unit) rationalization inventory optimization strategy.  The effort was ongoing when CW-1 left the Company in July 2019 and far

from complete.

73.    CW-1 reported that BBBY used Revionics markdown optimization software for price optimization as well as for initial pricing.  CW-1 reported that the markdown optimization software had three components: (i) initial pricing, which suggested the ticket price; (ii) promo pricing, which was for temporary markdowns rolled out to promote products and optimize gross margins; and (iii) markdowns, for pricing clearance items.

74.    Revionics software sets prices, particularly when goods are on clearance, and on promotions.  CW-1 gave the following example:  If you have $100 toaster ovens that have been on the shelf for 5 years, the software would look at pricing history and say sell them at $25.

75.    CW-1 stated that there were weekly Revionics reports that included data on inventory levels, pricing, and margins, all the way down to the SKU level, which included product color and size.  These weekly reports were "very detailed".

76.    CW-1 stated that these weekly reports were sent to senior BBBY management, including Defendants Winston and D'Elia.

77.    CW-1 also stated that there were weekly meetings at the Union, New Jersey headquarters with Defendants Winston and D'Elia.

78.    Additionally, CW-1 stated that BBBY also used JDA software for general inventory management.  CW-1 stated that JDA was a general "inventory tool" while Revionics was more geared towards "price optimization," although BBBY also utilized Revionics software for initial pricing.

I.    **DEFENDANTS WINSTON AND D'ELIA CONTINUE TO TOUT THE PROGRAM AND CLAIM BBBY WAS AHEAD OF KEY RISKS**

79.    Defendants Winston and D'Elia repeatedly discussed the Program during investor presentations, and continued to tout the Program's benefits to BBBY, while downplaying any harm that the Program could have on the Company.  On the October 2, 2019 conference call, Defendant D'Elia described the Program as follows:

> Well, this inventory write-down is tied to our strategic initiatives. It's flagging inventory that we see as aged inventory or duplicative SKUs in our assortment. So we've been

actively working on identifying those duplicative SKUs and wanting to move them out of our assortment again so that we can present a clearer point of view from an inventory and merchandising perspective to our customers. So we view this as tied to transformation.

80.     Defendant Winston stated during the same call that BBBY was removing aged inventory through the Program to "refresh" the Company's assortment and make room for high volume, higher margin goods before the critical 2019 holiday season:

> During our call, we have provided a lot of transparency around the things that we are doing to advance our strategic priorities, including plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months, including the removal of aged inventory from our stores before the 2019 holiday season to refresh our assortment and support top line performance; the initiation of a rapid store refresh of nearly 160 of our highest volume and most profitable Bed Bath & Beyond stores to improve the in-store shopping experience; the completion of our initial fleet optimization analysis for Bed Bath & Beyond and the decision to close 40 Bed Bath & Beyond stores and 20 other concept stores this year; our decision to close down one of our least productive e-commerce businesses; and finally, the ongoing evaluation of our business concepts and our real estate holdings.

81.     Defendants D'Elia and Winston also stressed to investors that they had their arms around the Program, explaining that BBBY's planning, personnel, and software safeguarded the Company against margin erosion and/or sales cannibalization.  Thus, Defendants D'Elia and Winston appreciated the risks posed by the Program – but told investors that those risks were addressed.  Indeed, Defendant Winston stated that "more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season" and "[t]his will be accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator, ***all to be managed thoughtfully to prevent cannibalization of sales***."

82.     Defendant Winston also trumpeted BBBY's "new data-driven insights" and the Company's markdown optimization software, stating that these were fueling the $1 billion inventory sell-through:

> Our #1 priority is stabilizing our top line and optimizing our sales opportunities. A core component of our sales stabilization efforts and our transformation overall ***is based on new data-driven insights*** that we are using to identify opportunities for improving our

customer value proposition….

***We continue to make strategic pricing decisions to deliver noticeable value to our customers. These strategies include refining our dynamic pricing algorithms and online and in-store pricing actions to address customer price perceptions.   The implementation of markdown optimization software and processes is accelerating sell-through, resulting in less aged inventory and optimizing the profitability of our seasonal and fashion assortment.*** We believe that more effective pricing will drive both top line growth and profit improvement. These near-term opportunities will provide the foundation required to invest in and execute the shopping transformation consumers are demanding and allow us to reinvigorate our iconic brand.

83.     Defendant D'Elia reiterated during the call that the Program was protecting BBBY's margins:  "[O]n the inventory, you're asking about the margin impact as we take out the merchandise. ***Again, we're mindful not to cannibalize sales during the holiday period***."

84.     By repeatedly emphasizing that BBBY had the tools, including software, that specifically guarded against the risks of margin erosion and sales cannibalization, Defendants D'Elia and Winston gave BBBY investors the impression that – although the Program was no slam dunk in ease of execution – the Program was not exacerbating BBBY's problems.

85.     On October 3, 2020, Wedbush analyst Seth Basham stated that "clearing aged inventory and inventory not consistent with the company's curated merchandize assortment strategy will declutter stores and leave room to add traffic-driving treasure hunt merchandise." The report also stated that "[r]apidly refreshing 160 of BBBY's best stores prior to the holidays should also create a more exciting shopping environment to drive sales" and "[s]hifting and adding promotions and advertising to the holiday period should also drive traffic and sales…"

86.     On October 9, 2019, BBBY filed its quarterly report on Form 10-Q.  That report incorporated risk language from the Company's 2019 Annual Report, which stated that the Company "heavily" relied on its inventory software:

BBBY relies heavily on [information technology] systems to process transactions, ***manage inventory replenishment***, summarize results and control distribution of products.  (Emphasis added).

### J.     UNBEKNOWNST TO INVESTORS, BBBY'S UNSTABLE MANAGEMENT WAS UNDERMINING THE PROGRAM

87.     On the October 2, 2019 conference call, Defendant Winston discussed BBBY's

talent recruitment goals and realignment efforts, but did not reveal that BBBY's then-current management instability was actually undermining the Program:

> Our fourth and final near-term priority is to take a fresh look at our organization structure. It is critically important that as we transform Bed Bath & Beyond, we ensure we have not only the right talent and expertise but also the right team structures in place to facilitate a connected and efficient organization. During this interim period, we have realigned the reporting structure of the organization such that all other business concepts now report into one leader.

88. One week later, on October 9, 2019, BBBY announced that its search for a permanent CEO replacement for Temares had ended, and that Defendant Tritton would become the Company's new CEO.

89. Defendant Tritton became BBBY's CEO on November 4, 2019, approximately two months after Defendant Winston initiated the Program.

90. Rather than pause the Program for evaluation, Defendant Tritton ratified the Program immediately upon starting at the Company. Defendant Tritton also began to further the management overhaul that the Activist Investors had begun in May 2019.

91. On December 17, 2019, three months into the Program, BBBY disclosed that Defendant Tritton had axed six senior management, including the Chief Merchandise Officer, from the Company to pave the way for a new guard:

> UNION, N.J., Dec. 17, 2019 /PRNewswire/ -- Bed Bath & Beyond Inc. (Nasdaq: BBBY) today announced an extensive restructure of its leadership team, including the departure of six senior members…. The new team will be charged with streamlining decision-making, accelerating the pace of transformation, and re-establishing Bed Bath & Beyond's authority in the home space through a more customer focused, omnichannel retail operation, a redefined product assortment, and a more convenient and inspirational shopping experience….
>
> In redefining the structure and roles of the new leadership team, five senior members are leaving their positions, including the Chief Merchandising Officer, Chief Marketing Officer, Chief Digital Officer, Chief Legal Officer & General Counsel, and Chief Administrative Officer. The sixth member, the Chief Brand Officer, resigned last week. While interim leads have been appointed, the Company has commenced a search to fill the positions of Chief Merchandising Officer, Chief Digital Officer, General Counsel, as well as a newly combined Chief Marketing and Brand Officer position.

BBBY did not replace its Chief Merchandising Officer (Todd Johnson), a role inherently important

to the Program, until March 2020.  Thus, BBBY had a critical vacancy between December 17, 2019 and the end of the Class Period – right at the important holiday sales season.  Moreover, BBBY did not disclose that this significant and ongoing shift in leadership was impeding the Program, including, *inter alia*, by creating gaps in oversight over the Program.

### K.  FOUR MONTHS INTO THE PROGRAM, BBBY PULLS ITS FY2019 GUIDANCE AND BEGINS TO REVEAL FALLING MARGINS

92.  On January 8, 2020, BBBY announced an adjusted net loss of $.38 per share (far below the $.02 consensus), withdrew its guidance, and reported falling margins – but did not disclose the profound problems with the Company's inventory management or the full extent of the problems with the Program:

> UNION, N.J., Jan. 8, 2020 /PRNewswire/ -- Bed Bath & Beyond Inc. (Nasdaq: BBBY) today reported financial results for the third quarter of fiscal 2019 ended November 30, 2019…
>
> **Fiscal 2019 Third Quarter Results**
>
> ***For the fiscal 2019 third quarter, the Company reported a net loss of $(0.31) per diluted share ($(38.6) million),…*** Net sales for the fiscal 2019 third quarter were $2.8 billion, a decrease of 9.0% compared to the prior year period.  Comparable sales in the fiscal 2019 third quarter declined 8.3%….(Emphasis added).
>
> **Outlook**
>
> The Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter.  Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month, ***the Company believes it is appropriate to withdraw its fiscal 2019 full year financial guidance***. (Emphasis added).

93.  Pulling guidance is a rare and draconian step; executives often revise guidance

when warranted, but withdrawing it completely is highly unusual.[9]

94.     On a January 8, 2020 conference call, Defendant D'Elia disclosed that BBBY's gross margins had plummeted by 80 basis points.  Defendant D'Elia stated that the "80 basis point decline is primarily due to a decrease in merchandise margin driven by a higher level of promotional activity in the quarter and was partially offset by a decrease in net direct-to-customer shipping expense."

95.     For the first time, Defendant Tritton also admitted that BBBY was out of its depth with the promotional strategy, stating that "in terms of the Thanksgiving period, this was the first time that we actually deployed an active mass promotional strategy, not a coupon strategy."

96.     On the same call, when discussing BBBY's problems at the end of 2019, Defendant Tritton confirmed that BBBY was monitoring inventory as part of the Program on a real-time basis – indeed, "hour by hour":

> [W]e started entering into Thanksgiving period, and we saw real pressure on sales. And we realized that some of our activity in digital, by trying to remain independently profitable in that space and not thinking about the gateway experience on the Thanksgiving period, was distorting our true price value equation and what we could mean to the customer at that time. We made really sharp pivots, and I was really proud of the team, and we instantly saw key items we're winning share back. ***We're watching it hour by hour***. (Emphasis added).

97.     Defendant Tritton also emphasized that he was on top of the situation given his experience as a veteran in the field:  "I'm no stranger to this, I've been through it before, converting promotional sales or clearance sales to regular price sales."  Defendant Tritton also stated on the call that BBBY was "taking aggressive steps to rationalize the assortment and better manage inventory".

98.     However, Defendant Tritton did not disclose the extent of the inventory management problems that were materially undermining BBBY's margins and cannibalizing sales, *i.e.*, that while BBBY was unloading inventory through the Program, it was doing so at the expense

---

[9]   *See, e.g.*,   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3077262   at 22 (withdrawing financial guidance is "rare").

of sales cannibalization and margin reduction – the very issues Defendants assured investors they avoided and had the tools and oversight to safeguard against.

99.    Defendant Tritton also discussed the rapidly-changing landscape of BBBY's internal management on the call, but failed to acknowledge that BBBY's then-current instability within management was actually impeding the Program:

> As we reconstruct and modernize our operating model, we need to embed the right leadership capabilities and accountability measures to ensure the business operates efficiently and effectively. A rethink of the company's leadership team was necessary to propel Bed Bath & Beyond forward.  Last month, I announced extensive changes to our leadership team, including the departure of 6 senior members. We'll be putting a team in place that will not only have the right talent and expertise to execute our new vision and inject new ideas but also the right organizational structure to facilitate a more streamlined decision-making, to accelerate the pace of transformation and to reestablish Bed Bath & Beyond's authority in the home space.

100.    Analysts reacted swiftly to the January 8, 2020 disclosures, immediately realizing the significance of BBBY's plunging margins – including the Company's "largest adjusted EPS loss in [] history" and the collapse of the Company's EBIT margins by 200 basis points.  Wells Fargo published a January 8, 2020 report entitled "BBBY: Shares Living The Dream, But Fundamental Nightmare Continues" by Zachary Fadem, Eric Cohen and David Lantz, noting its surprise over BBBY's low margins and the Company's lack of transparency, and that Defendant Tritton was picking up with the Program where Defendant Winston left off instead of previewing his own strategic initiatives:

> **While Q3 was not supposed to be about the numbers, poor results the largest incremental takeaway.** *In our view, Q3 results were clearly worse than expected* and with shares +67% over the past 3 months (+12% SPX), we believe a pullback tomorrow is warranted. Calendar headwinds were well documented, but comp declines of -8.3% were -400bps below consensus,… *EBIT margins compressed -222bps and BBBY posted its largest adjusted EPS loss (-38c) in history*…. We believe tonight wasn't supposed to be about the numbers, as investors widely anticipated new CEO Mark Tritton's plan for the future, opportunities for improvement, and prospects for a comp inflection. Instead, few concrete details were provided (aside from already anticipated opportunities in digital, merchandising, private brands and real estate rationalization), and with BBBY posting its worst comp in over a decade (maybe ever), negative EBIT margins and

widening FCF losses, we view the prospects for NT improvement increasingly distant at this stage.  (Underline and bold in original).[10]

101.    Guggenheim also published a January 8, 2020 report entitled "BBBY – 3Q Shortfall Resets 2020 "Starting Point" – Curtailing Customer Attrition in Focus; NEUTAL"  by analysts Steven Forbes, John Heinbockel and Stephen Kovalsky discussing BBBY's historic negative EBIT margins:

Adjusted gross margin eroded 85 basis points year-over-year, despite an estimated ~30 basis point benefit from the net change in the company's sales return liability. And, adjusted SG&A expenses delevered ~130 basis points, even with an estimated ~25 basis point benefit from the recent corporate workforce reduction… **Bottom line, 3Q results were disappointing as EBIT margin turned negative for the first time in recent history**. (Emphasis added).

## THE FULL TRUTH IS REVEALED: THE PROGRAM SUBSTANTIALLY ERODED MARGINS AND CANNIBALIZED REVENUES

102.    On February 11, 2020, after market close, BBBY disclosed that the Program was harming BBBY precisely in the manner Defendants claimed to have guarded against through BBBY's planning, oversight, and software tools.   Namely, the Program's promotions and markdowns cannibalized sales and caused key, high-margin goods to be out of stock ahead of the holiday season.  The Program also harmed margins far more than was revealed on January 8, 2020. The February 11, 2020 disclosure further revealed that Defendants lacked the "thoughtful", "mindful" and diligent oversight that they represented to investors they had over the Program.  A press release of February 11, 2020 provided, in relevant part:

Bed Bath & Beyond Inc. (Nasdaq: BBBY) today reported preliminary, unaudited financial performance data for the first two months of the fiscal 2019 fourth quarter (December 2019 and January 2020), **including a 5.4% decline in comparable sales driven primarily by store traffic declines combined with inventory management issues, and increased promotional activity and markdowns**.  The Company is providing this update today to provide visibility into the current pressures on the business, which the Company's new management has been reviewing to ascertain insights and key learnings.

---

[10] The "calendar headwinds" in the report refer to the fact that BBBY's 3Q2019 included the day after Thanksgiving – but (unlike 3Q2018) not the Monday (cyber Monday) and week following.

> (Emphasis added).
>
> Mark J. Tritton, President and CEO of Bed Bath & Beyond, said, "We are experiencing short-term pain in our efforts to stabilize the business, including the pressures of store traffic trends coupled with our own executional challenges….
>
> Fiscal December 2019/January 2020 Comparable Sales…
>
> ***Product availability leading into the holiday period was also a contributing factor, as inventory within certain key categories in the Bed Bath & Beyond assortment was too low or out-of-stock during the period. The Company is immediately reforming its internal planning and inventory management procedures to master the fundamentals.*** (Emphasis added).

103. On this news, the Company's share price fell $3.06 per share, or over 20%, to close at $11.79 per share on February 12, 2020, on unusually heavy trading volume.

104. Analysts again pounced on BBBY for the unexpected bad news. A February 11, 2020 Wells Fargo report by Zachary Fadem, Eric Cohen and David Lantz was highly critical of the Company, characterizing the announcement as a "discouraging start to the Tritton era" and noting that BBBY's gross margins had plunged by 300 basis points – the "largest decline in 10+ years":

> **BBBY: Falling Further Off The Bed; Preannounce Dashes NT Turnaround Hopes**
>
> **BBBY's FQ4 pre-announcement suggests NT trends even worse than feared; Expecting aggressive plan at Spring 2020**
>
> **Analyst Day.** This evening (2/11), just one month following new CEO Mark Tritton's first earnings call, BBBY provided disappointing preliminary financial results for December/January, which were well below Consensus. Details include: **1)** A -5.4% reported comp decline (vs. our/Street of -3.5%/-3.8%), comprised of -11% store comps and a +20% increase online (implying digital is ~27.5% of sales); **2)** ***Roughly -300bps of gross margin pressure (the largest decline in 10+ years) owing to heightened promotional activity and mix shift to lower margin (online) channels***; and **3)** Implied adjusted EBIT margins of +1.5% (-490bps y/y). ***BBBY cited declining traffic, increased promo activity and poor inventory management as key drivers***, and as a result plans to expedite efforts to rebalance its portfolio, reset the cost structure and enhance its leadership/talent. ***In our view, this represents a discouraging start to the Tritton era, and while it's widely understood that a BBBY turnaround would be no easy task, we believe it's safe to say that NT improvement appears increasingly unlikely at this point***. As a result, we anticipate a deeply negative reaction from the market tomorrow…we are lowering our FY19/20 EPS estimates by -77%/-55% to $0.28/$0.60 (from $1.21/$1.34).

Our new price target is $10 (16x our FY20E EPS), down from $12. Reiterate Underweight. (Emphasis added).

105. Credit Suisse also published a critical report on February 12, 2020 by analysts Seth Sigman, Kieran McGrath and Lavesh Hemnani. That report discussed BBBY's out-of-stock goods during the critical holiday period, the cannibalization of revenues resulting from BBBY's holiday promotions, and the collapse of BBBY's margins by 300 basis points. In other words, Credit Suisse noted that the Program failed in the very ways that BBBY claimed to have safeguarded against:

Tough Getting Out of This Bed; Still See Pressure Continuing; Monitoring Upcoming Catalysts…

**3. Execution challenges noted.** *The company cited traffic- and execution-related issues, incl. out of stocks. It promoted key promotional items during the Thanksgiving period, with more attractive dynamic pricing and excluded the coupon. This sale went well over Thanksgiving (as noted previously, this supported the 7% comps during that holiday week), but caused BBBY to move through a lot of inventory, leaving it out of stock into the Christmas period.* December was weak, and the company was anticipating an improvement in January, which it did not see. We believe these pressures will continue into 1H….(Emphasis added)

**5. GM -300 bps y/y vs. -85 bps last quarter,** *due to promotional/markdown activity, mix of key promotional items (such as kitchen appliances which are lower margin) and more online sales* (Cyber shift, recall last quarter got the benefit of lower shipping costs due to the decline in online sales). (Emphasis added).

106. A February 11, 2020 UBS report by analysts Michael Lasser, Atul Maheswari and Mark Carden also highlighted the negative effect of BBBY's Program:

Bed Bath & Beyond Inc.
It's Hard to Look At This Bath as Half Full

**BBBY comps declined -5.4% for Dec/Jan (down -13% on a shifted basis)**

*Any way you slice it, it was a rough holiday for Bed Bath*….

**Bed Bath will likely end FY'19 with around a 1% operating margin**

*We think BBBY's increased promotions heavily impacted its GM (this line was down -300 bps in Dec/Jan vs. the cons. of -50 bps for 4Q).* Notably, its 4Q GM dollars are on track to decline -14% in 4Q, showing how fast the business deteriorated. At the same time, its adj. SG&A deleveraged 190 bps due to a lower comp & increased advertising.

We now lower our 4Q EPS to $0.19 (was $0.97). Clearly, BBBY needs to demonstrate its ability to balance its sales and profitability in the short run. (Emphasis added).

107.   On February 12, 2020, Wedbush Securities analysts Seth Basham and Nathan Friedman also described its surprise that BBBY's margins continued to fall – when BBBY assured they would not – and noted the Company's promotions had cannibalized revenues and caused the plummeting margins:

> **Breaking Down the House in Order to Fix It**
>
> **The Wedbush View**
> Yesterday AMC, BBBY provided an update on FQ419 performance that is trending considerably worse than expectations. ***The surprise was not in comparable store sales, but in both gross and SG&A margins***. ***Gross margins declined ~-300 bps through the first two months of the quarter (vs. our -10 bps and consensus' -60 bps F4Q estimates) while adjusted SG&A deleveraged 190 bps (vs. our +20 bps and consensus' +10 bps F4Q estimates). Higher promotional activity drove the gross margin weakness***, while a sales mix shift to the online channel also contributed…..
>
> BBBY announced that for the first two months of 4Q19 same-store sales declined -5.4% y/y, slightly below our estimated -5.0% y/y for the quarter and further below consensus of -4.1% y/y. This decline was driven by a low-double-digit percentage decrease in transactions per store offset by a mid-single-digit increase in average ticket amount (similar to the dynamics we saw in 3Q19) and was partly caused by ***a lack of in demand inventory*** and a muted reaction to some initial promotions. (Emphasis added).

108.   A Guggenheim report entitled "BBBY – P&L Uncertainty Increases Meaningfully—A Year of Management Transition + FCF Neutrality, Lowering Estimates" by Steven Forbes, John Heinbockel and Stephen Kovalsky dated February 12, 2020 also noted that BBBY's "margin erosion" was attributed to the Program:

> 4Q Update: ~500 Basis Points of EBIT Margin Erosion—BBBY Is Now a 1.00% Margin Business; Lowering Estimates. As shown within Exhibit 1, BBBY's 4Q update results in a meaningful change in the recent trajectory of the company's EBIT(DA) margin profile, elevating P&L uncertainty as we head into 2020.

109.   A February 12, 2020 J.P. Morgan report by Christopher Horvers, Megan Alexander, Tami Zakaria and C. Jerry Sullivan also noted the significant problems that BBBY had just disclosed concerning the Program:

**Takeaways from our follow-up with the company. (1)** Product availability issues were primarily related to key holiday categories (*i.e.* small home appliances such as Instant Pots) resulting from increased promotions and dynamic pricing actions taken around Black Friday leading to out of stocks into Christmas with issues still affecting comps currently.

110.    Market commentators also noted BBBY's ongoing inventory management problems, which Defendants claimed were managed through proper planning, oversight and industry software.  On February 11, 2020, *USA TODAY* published an article by Kelly Tyko entitled "Bed Bath & Beyond CEO Mark Tritton says company experiencing 'short-term pain,' sales decline" stating that BBBY had acknowledged that "[p]roduct availability was a contributing factor" and "inventory within certain key categories in the [BBBY] was too low or out-of-stock during the period."

111.    BBBY held a conference call with analysts on February 18, 2020.  On the call, Defendant Tritton expanded on the inventory issues that beset the Program, including that BBBY failed to manage its stock of key, higher-margin products that the Program was specifically designed to prioritize:

> [BBBY] had a double-edged sword in terms of inventory, and I would talk to, firstly, the negative in that we've been dealing with some ***out-of-stocks in terms of our primary items that have been driving our business traditionally and that's what's hurt us in the third and fourth quarter****….  **So on that inventory side, we didn't have enough of the right stuff***…. We just need to course-correct in terms of the mix of merchandise and our focus.

The entire purpose of the Program, as represented to investors, was to fix BBBY's aged and bloated inventory problem by unloading low margin inventory so BBBY could focus on the high margin inventory.

112.    These analyst reports and news articles, as well as Defendant Tritton's statement during the February 18, 2020 conference call, demonstrate that the Program was not as Defendants represented.

## AFTER THE CLASS PERIOD, TRITTON ADMITS THAT BBBY KNEW OF THE PROGRAM'S PROBLEMS EARLY ON

113.    On April 15, 2020, BBBY held a conference call to discuss its FY2019 results –

which included FY2019 diluted earnings per share of only $.46, radically below BBBY's repeated guidance of $2.08 to $2.13 – and the failures of the Program.   On the call, Defendant D'Elia reported that the Company's general margins plummeted by 210 basis points "primarily due to unfavorable impact on merchandise margin from promotional activity and markdowns." Defendant Tritton also disclosed that BBBY was aware of the inventory management problems that beset the Program from early on.  Defendant Tritton admitted that BBBY had done "intel work" and knew in December 2019 and January 2020 that BBBY had failed to ensure that best-selling products were in stock for customers during the holiday season:

**Curtis Smyser Nagle** - BofA Merrill Lynch, Research Division – VP

…As you said, February and 4Q are very much in the rear view. But I just wanted to – if you could possibly hash out some of the math in terms of what was implied for the February comp. And I think it improved relative to what was going on in the 2 prior months, but anything you could comment on that would be great.

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. I think for us, it was tough to hit the COVID moment when we just saw some pivots happening in February. *We knew we were plagued by issues in December and January,…[s]ome of it was self-inflicted. I mean when we don't have best sellers in stock, we've got discounting and we don't have our inventory. I mean some of the sales decline we saw in our stores wasn't necessarily traffic. We did some intel work on that, saw the customers were coming in, and they just couldn't find the product in stock.* So we were shooting ourselves in the foot.

In addition, as detailed *supra*, Defendants had real-time access to data that informed management about BBBY's inventory, and thus the Program's failures, from day one.  *See supra* ¶¶62-68. Defendant Tritton's candor therefore was too little too late.

114.    Further demonstrating the depth of the inventory management problems at BBBY, Defendant Tritton noted that the Company was investing "about $250 million on our core business and key projects…such as…omni *inventory management*".

115.    Defendants D'Elia and Tritton also admitted on the call that BBBY's failure to monitor the promotions and markdowns caused the fourth quarter plunge in margins:

> **Peter Sloan Benedict - Robert W. Baird & Co. Incorporated, Research Division - Senior Research Analyst**
>
> [B]ack to the -- in the fourth quarter, can you give us a sense how much of that -- of the 210 basis point hit to gross margin, how much of that was from the digital fulfillment headwinds?
>
> **Robyn M. D'Elia - Bed Bath & Beyond Inc. - CFO & Treasurer**
>
> The majority was really on -- ***related to markdowns and promotional activity***. So more heavily weighted there, with just a lesser extent was the shift in the mix to digital.
>
> **Mark J. Tritton - Bed Bath & Beyond Inc. - President, CEO & Director**
>
> Yes. ***We really saw some pain points there based on the promotional activity and how we managed it***. And that, as I said earlier, Peter, has been a tight learning. There was some impact of the digital sale, but it was outweighed by the margin impact that we took with markdowns and promos….
>
> Now turning to the fourth quarter, which just seem like a lifetime ago. In short, the pressures of store traffic trends and heavy promotional activity, coupled with the inventory management issues around the holiday selling period, hampered our efforts to stabilize the business in the fourth quarter.

116. Defendant Tritton also specified on the call that "certain key promotional categories" like "kitchen electrics" were at the heart of the end of 2019 inventory problems:

> All 4 of our e-commerce fulfillment centers are currently operating. And by the end of this week, we will have converted approximately 25% of our Bed Bath & Beyond and buybuy BABY stores in the U.S. and Canada into regional fulfillment centers to use our vast inventory resources to assign orders locally and deliver quickly….
>
> ***Product availability with certain key promotional categories, such as kitchen electrics, leading into the holiday period were either too low or just out of stock. We just didn't have enough of the right stuff, which hurt us***. (Emphasis added).

117. In response to a question by Guggenheim analyst Steven Forbes, Defendant Tritton expanded on the inventory problems that the Program was supposed to cure, not exacerbate, conceding "big misses" during the critical holiday season. Defendant Tritton also conceded that these problems, in part, were caused by management instability and key personnel vacancies at BBBY – in particular the Company's lack of a Chief Merchandising Officer since December 2019 – that were critical to managing inventory, particularly stocking and seasonality:

**Steven Paul Forbes** - Guggenheim Securities, LLC, Research Division – Analyst

And then maybe just a quick follow-up on inventory management. It's sort of interesting here given your comments around not having enough inventory this holiday, right, holiday 2019, about all the uncertainty that exists today. So maybe just give us an update or discuss how you're planning your inventory buys this year, and particularly for holiday 2020, what's sort of the typical time frame when you have to make those decisions and commit to those POs? And how important, right, is it that you're open by the time those commitments occur?

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. Look, I mean, a couple of things there. I think that we've been – Joe [Hartsig, BBBY's new Chief Merchandising Officer] has been leading the charge here and having deep conversation with all our majors and our general vendor bases about flow. If you go back to the inventory position that we had, there's kind of 2 things going there. The good news was that overall, we reduced our inventory by about 16% at the close of the quarter. And so we were working leaner on that. But inside of that, *we did have big misses*. Not by having more inventory. We think that's a good level that we can come down to. ***But we could have traded some of our mix to be more in stock of our key items and generated more sales and gross margin by having the right merchandise***. So again, the level coming down is a positive, the curation within the level becomes critical. Joe has really lent into that charge, getting it back in stock about top 100, 250, 500 items and making sure that we can draw that down. I think also getting the flexibility to draw the stock from different places helps us to kind of speed up sales and get clarity and delivery to the customer on time. (Emphasis added).

In terms of the point around the commitments, we quickly moved into an evaluation of high-risk merchandise, seasonal merchandise and anything that kind of -- if we looked at our long-term plan of what could have been a close at hold, really looking at minimizing our quantification of risk and adjusting flow. So that's a very fluid discussion, a very real discussion. And that began on day 1 when we started to see the problem emerge. So it's a real strength in having Joe on board, focusing on this. And our overall inventory plans are really highlighted by being in stock with best sellers, getting our preplan with our vendors in place so that we could get that in stock and we play out the third and fourth quarter in a different way and then keeping a close eye on seasonality and flow of merchandise from offshore vendors.

118.    By frankly discussing the problems that the new Chief Merchandising Officer (Hartsig) had to rectify, Defendant Tritton tacitly conceded that BBBY's lack of a Chief Merchandising Officer as of December 2019 (and effectively before then since it was known Defendant Tritton was continuing the management overhaul prompted by the Activist Investors) exacerbated the Company's inventory management problems.

119.    Notably, Chief Merchandising Officers are responsible for overseeing a company's

buying and selling activities and utilizing the information gathered to develop a plan of action toward future purchase decisions.  Thus, BBBY's Chief Merchandising Officer was crucial for managing inventory and to executing and overseeing the Program.

120.    Defendant Tritton also noted on the call that "recruiting talent remains a top priority" for BBBY – demonstrating that the Company still had many key management vacancies to fill even after hiring Hartsig.

121.    Defendant Tritton also conceded on the call that BBBY's promotions – which were very different than the Company's usual coupon marketing – "burn[ed]" (or cannibalized) the Company's inventory and margins, which were the precise risks Defendants D'Elia and Winston had assured investors would not happen:

**Seth Ian Sigman** - Crédit Suisse AG, Research Division - United States Hardline Retail Equity Research Analyst

Just wanted to start with pricing. Mark, it seems like you were pleased with some of the results as you sharpen price over the holiday period. What are you learning about in terms of Bed Bath's pricing today? What changes should we expect in the current environment and, I guess, beyond that?

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. Look, I mean I think that we entered into promotional activity in a way that we hadn't ever before, Seth. *I think that if we go back to the end of the third quarter, start of the fourth quarter, it was the first time we'd ever really been truly promotional outside of coupon. And we really didn't lay down the plans to get there in the right way. So we burn the margin and we burn a lot of inventory and weren't prepared to get back into stock. So they're kind of tough learnings*.

122.    These were indeed "tough learnings" for BBBY investors who saw hundreds of millions of dollars in market capitalization wiped out of their investments in BBBY.

## L.    THE INDIVIDUAL DEFENDANTS KNEW OF, OR RECKLESSLY DISREGARDED, THE PROGRAM'S PROBLEMS FROM EARLY ON

123.    The software utilized by BBBY, including that of Revionics, provided real-time information about inventory, pricing, promotions, and was specifically geared to ensure that the Company did not cannibalize sales and revenues.

124.   CW-1 stated that senior BBBY management, including Defendants D'Elia and Winston, received weekly Revionics reports.  *See* ¶76.

125.   As CEO, Defendant Tritton was the highest BBBY manager.  Thus, Defendant Tritton also received these reports.

126.   These weekly Revionics reports contained extensive real-time data about inventory, pricing, margins, promotions, and markdowns.  Indeed, Defendant Tritton conceded that key inventory data was reviewed "hour by hour" (¶96).  In addition to these reports, Defendants had real time access to the data through the software directly.

127.   BBBY admitted that (i) holiday promotions and markdowns cannibalized BBBY sales and revenues and materially reduced margins (¶¶92, 94, 115, 121 197, 201); and (ii) the Company was out of stock of key goods and had minimal stock of others (¶102).

128.   BBBY's inventory software, including Revionics, disclosed these problems with promotions, markdowns, out-of-stock inventory, and reduced margins throughout the Class Period.  As set forth *supra*, the software tracked the progress of the Program.

129.   In addition to software problems, the Individual Defendants also knew or recklessly disregarded that BBBY lacked the key personnel necessary to execute and oversee the Program in a manner that would not cause adverse effects.  Specifically, BBBY's Chief Merchandising Officer Todd Johnson resigned in December 2019.  BBBY did not replace him  until March 2020.  *See supra* ¶91.  Because of the pivotal importance of the Chief Merchandising Officer to the Program, a vacancy in that office materially undermined the Program.

130.   Furthermore, the Individual Defendants knew or recklessly disregarded (as conceded by Defendant Tritton, *see* ¶25) that, despite representations to the contrary, BBBY did not adequately plan for the Program's success.

**DEFENDANTS HAD TO COMPLY WITH REGULATION S-K**

131.   SEC Regulation S-K contains disclosure requirements for companies' SEC filings.  Regulation S-K includes Item 303 and Item 105.

132.   Item 303 of Regulation S-K, 17 C.F.R. § 229.303 requires that quarterly (or

"interim period") financial reports "describe any known trends or uncertainties that have had or that registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" from the end of the preceding fiscal year to the date of the most recent interim balance sheet:

[a] (ii) *Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations*. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed....

b) *Interim periods*. If interim period financial statements are included or are required to be included by Article 3 of Regulation S–X (17 CFR 210), a management's discussion and analysis of the financial condition and results of operations shall be provided so as to enable the reader to assess material changes in financial condition and results of operations between the periods specified in paragraphs (b)(1) and (2) of this Item. *The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item*, except that the impact of inflation and changing prices on operations for interim periods need not be addressed.

(1) Material changes in financial condition. Discuss any material changes in financial condition *from the end of the preceding fiscal year to the date of the most recent interim balance sheet provided*....

(2) Material changes in results of operations. Discuss any material changes in the registrant's results of operations with respect to the *most recent fiscal year-to-date period* for which a statement of comprehensive income (or statement of operations if comprehensive income is presented in two separate but consecutive financial statements or if no other comprehensive income) is provided and the corresponding year-to-date period of the preceding fiscal year.[11]

133.    BBBY filed its 2Q19 financial report on October 9, 2019 for the time period of June 1, 2019 through August 31, 2019.

134.    BBBY filed its 3Q19 financial report on January 9, 2020 for the time period of

---

[11] Paragraph (a) provides: "Discuss registrant's financial condition, changes in financial condition and results of operations. The discussion shall provide information as specified in paragraphs (a)(1) through (5) of this Item and also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations."

September 1, 2019 through November 30, 2019.

135.     Item 303 required BBBY's October 2019 and January 2020 Forms 10-Q to discuss any "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" between (i) March 3, 2019 (the date of the last BBBY annual report) and August 31, 2019 for the October 2019 Form 10-Q; and (ii) March 3, 2019 and November 30, 2019 for the January 2020 Form 10-Q.  As alleged below (*see* ¶¶168, 188), the October 2019 and January 2020 Forms 10-Q failed to discuss the known trends and uncertainties surrounding the Program.

136.     Item 105 of Regulation S-K, 17 C.F.R. § 229.105 required a discussion in the October 2019 and January 2020 Forms 10-Q of the most significant factors that made investing in BBBY risky or speculative and that each risk factor adequately describe the risk:

> Where appropriate, provide under the caption "Risk Factors" a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply generically to any registrant or any offering. Explain how the risk affects the registrant or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk. If the risk factor discussion is included in a registration statement, it must immediately follow the summary section. If you do not include a summary section, the risk factor section must immediately follow the cover page of the prospectus or the pricing information section that immediately follows the cover page. Pricing information means price and price-related information that you may omit from the prospectus in an effective registration statement based on Rule 430A (§ 230.430A(a) of this chapter). The registrant must furnish this information in plain English. See § 230.421(d) of Regulation C of this chapter.

137.     Despite Item 105's requirements, the Forms 10-Q failed to disclose the risk posed by the significant flaws in the Program.  Because the omitted material facts alleged herein were not disclosed, as well as the consequent material adverse effects on the Company's future results and prospects, BBBY violated Item 105.  *See* ¶¶171, 191.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

138.     The Class Period begins on September 4, 2019.  On that date, BBBY filed a Form 8-K with the SEC.  The Form 8-K was signed by Defendant D'Elia and attached a letter from

Defendant Winston to BBBY shareholders about the Program.  That letter provided, in relevant

part, as follows:

> Dear Fellow Shareholders,
>
> In recent months, we have initiated significant changes at Bed Bath & Beyond, including at the Board level and across the entire organization.  Our objectives are to accelerate improvement in our financial performance, enhance our competitive positioning and ensure we have a best-in-class governance structure.  While in its early stages, the transformation underway is advancing, and we wanted to share an update on the progress we are making toward achieving these objectives.
>
> The Board and management team are aligned around four key priorities, which interim CEO Mary Winston communicated during the Company's first quarter 2019 earnings conference call in July.  These priorities include stabilizing and driving top-line growth; resetting the cost structure; *reviewing and optimizing the Company's asset base*, including the portfolio of retail banners; and refining Bed Bath & Beyond's organization structure. We are relentless in our pursuit of short-term opportunities to effect meaningful change, while laying the foundation for transforming our Company for long-term success. Some examples are…
>
> ***Reviewing and Optimizing Our Asset Base** – An aggressive reduction of up to $1 billion of inventory is expected to be executed over the next 18 months, including the removal of excess aged inventory from our stores anticipated before the 2019 holiday season. This effort should allow us to quickly reset inventory levels in both our stores and distribution centers, as well as refresh our assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance.*

139.    These statements were materially false and misleading when made because:

(i) As later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196) – thus, the Program was fatally flawed from the start; and

(ii) Defendants Winston, D'Elia and BBBY omitted to disclose the serious risks relating to the Program, namely that BBBY:

> (a) might not be able to remove "excess aged inventory" without material adverse consequences such as cannibalizing sales, causing inventory shortages in higher-margin products, and reducing earnings and margins (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201);
>
> (b) lacked adequate plans and personnel to meaningfully execute and oversee the Program – particularly in the middle of a management overhaul that included a search for a more permanent CEO for BBBY (*see* ¶¶121, 87-91); and

(c) had no experience executing or overseeing wide-scale markdowns and promotions and was out of its depth (*see* ¶121).

140.    On October 2, 2019, BBBY announced FY2019 adjusted earnings per share guidance of $2.08 to $2.13 per share:

Fiscal 2019 Updated Financial Outlook

Fiscal 2019 full-year results continue to be in line with the Company's most recent guidance and assumes current investment plans to drive top-line performance in the back half, as well as its comp sales trends year to date, and excludes goodwill and other impairments, severance costs, shareholder activity costs, the inventory write down, and any incremental impact from tariffs. Fiscal 2019 full-year net sales are estimated to be around $11.4 billion and ***net earnings per diluted share are estimated to be between $2.08 and $2.13***.

141.    BBBY's net earnings per diluted share guidance had no reasonable basis, and was materially false and misleading when made, because Defendants knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as also admitted by Defendant Tritton, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

142.    BBBY held a conference call with analysts on October 2, 2019.  During that call, Defendants Winston and D'Elia repeatedly and extensively discussed the Program.  Indeed, the Program was a chief concern of analysts on the call.

143.    During the call, Defendant Winston provided an overview of the Program – but was anything but "transparent" about the serious risks with it:

> During our call, we have provided a lot of transparency around the things that we are doing to advance our strategic priorities, including plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months, including the removal of aged inventory from our stores before the 2019 holiday season to refresh our assortment and support top line performance; the initiation of a rapid store refresh of nearly 160 of our highest volume and most profitable Bed Bath & Beyond stores to improve the in-store shopping experience; the completion of our initial fleet optimization analysis for Bed Bath & Beyond and the decision to close 40 Bed Bath & Beyond stores and 20 other concept stores this year; our decision to close down one of our least productive e-commerce businesses; and finally, the ongoing evaluation of our business concepts and our real estate holdings.

144.    Defendant Winston's statements were materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

> (i) as later admitted, BBBY did not "have price management floated properly []  coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

> (ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

>> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

>> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

> (iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶¶121).

145.    Defendant Winston also stated on the call:

In the short term, more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season. This will be accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales.

146.    These statements were materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

147.    Defendant Winston also touted the importance of industry software in managing the Program.  Defendant Winston trumpeted BBBY's "new data-driven insights" and the Company's "markdown optimization software", assuring investors that these tools would fuel the $1 billion inventory sell-through while avoiding the risk of margin erosion and sales

cannibalization:

> Our #1 priority is stabilizing our top line and optimizing our sales opportunities. A core component of our sales stabilization efforts and our transformation overall ***is based on new data-driven insights*** that we are using to identify opportunities for improving our customer value proposition....
>
> ***We continue to make strategic pricing decisions to deliver noticeable value to our customers. These strategies include refining our dynamic pricing algorithms and online and in-store pricing actions to address customer price perceptions. The implementation of markdown optimization software and processes is accelerating sell-through, resulting in less aged inventory and optimizing the profitability of our seasonal and fashion assortment.*** We believe that more effective pricing will drive both top line growth and profit improvement. These near-term opportunities will provide the foundation required to invest in and execute the shopping transformation consumers are demanding and allow us to reinvigorate our iconic brand. (Emphasis added).

148. Defendant Winston's statement that BBBY was using its software and that it was "accelerating sell-through" and "optimizing profitability of seasonal and fashion assortment" was materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

> (i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);
>
> (ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):
>
>> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and
>>
>> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶ 94, 102, 104, 106-108);
>
> (iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and
>
> (iv) as later admitted, BBBY was out of its depth because it had never conducted

markdown promotions like this before (*see* ¶121).

149.    Defendant Winston also stated on the call:

We feel good about the progress we are making against our 4 key near-term priorities, including stabilizing sales and driving top line growth; resetting the cost structure; ***reviewing and optimizing the company's asset base***, including the portfolio of retail banners; and refining our organization structure. This work is being done with the support and guidance of the Business Transformation and Strategy Review Committee of the Board and a highly engaged leadership team. I'm even more confident in the tremendous opportunity in front of us. Today, I would like to provide an update on the progress we have made against each of our 4 priorities as well as what this means for our path forward. Our goal is to ***ensure our customers see a meaningful difference this critical holiday season*** while laying the foundation for transforming our company for long-term success. (Emphasis added).

150.    Defendant Winston's statement was materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

151.    Thus, the only "difference" BBBY customers saw during the 2019 holiday season was empty or minimally stocked shelves.

152.     Later on the call, Defendant D'Elia boasted of BBBY's growing gross margins and represented that the Program would not undermine them – which was an issue of particular importance to analysts and the market:

**Robert Kenneth Griffin** - Raymond James & Associates, Inc., Research Division - Senior Research Associate

I was first hoping to dive a little bit into the gross margin aspect. Can you maybe give us a little color, by concept or maybe month by month, the progress you're making in improving the margin structure? And then basically the same question on the SG&A side, too, if we can get some color around, month-over-month, how it's improved and where the bigger opportunities are for the remainder of the year.

**Robyn M. D'Elia** - Bed Bath & Beyond Inc. - CFO & Treasurer

Sure. Just to address your point on breaking out the components by concept, that is not historically been our reporting cadence to break it out at that granular level. But from a gross margin perspective, we are pleased that this quarter, we have favorable trends, 20 basis points improvement. That is a significant shift from what we've been experiencing from a trending perspective. And it's driven by benefits in coupons and net direct-to-customer shipping with some offset in merchandise margin. But that merchandise margin, which I'm talking about on a consolidated basis, ***the trend in that has been improving due to some of the ongoing initiatives that we have in place***. So for some select product, we've actually moved to direct importing and gained efficiencies from our own supply chain, which has benefited us. We've also been actively engaging in vendor negotiations around our merchandise. ***And then we've also continued with some strategic pricing initiatives, which has helped benefit our margin.  And we have more to come***. (Emphasis added).

153.     These statements were materially false and misleading because Defendants knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

154.    Later on the same call, Defendant D'Elia represented to a Wedbush Securities analyst that BBBY's holiday promotions and markdowns were "built" into the earnings model and would enable the Company to meet its earnings guidance:

**Seth Basham – Wedbush Securities**

My question is around the outlook for holidays. You guys are shifting a bunch of marketing dollars and promotional dollars to the holiday period. Can you first quantify how much you're shifting and how much you're adding? And secondly, what type of improvement do you expect in those sales as well as margin over this period?

**Robyn M. D'Elia - Bed Bath & Beyond Inc. - CFO & Treasurer**

Sure. Thanks, Seth. So as you've mentioned, we are shifting dollars into the back half for promotional and marketing support. Those dollars are being generated from ongoing transformation initiatives as well as the benefits that Mary mentioned in our cost structure savings initiatives. And those dollars that we're planning to invest will be spent on promotional events during Thanksgiving week through Cyber Monday as well as driving enrollment in BEYOND+ and investing in new communication channels, such as digital, video and radio. In terms of quantifying it, *we've built it all in for the model, and those – the reinvestment of those dollars is allowing us to maintain our top line at around $11.4 billion [revenues] as well as maintain our bottom line within the previously guided range*. (Emphasis added).

155.    This statement was materially false and misleading when made because Defendant D'Elia knew or recklessly disregarded that the "bottom line" FY2019 earnings guidance had no reasonable basis because:

(i) as later admitted, BBBY did not "have price management floated properly []  coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose

reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

156.    Defendants Winston and D'Elia further stressed BBBY's continued profitability and its ability to meet the FY2019 guidance on the call:

**Daniel Harry Hofkin - William Blair & Company L.L.C., Research Division – Analyst**

Just a quick question about general fundamentals and then a quick – just a couple of quick housekeeping questions. So you talked about efforts to drive more sales in the back half and to the holidays. Can you just talk about what sort of impact you expect on profit margins or profitability from that and how that could kind of build over time? Obviously, driving top line is important but in terms of the trade-up between sales and margins and then, like I said, I have a couple of quick housekeeping questions after that.

**Mary A. Winston** - Bed Bath & Beyond Inc. - Interim CEO & Director

So let me just start, and then I'm going to turn it over to Robyn to maybe talk at a little bit more detailed level. But even as we said in the fourth quarter, we are focused on driving – I mean the first quarter call, we're focused on driving top line, but we're focused on maintaining profitability as well. So we believe, given the number of levers we have to pull and the number of opportunities we have in the business, *that we can drive sales and we may be on promotion, of course, through the holiday season and be doing more advertising. But we think we have other levers to pull to control the cost structure to maintain profitability*.

157.    These statements were materially false and misleading when made because

Defendant D'Elia and Winston knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly []
coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose
reports the Individual Defendants received weekly, and which provided them with
real-time data from the start of the Program):

> (a) the Program's promotions and markdowns were having material adverse
> consequences in that they were cannibalizing revenues, causing inventory
> shortages in higher-margin products, and reducing earnings and margins
> ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121,
> 123-130, 197, 201); and; and
>
> (b) BBBY was selling higher margin inventory under promotions that
> reduced margins and/or such inventory could not be restocked ahead of the
> critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO
and lacked adequate plans and personnel to meaningfully execute and oversee the
Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121,
87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted
markdown promotions like this before (*see* ¶121).

158.    Defendant D'Elia also stated at the end of the call that BBBY was "maintaining our

guidance of the sales around $11.4 billion and then EPS between $2.08 and $2.13."

159.    Defendant D'Elia's reiteration of the earnings guidance was materially false and

misleading when made because Defendant D'Elia knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly []
coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose
reports the Individual Defendants received weekly, and which provided them with
real-time data from the start of the Program):

> (a) the Program's promotions and markdowns were having material adverse
> consequences in that they were cannibalizing revenues, causing inventory
> shortages in higher-margin products, and reducing earnings and margins
> ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121,
> 123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

160.    Defendant D'Elia then soothed analyst concerns over previously undisclosed risks of the Program, representing that the Program safeguarded against margin erosion and sales cannibalization:

**Oliver Wintermantel** - Evercore ISI Institutional Equities, Research Division - MD & Fundamental Research Analyst

I just wanted to clarify, when you said that the inventory fell [sic] through, that should not have a gross margin impact towards the rest of the year. So I just want to clarify that. And then my other question on gross margins is like the shipping cost seemed to be a benefit in the second quarter. So was that driven by lower sales and that's why shipping costs were better? And then now looking into the back end of the year, do you expect that your sales are going to improve throughout the year?...

**Robyn M. D'Elia** - Bed Bath & Beyond Inc. - CFO & Treasurer

So that was a multipart question. I'm going to start with the first one, and I may have to ask you to repeat a couple of your sub-bullet points. ***So on the inventory, you're asking about the margin impact as we take out the merchandise. Again, we're mindful not to cannibalize sales during the holiday period***. And we can, using a third-party liquidator, remove that merchandise from our stores but not have it out in the market competing against ourselves or be liquidating it in a heavy fashion during this time frame. (Emphasis added).

161.    These statements were materially false and misleading when made because Defendant D'Elia knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly []  coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

162.    Defendant Winston further discussed the Program and echoed Defendant D'Elia's earlier claim during the call that cannibalization of sales was not an issue:

As we mentioned in the recent shareholder letter, we have plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months. As a result of the decision, we took $194 million inventory writedown in the second quarter. We believe this aggressive disposition of inventory will enable us to more quickly reset inventory levels in both our Bed Bath & Beyond stores and distribution centers to allow for a faster refresh of our assortment, as well as to enable us to refocus store labor activity to better support our customers and drive sales. ***In the short term, more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season. This will be accomplished through a series of markdowns and clearance events, as well as with the assistance of the independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales....*** **(Emphasis added).**

163.    These statements were materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory

shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

164.    After analyst Simeon Gutman asked Defendant D'Elia about inventory issues, Defendant D'Elia again reiterated that the Program safeguarded against "cannibaliz[ing] sales during this holiday period":

**Simeon Ari Gutman - Morgan Stanley, Research Division - Executive Director**

My first question, back on some of the inventory and the destocking. I know you said an 18-month process, can you tell us maybe what inning is it in from, I guess, a store perspective? And the impact that it's having as the customer shops, can you give us some sense? Are you seeing a basket-size change? Are you seeing conversion then go up online if they're not finding something in the store? And then I have one follow-up on the gross margin.

**Robyn M. D'Elia - Bed Bath & Beyond Inc. - CFO & Treasurer**

From a timing perspective, in the short term, we are planning that – to have about $350 million of the inventory out of the stores before holiday. We are in the early innings of starting that process and of removing the inventory from the physical store locations. ***As we're working through that, we're mindful not to cannibalize sales during this holiday period***. (Emphasis added).

165.    This statement was materially false and misleading when made because Defendant D'Elia knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with

real-time data from the start of the Program):

> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

166.    On October 9, 2019 (amended on October 15, 2019), Bed Bath & Beyond filed its quarterly report for the period ended August 31, 2019, signed by Defendant D'Elia.  That Form 10-Q stated as follows in the Management's Discussion and Analysis section:

Gross profit for the three months ended August 31, 2019 was $727.0 million, or 26.7% of net sales, compared with $988.6 million, or 33.7% of net sales, for the three months ended September 1, 2018. Gross profit for the six months ended August 31, 2019 was $1.614 billion, or 30.5%, of net sales, compared with $1.953 billion, or 34.3% of net sales, for the six months ended September 1, 2018. The decrease in the gross profit margin as a percentage of net sales for the three and six months ended August 31, 2019 was primarily attributable to a decrease in merchandise margin, as a result of an incremental reserve for future markdowns of approximately $194.0 million taken in the second quarter of fiscal 2019 related to the Company's transformation initiatives, which was an incremental charge to the actual markdowns recorded in the second quarter of fiscal 2019.

***This incremental reserve for future markdowns was the result of the Company's strategic decision to reduce inventory by up to $1.0 billion at retail over the next 18 months. This reduction is being driven by the acceleration of the Company's inventory rationalization efforts, including reductions of aged and duplicative SKUs within the Company's assortment. By taking this action, the Company is seeking to reset its inventory levels in both stores and distribution centers, as well as refresh its assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance***. (Emphasis added).

167.    These statements were materially false and misleading when made because

Defendants BBBY and D'Elia knew or recklessly disregarded that:

> (i) as later admitted, BBBY did not "have price management floated properly []
> coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

> (ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose
> reports the Individual Defendants received weekly, and which provided them with
> real-time data from the start of the Program):

>> (a) the Program's promotions and markdowns were having material adverse
>> consequences in that they were cannibalizing revenues, causing inventory
>> shortages in higher-margin products, and reducing earnings and margins
>> ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121,
>> 123-130, 197, 201); and

>> (b) BBBY was selling higher margin inventory under promotions that
>> reduced margins and/or such inventory could not be restocked ahead of the
>> critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

> (iii) BBBY was in the middle of a management overhaul and search for a new CEO
> and lacked adequate plans and personnel to meaningfully execute and oversee the
> Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121,
> 87-91); and

> (iv) as later admitted, BBBY was out of its depth because it had never conducted
> markdown promotions like this before (*see* ¶121).

168.    Defendants BBBY and D'Elia also knew or recklessly disregarded that these statements were materially false and misleading when made because they violated Item 303 by failing to disclose the trends and uncertainties discussed in ¶167(i)-(iv).

169.    The October 2019 Form 10-Q also incorporated the following discussion about the risks in investing in BBBY from the Company's 2018 annual report filed on April 30, 2019:

The Company's operating results could be negatively impacted by a major disruption of the Company's information technology systems. ***The Company relies heavily on these systems to process transactions, manage inventory replenishment***, summarize results and control distribution of products. Despite numerous safeguards and careful contingency planning, these systems are still subject to power outages, telecommunication failures, cybercrimes, cybersecurity attacks and other catastrophic events. A major disruption of the systems and their backup mechanisms may cause the Company to incur significant costs to repair the systems, experience a critical loss of data and/or result in business interruptions.

170.    These statements were materially false and misleading when made because

Defendants knew or recklessly disregarded that:

> (i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

> (ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

>> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

>> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

> (iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

> (iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

171.    Defendants BBBY and D'Elia also knew or recklessly disregarded that the statements in paragraph 169 were materially false and misleading because they violated Item 105 by failing to disclose the "most significant factor" relating to the risks in investing in BBBY as articulated in ¶167(i)-(iv) above.

**BBBY BEGINS TO DISCLOSE THAT THE PROGRAM WAS HARMING MARGINS AND WITHDRAWS ITS GUIDANCE – BUT CONTINUES TO HIDE THE FULL EXTENT OF THE PROBLEMS**

172.    The truth began to emerge on January 8, 2020 when BBBY reported that the Company's earnings and margins had plunged and that it was pulling its FY2019 guidance – but the Company did not disclose the depth of either its inventory problems or its margin collapse, concealing the full extent of the collateral damage caused by the Program.  In a press release entitled "Bed Bath & Beyond Inc. Reports Results for Fiscal 2019 Third Quarter" that day, BBBY

stated, in relevant part:

Fiscal 2019 Third Quarter Results

For the fiscal 2019 third quarter, the Company reported a net loss of $(0.31) per diluted share ($(38.6) million),...  Net sales for the fiscal 2019 third quarter were $2.8 billion, a decrease of 9.0% compared to the prior year period. Comparable sales in the fiscal 2019 third quarter declined 8.3%.

Outlook

The Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter. Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month, ***the Company believes it is appropriate to withdraw its fiscal 2019 full year financial guidance.*** (Emphasis added).

173.    BBBY also held a conference call on January 8, 2020.  On that call, Defendant D'Elia stated:

Th[e] 80 basis point decline is primarily due to a decrease in merchandise margin driven by a higher level of promotional activity in the quarter and was partially offset by a decrease in net direct-to-customer shipping expense.

174.    On the call, Defendant Tritton acknowledged that "[p]erformance was impacted to some extent by ***self-inflicted*** issues, like [p]oor inventory management."   *See also id.* ("We're experiencing short-term pain, some of which has been self-inflicted").

175.    The January 8, 2020 disclosures did not reveal the full truth about BBBY's inventory management problems or the full extent of the Program's adverse impact.

176.    Defendant Tritton's statement that BBBY's "performance was impacted to some extent by self-inflicted issues, like poor inventory management" was materially false and misleading when made because it omitted the true extent of the inventory management problems and the adverse effects of the Program as:

(i) Defendant Tritton admitted:

(a) he knew of BBBY's inventory problems in November 2019 when he reviewed the issue "hour by hour" (*see* ¶96);

(b) he knew of BBBY's inventory management problems, including unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

177. Yet, after admitting the "self-inflicted" inventory management problems, Defendant Tritton "doubled down" on the "solid[ity]" of the Program:

I want to be really clear here, continuing to accelerate the existing transformation work that was put in place which ***is really solid, and we've been able to double down on that since me coming onboard***.

178. Defendant Tritton's statement was materially false and misleading when made because:

i) as Defendant Tritton admitted:

(a) he knew of BBBY's inventory problems in November 2019 when he reviewed the issue "hour by hour" (*see* ¶96);

(b) he knew of BBBY's inventory management problems, including

unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

179.   Defendant Tritton also stated on the call that BBBY was on top of the important dynamic between sales growth and inventory growth:

I think one of the real strengths of the season when we're under pressure is that we were able to maintain our inventories and always look at that mix of sales growth versus inventory growth. And the team had done a great job in terms of keeping the lid on inventory and really culling through that aged and excess inventory side of the business.

180.   Defendant Tritton's statements were materially false and misleading when made because:

i) as Defendant Tritton admitted:

(a) he knew of BBBY's inventory problems in November 2019 when he reviewed the issue "hour by hour" (*see* ¶96);

(b) he knew of BBBY's inventory management problems, including

unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

181.    After the January 8, 2020 revelations, BBBY's share price fell $3.20, or almost 20%, to close at $13.4 per share on January 9, 2020, on unusually heavy trading volume.

182.    On January 9, 2020, Bed Bath & Beyond filed its quarterly report on Form 10-Q for the period ended November 30, 2019, signed by Defendant D'Elia.  The January 2020 Form 10-Q contained the same Management's Discussion and Analysis and Risk Factors as the October 2019 Form 10-Q and was misleading for the same reasons as the October 2019 Form 10-Q.  *See supra* ¶167.

183.    The January 2020 Form 10-Q also stated as follows:

Gross profit for the three months ended November 30, 2019 was $913.8 million, or 33.1% of net sales, compared with $1.004 billion, or 33.1% of net sales, for the three months ended December 1, 2018. Gross profit for the nine months ended November 30, 2019 was $2.528 billion, or 31.4% of net sales, compared with $2.957 billion, or 33.9% of net sales, for the nine months ended December 1, 2018. The decrease in the gross profit margin for

the nine months ended November 30, 2019 was primarily attributable to a decrease in merchandise margin, as a result of an incremental inventory reserve for future markdowns of approximately $169.8 million related to the Company's transformation initiatives, which was an incremental charge to the actual markdowns recorded in the second and third quarters of fiscal 2019.

This incremental reserve for future markdowns was the result of the Company's strategic decision to reduce inventory by up to $1.0 billion at retail from the end of the second quarter of fiscal 2019 through the end of fiscal 2020 ***This reduction is being driven by the Company's inventory rationalization efforts, including reductions of aged and duplicative SKUs within the Company's assortment. By taking this action, the Company is seeking to reset its inventory levels in both stores and distribution centers, as well as refresh its assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance***.

184.    These statements were materially false and misleading when made because Defendants D'Elia and BBBY knew or recklessly disregarded that:

i) as later admitted:

(a) BBBY's inventory problems were evident in November 2019 when the Company reviewed those issues "hour by hour" (*see* ¶96);

(b) he knew of BBBY's inventory management problems, including unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

185.    Defendant D'Elia and BBBY also knew or recklessly disregarded that these statements were materially false and misleading when made because they violated Item 303 by failing to disclose the known trends and uncertainties relating to the Program listed in ¶184(i)-(iii).

186.    The January 2020 Form 10-Q also stated:

In other activity, the Company has been further evaluating its product assortment and taking aggressive steps to rationalize the assortment and better manage its inventory. These are among the early accelerated actions being taken to lay the foundation to create a new vision for the Company.

187.    These statements were materially false and misleading when made because (i) Defendant D'Elia and BBBY knew or recklessly disregarded that:

i) as admitted:

(a) BBBY's inventory problems were evident in November 2019 when BBBY  reviewed those issues "hour by hour" (*see* ¶96);

(b) BBBY had serious inventory management problems, including unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

188.    Defendants also knew or recklessly disregarded that these statements were materially false and misleading when made because they violated Item 303 by failing to disclose a "known trend or uncertainty" relating to the Program; namely, that it was materially reducing, and would continue to materially reduce, earnings and margins and cause cannibalization of sales and revenues.

189.    The January 2020 Form 10-Q also incorporated the following discussion about the risks in investing in BBBY from the Company's 2018, which was filed on April 30, 2019:

> The Company's operating results could be negatively impacted by a major disruption of the Company's information technology systems. ***The Company relies heavily on these systems to process transactions, manage inventory replenishment***, summarize results and control distribution of products. Despite numerous safeguards and careful contingency planning, these systems are still subject to power outages, telecommunication failures, cybercrimes, cybersecurity attacks and other catastrophic events. A major disruption of the systems and their backup mechanisms may cause the Company to incur significant costs to repair the systems, experience a critical loss of data and/or result in business interruptions. (Emphasis added).

190.    These statements were materially false and misleading when made because Defendants D'Elia and BBBY knew or recklessly disregarded that:

i) as admitted:

(a) BBBY's inventory problems were evident in November 2019 when BBBY  reviewed those issues "hour by hour" (*see* ¶¶96);

(b) he knew of BBBY's inventory management problems, including unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* 121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

191.    Defendants BBBY and D'Elia also knew or recklessly disregarded that these statements were materially false and misleading because they violated Item 105 by failing to disclose the "most significant factor" relating to the risks in investing in BBBY; namely, that the Program was cannibalizing revenues and materially harming earnings and margins, which risk was only exacerbated by BBBY's ongoing management overhaul.

## BBBY DISCLOSES THE FULL TRUTH: THE PROGRAM CANNIBALIZED REVENUES, DECIMATED MARGINS, AND CAUSED EMPTY OR SPARSELY STOCKED SHELVES OF KEY HOLIDAY ITEMS

192.    On February 11, 2020, BBBY issued a press release announcing abysmal preliminary fourth-quarter 2019 financial results, including a free-fall in margin by 300 basis points. The Company disclosed that despite assurances that the Program was safeguarding against margin erosion and sales cannibalization (*see* ¶¶81, 93, 160, 162, 164) it did precisely that:

Bed Bath & Beyond Inc. (Nasdaq: BBBY) today reported preliminary, unaudited financial performance data for the first two months of the fiscal 2019 fourth quarter (December 2019 and January 2020), ***including a 5.4% decline in comparable sales***

> ***driven primarily by store traffic declines combined with inventory management issues, and increased promotional activity and markdowns***. (Emphasis added).
>
> Fiscal December 2019/January 2020 Comparable Sales…
>
> ***Product availability leading into the holiday period was also a contributing factor, as inventory within certain key categories in the Bed Bath & Beyond assortment was too low or out-of-stock during the period. The Company is immediately reforming its internal planning and inventory management procedures to master the fundamentals.*** (Emphasis added).

193. On this news, the Company's share price fell $3.06 per share, or over 20%, to close at $11.79 per share on February 12, 2020, on unusually heavy trading volume.

194. The market was taken aback by BBBY's negative announcements. For example, on February 12, 2020, Wedbush stated that it was "surpris[ed]" that BBBY's promotions had cannibalized revenues and "drove the gross margin weakness":

> The surprise was not in comparable store sales, ***but in both gross and SG&A margins***. ***Gross margins declined ~-300 bps through the first two months of the quarter (vs. our -10 bps and consensus' -60bps F4Q estimates)*** while adjusted SG&A deleveraged 190 bps (vs. our +20 bps and consensus' +10 bps F4Q estimates). ***Higher promotional activity drove the gross margin weakness***, while a sales mix shift to the online channel also contributed.

**POST-CLASS PERIOD ADMISSIONS**

195. BBBY held a conference call with analysts on February 18, 2020. On the call, Defendant Tritton admitted that the Company had been out-of-stock of key products, which was precisely what the Program and the purported tools utilized to execute and oversee the Program were supposed to have avoided:

> **Seth Mckain Basham** - Wedbush Securities Inc., Research Division - MD Of Equity Research
> …And as it relates to your inventory plans, a few – I guess a couple of quarters ago, there was a plan to take out about $1 billion of inventory out of retail. Is that plan still intact for 2020?
>
> **Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director
>
> ***Yes, it is. I mean a couple of things on inventory. We've had a double-edged sword in terms of inventory, and I would talk to, firstly, the negative in that we've been dealing with some out-of-stocks in terms of our primary items that have been driving our***

*business traditionally and that's what's hurt us in the third and fourth quarter*. We see that as fully rectifiable in terms of the learning plan and implementation for 3rd and 4th in 2020. ***So on that inventory side, we didn't have enough of the right stuff***. Overall, though, we've got $1 billion worth of inventory that we look to take out through aged merchandise. About 1/3 of that we've already traded through ahead of our schedule. So we're pleased with the progress there. It is affecting a little bit heavily in clearance sales, but we see that as a moment in time. Overall, though, we have been trading – we're closing at the moment with about 15% less inventory. So we're operating leaner and getting better turns. ***We just need to course-correct in terms of the mix of merchandise and our focus***. So a lot of messages in there around inventory. Less inventory. We continue to trade on less inventory, and that's going to free up cash for us in the future. And we need to right-size our current inventory into the right items and the best sellers and getting the stock of those both now and in the future.

196.     Defendant Tritton also stated that going forward, things would be different – but he admitted on the call that BBBY was not managing prices properly "coming into the third and fourth quarter", *i.e.*, as of September 1, 2019, and that many of the issues that beset the Program were "self-inflicted":

We're going to have price management floated properly, ***which we didn't have coming into the third and fourth quarter.*** We're going to have our inventory right-sized. It's clear learnings there, and we're going to be able to de-stack and manage our promotions. So we feel like there's enough self-inflicted wounds that for us we'll be able to quantify the recovery on that, and we can adjust out what that means in terms of the performance of the quarter to be a lot more stable and really stem the declines that we saw in the third and fourth.

197.     On February 20, 2020, UBS issued a report by analysts Michael Lasser, Atul Maheswari and Mark Carden noting that BBBY's promotions "caused the sales and margin shortfall" and that "poor inventory management caused out of stocks":

The shortfall in December/January was driven by a confluence of several factors. ***First, wasteful promos lowered margin as not enough thought was given on the overall profitability impact to the company.*** Plus, digital grew much faster causing enhanced shipping costs. ***Poor inventory management caused out of stocks. All of these hit together in 4Q and caused the sales and margin shortfall***. (Emphasis added).

198.     On April 15, 2020, BBBY announced earnings per diluted share of only $.46 – radically below BBBY's Class Period guidance of $2.08 to $2.13.  On that date, BBBY also held a conference call discussing its FY2019 results and the Company's problems at the end of 2019. On the call, ***Defendant Tritton admitted that, in addition to having software reflecting the***

***Program's progress in real-time, BBBY also knew of the inventory issues in December 2019 and January 2020*** – indeed, the Company had done "intel" work and knew customers could not find their desired products:

> **Curtis Smyser Nagle** - BofA Merrill Lynch, Research Division – VP
> …As you said, February and 4Q are very much in the rear view. But I just wanted to – if you could possibly hash out some of the math in terms of what was implied for the February comp. And I think it improved relative to what was going on in the 2 prior months, but anything you could comment on that would be great.
>
> **Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director
>
> Yes. I think for us, it was tough to hit the COVID moment when we just saw some pivots happening in February. ***We knew we were plagued by issues in December and January,… Some of it was self-inflicted. I mean when we don't have best sellers in stock, we've got discounting and we don't have our inventory. I mean some of the sales decline we saw in our stores wasn't necessarily traffic. We did some intel work on that, saw the customers were coming in, and they just couldn't find the product in stock***. So we were shooting ourselves in the foot.

199. Defendant Tritton specified that "certain key promotional categories" like "kitchen electrics" were at the heart of the end of 2019 inventory problems:

> All 4 of our e-commerce fulfillment centers are currently operating. And by the end of this week, we will have converted approximately 25% of our Bed Bath & Beyond and buybuy BABY stores in the U.S. and Canada into regional fulfillment centers to use our vast inventory resources to assign orders locally and deliver quickly….
>
> ***Product availability with certain key promotional categories, such as kitchen electrics, leading into the holiday period were either too low or just out of stock. We just didn't have enough of the right stuff, which hurt us.***

200. After BBBY's misrepresentations and omissions about the inventory reduction program, Guggenheim analyst Steven Forbes was skeptical of whether BBBY would be able to accurately manage inventory in the future. Defendant Tritton engaged in classic damage control, but conceded "big misses" and the Company's failure to have the right goods in stock:

> **Steven Paul Forbes** - Guggenheim Securities, LLC, Research Division – Analyst
> And then maybe just a quick follow-up on inventory management. It's sort of interesting here given your comments around not having enough inventory this holiday, right, holiday 2019, about all the uncertainty that exists today. So maybe just give us an update or discuss how you're planning your inventory buys this year, and particularly for holiday 2020, what's sort of the typical time frame when you have to make those decisions and

commit to those POs? And how important, right, is it that you're open by the time those commitments occur?

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. Look, I mean, a couple of things there. I think that we've been – Joe has been leading the charge here and having deep conversation with all our majors and our general vendor bases about flow. If you go back to the inventory position that we had, there's kind of 2 things going there. The good news was that overall, we reduced our inventory by about 16% at the close of the quarter. And so we were working leaner on that. *But inside of that, we did have big misses*. Not by having more inventory. We think that's a good level that we can come down to. *But we could have traded some of our mix to be more in stock of our key items and generated more sales and gross margin by having the right merchandise*. (Emphasis added).

201.    Defendant Tritton also admitted that BBBY's unprecedented promotions had "burn[ed]" (or cannibalized) inventory and margins:

**Seth Ian Sigman** - Crédit Suisse AG, Research Division - United States Hardline Retail Equity Research Analyst

Just wanted to start with pricing. Mark, it seems like you were pleased with some of the results as you sharpen price over the holiday period. What are you learning about in terms of Bed Bath's pricing today? What changes should we expect in the current environment and, I guess, beyond that?

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. Look, I mean I think that *we entered into promotional activity in a way that we hadn't ever before*, Seth. I think that if we go back to the end of the third quarter, start of the fourth quarter, *it was the first time we'd ever really been truly promotional outside of coupon. And we really didn't lay down the plans to get there in the right way. So we burn the margin and we burn a lot of inventory and weren't prepared to get back into stock. So they're kind of tough learnings*. (Emphasis added).

202.    On July 8, 2020 in the BBBY-Q1 2020 Earnings Call, BBBY Chief Merchandising Officer Robert Hartsig stated that "we're doing a lot of work around inventory management in terms of centralizing inventory planning. We're using new tools and processes to manage efficiencies for inventory."  In other words, BBBY had to fundamentally re-orient its inventory management systems after the failures of the end of 2019.

**ADDITIONAL SCIENTER/FALSITY ALLEGATIONS**

203.    As alleged herein, Defendants acted with scienter since Defendants knew that the

public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding BBBY, their control over and/or receipt and/or modification of BBBY allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning BBBY, participated in the fraudulent scheme alleged herein.

### A.  The Individual Defendants Received Detailed, Weekly Revionics Reports That Contained Up-to-date Information About Inventory, Pricing, and Margins And Had Access To Real-Time Data Through The Software

204.    During the Class Period, BBBY used industry software, including that of Revionics, to manage and oversee the Program.  *See* ¶¶62-68, 82.

205.    BBBY's software, including that of Revionics, analyzed and optimized promotions and markdowns and provided in-depth knowledge about consumer buying influences, cannibalization and halo effects, and identified the most compelling vehicles and offers for different types of shoppers.  *See* ¶¶62-68.  In short, in tracked the progress of the Program in real time.

206.    Revionics software contained AI-based information on markdowns – specifically designed to maximize return on inventory, margins and sell-through.

207.    CW-1 reported that BBBY's CEO and CFO, including Defendants D'Elia and Winston, received these weekly Revionics reports.  *See* ¶76.  Defendant Tritton would have received the same reports.  The Individual Defendants likewise had access to real time data concerning inventory and the Program's status through the software itself.

208.    CW-1 also reported that there were weekly meetings at the Union, New Jersey headquarters with Interim CEO Winston and CFO D'Elia.

209.    Because of the weekly reports, as well as the weekly meetings, the Individual

Defendants knew or recklessly disregarded that the Program was cutting margins and cannibalizing sales.

**B.  Defendant Tritton's Admissions**

210.    Defendant Tritton made numerous admissions during and after the Class Period.

211.    On the January 8, 2020 conference call, Defendant Tritton admitted that at "Thanksgiving time" he had been "watching [the Company's sales and inventory] hour by hour", confirming the real-time access Defendants had to data bearing on the success or failure of the Program.

212.    On the February 18, 2020 conference call, Defendant Tritton admitted that Defendants did not have "proper price management" as of September 2019 (the first month of the Company's 3Q2019):

> We're going to have price management floated properly, ***which we didn't have coming into the third and fourth quarter***.  (Emphasis added).

213.    Defendant Tritton also made several admissions on the April 15, 2020 call that further demonstrate Defendants' scienter at different times.

214.    Defendant Tritton admitted on the call that "we really ***didn't lay down the plans*** [on promotional activity] to get there in the right way".  (Emphasis added). *See* ¶121.  With this statement, Defendant Tritton admitted that Defendants BBBY, D'Elia and Winston knew their statements about the Program, inventory, and margins were materially false and misleading when made because they knew they "didn't lay down the plans" underlying the Program "in the right way".  Since the Program involved a complete departure from the coupon discounts BBBY was accustomed to, and BBBY adopted unprecedented markdowns and promotions, robust planning was necessary to execute and oversee the Program.  Defendants gave investors the false sense that such planning had been done, but, as Defendant Tritton admitted, that was not actually the case – a fact he knew or recklessly disregarded immediately upon joining the Company when he adopted the Program without a reset.

215.    Defendant Tritton also admitted on the April 15, 2020 conference call that BBBY

knew of the inventory problems in December 2019 and January 2020:

- "***We knew*** we were plagued by [inventory] issues ***in December [2019] and January [2020]"*** (¶113)***.***

- "We did some intel work [in December 2019 and January 2020] on that, ***saw the customers were coming in***, and they just couldn't find the product in stock" (¶113)

216.    These admissions demonstrate that Defendants knew their statements were misleading when made.

### C.   The Individual Defendants Repeatedly Discussed The Program – Which Was Critical to Turning Around the Company – With Analysts

217.    BBBY announced its inventory reduction program on September 4, 2019.

218.    The Company's inventory reduction program was at the heart of turning BBBY around from years of poor results.

219.    The Individual Defendants repeatedly engaged in lengthy colloquies with analysts (who then wrote detailed reports) about BBBY's inventory and the Program (*see* ¶¶79-85, 95-97, 99-101, 104-111, 113-117, 120-121), demonstrating that they were well aware of these issues.

### D.   The Individual Defendants Knew BBBY Management Had Critical Vacancies During the Class Period

220.    On December 17, 2019, three months into the Program, BBBY disclosed that Defendant Tritton had fired five senior management from the Company, including the Chief Merchandising Officer, Chief Marketing Officer, Chief Digital Officer, Chief Legal Officer & General Counsel, and Chief Administrative Officer.  *See* ¶92.  The sixth member, the Chief Brand Officer, resigned the prior week.  *See id.*

221.    BBBY did not replace its Chief Merchandising Officer (Todd Johnson), a role inherently important to the Program, until March 2020.  Thus, BBBY had a critical vacancy between December 17, 2019 and the end of the Class Period – right at the important holiday sales season.  Departures of this kind are also rarely immediate and this key departure likely was set in motion even before December.

### E.   Defendants Winston and D'Elia Were Particularly Aware of the Program

**Because BBBY Had Tried Unsuccessfully To Reduce Inventory In The Past**

222.     As early as the beginning of 2018, BBBY had tried to reduce inventory in its stores. As explained by CW-1, this effort "never got off the ground".

223.     When BBBY doubled down in September 2019 and announced the $1 billion Program, Defendants Winston and D'Elia were acutely aware of the need to make inventory reduction work this time.

### F.   The Individual Defendants Were Motivated to Commit Fraud to Satisfy the Activist Investors

224.     After five years of poor results, the Activist Investors succeeded in restructuring BBBY's board of directors and replacing its CEO in May 2019.  *See* ¶51.

225.     The Activist Investors criticized BBBY for, *inter alia*, its serious inventory management problems and low margins in April and May 2019.

226.     The Activist Investors succeeded in restructuring BBBY's board and ousting its CEO.

227.     The Individual Defendants were motivated to commit fraud to address the Activist Investors' concerns about BBBY's stagnant and bloated inventory, as well as the Company's low margins.

228.     Defendants D'Elia and Tritton were motivated to maintain their jobs and avoid the fate of ousted CEO Stephen Temares.

### G.   Defendants Winston and D'Elia Were Motivated to Commit Fraud to Increase the Value of Their BBBY Stock and to Maintain Exorbitant Salaries

229.     Defendant D'Elia received BBBY stock in the amount of $1,559,469 during 2019.

230.     Defendant Winston received a restricted stock award with a value of $1,900,000 on November 4, 2019, the day Defendant Tritton became CEO.

231.     Defendants D'Elia and Winston were motivated to artificially inflate BBBY's stock to increase the value of their BBBY stock award.

232.     Defendant D'Elia was paid $750,000 in yearly salary during the Class Period.

233.    Defendant Winston earned approximately $550,000 in salary while working as BBBY's CEO for only six months.

234.    Defendant D'Elia was motivated to commit fraud to continue to receive her salary.

235.    Defendant Winston was motivated to commit fraud to stay at the Company for as long as possible, reaping her large salary.

236.    Defendant Tritton received approximately $11,250,000 annually consisting of a $1.2 million annual base salary, a $750,000 opportunity at target to be earned by developing and delivering to the Board a short-term strategic and business stabilization plan, a $1.125 million payment based on the Compensation Committee's assessment that Defendant Tritton exceeded objectives set for him, a $500,000 one-time sign-on cash award of time-vesting RSUs that will vest on November 4, 2020, subject to Defendant Tritton's remaining with the Company through that date, a $750,000 make-whole cash bonus, and a $6.9 million make-whole RSU award.

237.    Defendant Tritton was motivated to commit fraud to stay at the Company and receive the exorbitant benefits described in ¶236.

**PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

238.    At all relevant times, the market for BBBY securities was efficient for the following reasons, among others:  (1) the securities were listed and actively traded on the NASDAQ, a highly efficient and automated market; (2) as an issuer, BBBY filed periodic public reports on Form 10-K and Form 10-Q with the SEC; (3) BBBY regularly issued press releases that were carried by the national news wires, were publicly available, and entered the public marketplace; and (4) BBBY was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

239.    As a result, the market for BBBY securities promptly digested current information regarding BBBY from all publicly available sources and reflected such information in BBBY share price.

240.     Under these circumstances, all purchasers of BBBY securities during the Class Period suffered similar injury through their purchase of BBBY securities at artificially inflated prices and a presumption of reliance applies.

**LOSS CAUSATION / ECONOMIC LOSS**

241.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of BBBY securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about BBBY business, operations, and prospects as alleged herein.

242.     During the Class Period, as detailed herein, BBBY securities were artificially inflated due to Defendants' misleading statements and omissions.  When Defendants' prior misrepresentations and omissions were disclosed and became apparent to the market, the price of BBBY securities fell as the prior artificial inflation came out.

243.     As a result of their purchases of BBBY securities during the Class Period,  Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the securities laws.

244.     The decline in the price of BBBY securities after the corrective disclosures on January 8, 2020 and February 11, 2020, was a direct result of Defendants' misrepresentations being revealed to investors and the market.

245.     The decline in the price of BBBY securities was also the result of the materialization of the concealed investment risks concerning BBBY.

246.     Defendants' materially false and misleading statements relate to the Company's inventory reduction program.

247.     The corrective disclosure on January 8, 2020 revealed that BBBY's earnings and margins had plunged in the 3Q19, and began to reveal the Company's inventory management issues.

248.     After this disclosure, BBBY stock fell almost 20%.  *See* ¶¶20, 181.

249.    Analysts' statements after the January 8, 2020 disclosure show the importance of Defendants' revelations of that date.  *See* ¶¶100-101.

250.    The January 8, 2020 disclosure did not fully reveal the truth about BBBY's inventory management problems.

251.    The corrective disclosure on February 11, 2020 revealed the full extent of the truth; namely, that the Program, including its promotions and markdowns, had caused out-of-stock and minimally stocked goods and cannibalized sales and revenues.

252.    After this disclosure, BBBY stock again fell, this time by over 20%.  *See* ¶¶22, 103.

253.    Analysts' statements after the February 11, 2020 disclosure show the importance of Defendants' revelations.  *See* ¶¶104-109.

254.    The timing and magnitude of the price declines in BBBY securities negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of BBBY securities when Defendants' misrepresentations were revealed.

**CLASS ACTION ALLEGATIONS**

255.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired BBBY securities between September 4, 2019 and February 11, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

256.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, BBBY common shares actively traded on the

NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of shares of BBBY common stock were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by BBBY or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

257.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

258.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

259.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of BBBY; and

(c)    to what extent the members of the Class have sustained damages, and the proper measure of damages.

260.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against all Defendants

261.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

262.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase BBBY securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

263.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for BBBY securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

264.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about BBBY's inventory reduction program, as specified herein.

265.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BBBY's value and performance,

which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about BBBY and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

266.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants had access to BBBY's inventory management software: (iv) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (v) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

267.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Thus, Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with BBBY business and financial results from the investing public and supporting the artificially inflated price of its securities.

268.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of BBBY

securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired BBBY securities during the Class Period at artificially high prices and were damaged thereby.

269.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that BBBY was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their BBBY securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

270.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

271.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

272.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

273.    Individual Defendants acted as controlling persons of BBBY within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing

public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

274.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

275.    As set forth above, BBBY and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(A)    Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(B)    Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

(C)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: October 20, 2020

Respectfully submitted,

/s/ Richard L. Elem

_____

Richard L. Elem
Law Offices of Jan Meyer & Associates, P.C.
1029 Teaneck Road
Second Floor
Teaneck, New Jersey  07666
Tel:  (201) 862-9500
Email: relem@janmeyerlaw.com

*Liaison Counsel for Plaintiffs and the Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Laurence J. Hasson (admitted pro hac vice)
Joseph R. Seidman, Jr. (admitted pro hac vice)
Matthew E. Guarnero
10 East 40th Street
New York, NY  10016
Telephone: (212) 779-1414
Facsimile:  (212) 779-3218
lhasson@bernlieb.com
seidman@bernlieb.com
mguarnero@bernlieb.com

*Lead Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that October 20, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Richard L. Elem*
RICHARD L. ELEM