Edna D. Guerrasio
Jonathan E. Richman (admitted *pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, New York  10036
(212) 969-3000
eguerrasio@proskauer.com
jerichman@proskauer.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **STEPHEN AND JUNE VITIELLO,** **Individually and on Behalf of All Others Similarly Situated,** | **No. 2:20-cv-04240-MCA-MAH** |
| **Plaintiffs,** | |
| **v.** | |
| **BED BATH & BEYOND INC.,** *et al.*, | |
| **Defendants.** | |

<br>

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS
## PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

<br>

December 21, 2020

**TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

      FACTUAL BACKGROUND .................................................................................. 4

           A.     BBBY's Business, Management, and Transformation Plans ...................... 4

           B.     BBBY's Statements During the Class Period .............................................. 5

                  1.     September/October 2019 Disclosures .................................................. 5

                  2.     January 2020 Disclosures .................................................................... 7

                  3.     February 2020 Disclosures .................................................................. 8

           C.     The Complaint's Allegations ..................................................................... 8

ARGUMENT ................................................................................................................. 9

      I.     APPLICABLE LEGAL PRINCIPLES ............................................................. 9

      II.     PLAINTIFFS HAVE NOT PLED A MATERIAL MISSTATEMENT OR OMISSION. ................................................................................................. 13

           A.     No Material Misrepresentations or Omissions in September/October 2019 ......................................................................... 13

                  1.     No False or Misleading Statements .................................................... 13

                  2.     Safe-Harbor Protection for Forward-Looking Statements ............. 18

                  3.     Protection for Opinions ..................................................................... 20

                  4.     Immaterial Statements of Puffery ..................................................... 21

                  5.     No Violation of Item 303 or 105 of Regulation S-K ..................... 22

           B.     No Material Misrepresentations or Omissions in January 2020 ............... 24

                  1.     No False or Misleading Statements .................................................... 24

                  2.     Safe-Harbor Protection for Forward-Looking Statements ............. 27

                  3.     Protection for Opinions ..................................................................... 29

                  4.     No Violation of Item 303 or 105 of Regulation S-K ..................... 29

      III.     PLAINTIFFS HAVE NOT PLED A STRONG INFERENCE OF SCIENTER. ..................................................................................................... 30

           A.     No Strong Inference of Conscious Misbehavior or Recklessness ............. 32

                  1.     Alleged Access to Reports and Data .................................................. 32

                  2.     Mr. Tritton's Alleged "Admissions" ................................................. 35

                  3.     Knowledge of "Critical Vacancies" .................................................. 36

i

*Page*

B.    No Strong Inference of Scienter from "Motive and Opportunity" Allegations ...................................................................................37

C.    Plaintiffs' Inferences of Scienter Are Not as Strong as an Opposing Inference of Nonfraudulent Conduct. ........................................................39

IV.    PLAINTIFFS HAVE NOT PLED A CONTROL-PERSON CLAIM...................40

CONCLUSION.................................................................................................................41

## TABLE OF AUTHORITIES

*Page(s)*

**CASES:**

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................................12

*Belmont v. MB Inv. Partners, Inc.*,
   708 F.3d 470 (3d Cir. 2013) ......................................................................................40

*Blackmoss Inv. Inc. v. ACA Cap. Holdings, Inc.*,
   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .......................................................23, 30

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ...................................................................4, 11, 14, 33

*Chan v. New Oriental Educ. & Tech. Grp. Inc.*,
   2019 WL 2865452 (D.N.J. July 3, 2019) .................................................................33

*City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*,
   865 F. Supp. 2d 811 (W.D. Mich. 2012) ..................................................................27

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ......................................................................................17

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................................9-10

*Fialkov v. Alcobra Ltd.*,
   2016 WL 1276455 (S.D.N.Y. Mar. 30, 2016) ..........................................................21

*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004) ......................................................................................38

*Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ...................................................................................18

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) .....................................................................................14

*Hoey v. Insmed*,
   2018 WL 902266 (D.N.J. Feb. 15, 2018) ............................................................37, 39

*Howard v. Arconic, Inc.*,
   395 F. Supp. 3d 516 (W.D. Pa. 2019) ..................................................................21, 23

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010)...................................................................................18, 22, 26

*In re Alpharma Inc. Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004)................................................................................11, 31, 37, 38

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)..........................................................................................28

*In re Campbell Soup Co. Sec. Litig.*,
  2020 WL 7022655 (D.N.J. Nov. 30, 2020) ...............................................................34

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) ........................................................................................33

*In re Crocs, Inc. Sec. Litig.*,
  774 F. Supp. 2d 1122 (D. Colo. 2011),
  *aff'd*, 667 F. App'x 710 (10th Cir. 2016).......................................................................34

*In re Digital Island Sec. Litig.*,
  357 F.3d 322 (3d Cir. 2004)......................................................................................37, 38

*In re Donald J. Trump Casino Sec. Litig.*,
  793 F. Supp. 543 (D.N.J. 1992),
  *aff'd*, 7 F.3d 357 (3d Cir. 1993) .....................................................................................17

*In re Electronics for Imaging, Inc. Sec. Litig.*,
  2019 WL 397981 (D.N.J. Jan. 31, 2019).......................................................11, 12, 31, 32, 38

*In re Focus Media Holding Ltd. Litig.*,
  701 F. Supp. 2d 534 (S.D.N.Y. 2010)...........................................................................14

*In re Galena Biopharma, Inc. Sec. Litig.*,
  336 F. Supp. 3d 378 (D.N.J. 2018) ...............................................................................22

*In re Hertz Global Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018).........................................................................................31

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  2015 WL 4469143 (D.N.J. July 22, 2015)...........................................................20, 22, 33, 35

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017),
  *aff'd*, 905 F.3d 106 (3d Cir. 2018)..........................................................1, 11, 21, 22, 27, 36

*In re Leapfrog Enter., Inc. Sec. Litig.*,
  200 F. Supp. 3d 987 (N.D. Cal. 2016) ..............................................................15, 18, 26

iv

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2002)........................................................................................11

*In re Newell Brands, Inc. Sec. Litig.*,
2019 WL 6715055 (D.N.J. Dec. 10, 2019),
*aff'd*, 2020 WL 7040968 (3d Cir. Dec. 1, 2020)..................................................11, 15

*In re NutriSystem Inc. Sec. Litig.*,
653 F. Supp. 2d 563 (E.D. Pa. 2009) ...........................................................................31

*In re Par Pharm. Sec. Litig.*,
2008 WL 2559362 (D.N.J. June 24, 2008) ...................................................................31

*In re Party City Sec. Litig.*,
147 F. Supp. 2d 282 (D.N.J. 2001) .........................................................................15, 37

*In re Synchronoss Techs., Inc. Sec. Litig.*,
2019 WL 2849933 (D.N.J. July 2, 2019)......................................................................34

*In re Target Corp. Sec. Litig.*,
275 F. Supp. 3d 1063 (D. Minn. 2017),
*reconsideration denied*, 2018 WL 1378755 (D. Minn. Mar. 19, 2018),
*aff'd*, 955 F.3d 738 (8th Cir. 2020) .............................................................................15

*In re Target Corp. Sec. Litig.*,
955 F.3d 738 (8th Cir. 2020) ..........................................................................15, 22, 26

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)..........................................................................................37

*Int'l Bhd. of Elec. Workers Local 697 v. Limited Brands, Inc.*,
788 F. Supp. 2d 609 (S.D. Ohio 2011) .........................................................................39

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020)......................................................................................32, 40

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
564 U.S. 135 (2011)........................................................................................................11

*Jaroslawicz v. M&T Bank Corp.*,
962 F.3d 701 (3d Cir. 2020)..........................................................................................23

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
363 F. Supp. 3d 476 (D. Del. 2019)...............................................................................27

*McLaughlin v. Cendant Corp. (In re Cendant Corp. Sec. Litig.)*,
76 F. Supp. 2d 539 (D.N.J. 1999) .................................................................................38

*Novak v. Kasaks,*
 216 F.3d 300 (2d Cir. 2000)........................................................................................33

*OFI Asset Mgmt. v. Cooper Tire & Rubber,*
 834 F.3d 481 (3d Cir. 2016)..................................................10, 11, 12, 18, 19, 28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
 575 U.S. 175 (2015)...............................................................11, 19, 20, 21, 29

*Oran v. Stafford,*
 226 F.3d 275 (3d Cir. 2000)........................................................................................22

*Patel v. Zoompass Holdings, Inc.,*
 2018 WL 10154207 (D.N.J. Aug. 8, 2018) ..............................................................37

*Rahman v. Kid Brands, Inc.,*
 736 F.3d 237 (3d Cir. 2013).................................................................................31, 33

*Ressler v. Liz Claiborne, Inc.,*
 75 F. Supp. 2d 43 (E.D.N.Y. 1998),
 *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.,*
 189 F.3d 460 (2d Cir. 1999)........................................................................................14

*Santa Fe Indus., Inc. v. Green,*
 430 U.S. 462 (1977)..................................................................................................3

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.,*
 2020 WL 6484310 (D. Del. Nov. 4, 2020) ..............................................................16

*Stratte-McClure v. Morgan Stanley,*
 776 F.3d 94 (2d Cir. 2015).........................................................................................22

*Teachers' Ret. Sys. of La. v. Hunter,*
 477 F.3d 162 (4th Cir. 2007) ....................................................................................33

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap.,*
 531 F.3d 190 (2d Cir. 2008)................................................................... 31-32, 40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
 551 U.S. 308 (2007)............................................................................................30, 31

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.,*
 325 F. Supp. 3d 728 (N.D. Tex. 2018),
 *aff'd*, 935 F.3d 424 (5th Cir. 2019)...........................................................................35

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands Inc.,*
 2020 WL 6118605 (N.D. Ill. Oct. 15, 2020).............................................................20

*Williams v. Globus Med., Inc.*,
 869 F.3d 235 (3d Cir. 2017)..................................................................10, 12, 16, 19

*Winer Family Tr. v. Queen*,
 2004 WL 2203709 (E.D. Pa. Sept. 27, 2004),
 *aff'd*, 503 F.3d 319 (3d Cir. 2007) ...................................................................17

*Winer Family Tr. v. Queen*,
 503 F.3d 319 (3d Cir. 2007)...............................................................................11

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) .............................................................................33

STATUTES:

15 U.S.C. § 78j(b) ....................................................................................... *passim*

15 U.S.C. § 78u-4(b)(1) .......................................................................................12

15 U.S.C. § 78u-4(b)(2) .......................................................................................31

15 U.S.C. § 78u-5(i)(1) ...................................................................................10, 18

15 U.S.C. § 78u-5(c)(1)(A)(i) ..............................................................................10

15 U.S.C. § 78u-5(c)(1)(B) .............................................................................10, 19

15 U.S.C. § 78(t)(a)................................................................................................2

OTHER AUTHORITIES:

17 C.F.R. § 229.105 .............................................................................................23

17 C.F.R. § 229.303 .............................................................................................22

17 C.F.R. § 240.10b-5.................................................................................. *passim*

17 C.F.R. § 240.13a-13 ..................................................................................14, 16

Fed. R. Civ. P. 9(b) .............................................................................................12

SEC Form 10-Q General Instructions A.1, https://www.sec.gov/forms........................14

## PRELIMINARY STATEMENT

In 2019, Bed Bath & Beyond Inc. ("BBBY") announced that it would begin a bold strategic "transformation," undertaking a number of "significant changes" to its business to respond to investor concerns and challenges in the competitive marketplace. Those projected changes involved refreshing almost all of BBBY's directors over two years; announcing the resignation of BBBY's CEO and COO before subsequently "restructuring" its entire leadership team by replacing six additional senior executives (including the CEO), appointing an interim CEO, and searching for a new permanent CEO; initiating a reduction in corporate staff after a prior reduction of approximately 7% of staff, including vice presidents, directors, and managers; and launching an ambitious inventory-reduction program, under which the company planned to "aggressive[ly] reduc[e]" up to $1 billion of "excess aged inventory" in 18 months so that it could focus on selling "higher-margin goods." [9/4/19 8-K at 4 (Ex. H)][1]

Although the business-execution risks of such a sweeping "transformation" plan were self-evident, BBBY warned investors about them from the start, including that "there is critical work to do and there are challenges we are working to address" [7/10/19 Tr. at 7 (Ex. E)] and that "[t]he success of the Company is dependent, in part, on the ability of its employees in all areas of the organization to execute its business plan" [FY2018 10-K at 10 (Ex. C)]. BBBY also discussed with market analysts that the "aggressive disposition of inventory" could lead to the "cannibalization of sales." [10/2/19 Tr. at 5 (Ex. I)] BBBY further cautioned that, while "eliminating" less-profitable inventory and "modifying our pricing algorithms" might

---

[1]     "Ex." refers to the exhibits attached to the accompanying Declaration of Jonathan E. Richman. The Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice, such as SEC filings, press releases, and transcripts.'" *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *2 n.1 (D.N.J. Apr. 27, 2017) ("*Hertz II*") (internal quotations omitted), *aff'd*, 905 F.3d 106 (3d Cir. 2018).

"unfavorably impact our sales in the near term, we believe these sound business decisions will lead to a stronger company and improved profitability over time." [1/9/19 Tr. at 5 (Ex. A)]

The Amended Class Action Complaint (the "Complaint" or "Compl.") alleges that some of those risks later came to pass and that certain aspects of the transformation strategy did not initially work as well as expected, causing BBBY to suffer reduced holiday sales in 2019 because (in part) it "'didn't have enough of the right stuff'" on the "'inventory side.'" [Compl. ¶ 195] With the benefit of hindsight from those subsequent disclosed events, this case now attempts to assert claims of corporate mismanagement masquerading as securities fraud.

The Complaint's theory seems to be that – rather than experiencing difficulty implementing an ambitious business strategy during a significant corporate transformation – BBBY and the Individual Defendants (former interim CEO Mary Winston, former CFO Robyn D'Elia, and incoming CEO Mark Tritton) consciously or recklessly allowed the new inventory-management program to "cannibalize" holiday sales and then concealed that information from the market to protect the Individual Defendants' jobs and stock holdings (which they are not alleged to have sold), even though the impact of that alleged sabotage would be disclosed each quarter in BBBY's financial results (which are not alleged to have been inaccurately reported). Based on this theory, which is not supported by any contemporaneous undisclosed facts, lead plaintiff Kavin Bakhda and plaintiff Richard Lipka ("Plaintiffs") assert fraud claims under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and control-person liability claims against the Individual Defendants under § 20(a) of the Exchange Act, 15 U.S.C. § 78(t)(a).

The Court should dismiss the Complaint for failure to state a claim. As an initial matter, Plaintiffs have not pled an actionable misrepresentation or omission. The Complaint does not

2

allege any facts showing that Defendants' statements were false or misleading when made; it instead relies on the benefit of hindsight to contend that Defendants must have known earlier about subsequently disclosed problems. Moreover, statements about the inventory-reduction program's prospects were forward-looking statements protected by the safe harbor under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") – and thus are not actionable unless Defendants both *actually knew* that the statements were false when made *and* failed to provide adequate warnings to the market. The Complaint pleads no such facts. And many of the statements also were inactionable opinions or puffery.

In addition, the Complaint fails to plead particularized facts creating a strong inference (indeed, *any* inference) that Defendants made any alleged misstatements or omissions with scienter – conscious or reckless disregard of the truth. To the contrary, Plaintiffs acknowledge BBBY's efforts to be candid with the market, including by withdrawing its 2019 fiscal-year guidance in January 2020 (a step that the Complaint calls "rare and draconian" [¶ 18]) and by voluntarily disclosing preliminary financial results for the first two months of the fourth quarter in February 2020, two months earlier than BBBY was obliged to report on the fourth quarter.

At bottom, Plaintiffs are complaining that Defendants mishandled the inventory-reduction program and, perhaps, that the program was ill-advised in the first place because BBBY purportedly did not have the experience or the personnel to make it work. But allegations of corporate mismanagement and negligence are not actionable under the securities laws. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977). Plaintiffs' efforts to cast their mismanagement theories as disclosure violations thus cannot withstand scrutiny. And their attempts to prove fraud based on Defendants' after-the-fact, candid assessments of what went wrong with the inventory-management program during the 2019 holiday season violate the

3

cardinal rule prohibiting claims of fraud by hindsight. *E.g.*, *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004).

## FACTUAL BACKGROUND

### A.    BBBY's Business, Management, and Transformation Plans

BBBY is a large retailer of household merchandise and home furnishings. [Compl. ¶ 1] BBBY competes for sales against a wide range of companies, from specialty retailers to department stores and discounters, as well as online and multichannel retailers. [2018 10-K at 9 (Ex. C)] In recent years, rapidly evolving technologies have changed how BBBY and its competitors transact and communicate with customers. [*Id.*]

According to Plaintiffs, BBBY did not effectively adapt to those changes. The Complaint alleges that BBBY had performed "poorly" between 2014 and 2019, in part because of its reliance on "coupon mailers to attract consumers" [*id.* ¶ 44]. In 2019, certain "Activist Investors" pressured BBBY to address its "'weak sales'" and gross margins [*id.* ¶ 52], to "'improve inventory by increasing inventory turns'" [*id.* ¶ 53], and "to move away from its traditional coupon merchandising to try a different strategy:  promotions and markdowns" [*id.* ¶ 45]. The "activists" also pushed BBBY to change its leadership structure. [*Id.* ¶¶ 50-55]

In response, in April 2019, BBBY announced a "[t]ransformation of [its] Board of Directors" [4/22/19 8-K at 6 (Ex. B)] – including the appointment of five "new and independent, highly qualified, and diverse directors" [*id.* at 15] – as well as additional governance enhancements, such as the formation of a "Business Transformation and Strategy Review Committee" to "review all aspects of the Company's business transformation, strategy and structure" [*id.* at 6]. Four more independent directors were appointed in May 2019. [5/29/19 8-K (Ex. D)] Following those changes, 12 out of BBBY's 13 directors had joined the Board within the prior two years. [*Id.*] During this time, BBBY also made sweeping changes to its executive

4

ranks.  On May 12, 2019, BBBY's CEO was replaced on an interim basis by Ms. Winston, who served until the new CEO (Mr. Tritton) took over on November 4, 2019.  [Compl. ¶¶ 36, 38, 89]  On July 23, 2019, BBBY announced "a reduction in corporate staff at its headquarters," including the departure of its President and Chief Operating Officer, after an earlier "reduction of approximately 7% of its corporate staff, including vice presidents, directors, managers and professional staff."  [7/23/19 8-K (Ex. G)]  And on December 17, 2019, BBBY announced "an extensive restructure of its leadership team, including the departure of six senior members," including its Chief Merchandising Officer, Chief Marketing Officer, Chief Digital Officer, Chief Legal Officer, Chief Administrative Officer, and Chief Brand Officer – a restructuring that BBBY called a "bold pivot" and a "new vision for the Company."  [12/17/19 8-K (Ex. K)]

Upon assuming her position, Ms. Winston cautioned that BBBY was "at an important inflection point in the Company's history" [5/29/19 8-K at Ex. 99.1 (Ex. D)], "recognize[d] that there needs to be a fundamental change in our approach" [7/10/19 8-K at Ex. 99.1 (Ex. F)], and acknowledged that BBBY had suffered from "a lack of strategic focus," but said that the new management and directors were "committed to completing a deep review of the business . . . to drive the intensive business transformation that is needed" [7/10/19 Tr. at 5 (Ex. E)].  She also told the market that the Business Transformation and Strategy Committee was tasked with "review[ing] and evaluat[ing] the ongoing business transformation" and "mak[ing] recommendations on how the company can best capitalize on and navigate the evolving retail environment to accelerate the company's evolution."  [*Id.*]

## B.    BBBY's Statements During the Class Period

### 1.    September/October 2019 Disclosures

On September 4, 2019, the first day of the Class Period, BBBY published a letter giving shareholders "a strategic update on the Company's business transformation efforts."  [9/4/19 8-K

at 4 (Ex. H)]  BBBY announced that it had "initiated significant changes," but cautioned that the "transformation" remained "in its early stages."  [*Id.*]  BBBY said that, as part of its "transformation," it "expected" to execute an "aggressive reduction" of up to $1 billion of inventory over the next 18 months, "including the removal of excess aged inventory . . . anticipated before the 2019 holiday season."  The program was intended to "quickly reset inventory levels . . . in an effort to drive customer traffic."  [*Id.*]  BBBY warned, however, that such an outcome was not guaranteed, and instead depended on a number of factors, including BBBY's "ability to achieve a successful outcome for . . . its business strategies" [*id.* at 6]. BBBY promised a fuller update during the next earnings call, on October 2, 2019.  [*Id.* at 5]

Four weeks later, on October 2, BBBY reported financial results for its second fiscal quarter and gave an update for the rest of the 2019 fiscal year.  [Compl. ¶ 140]  BBBY provided estimates of full-year net sales and net earnings per diluted share and projected that full-year results would "'continue to be in line with the Company's most recent guidance'" [*id.*].

During a conference call with analysts on the same day, BBBY reported a $194 million inventory write-down in the second quarter because of the inventory-reduction plan and stated that it hoped to reduce inventory by $350 million before the 2019 holiday season.  [*Id.* ¶¶ 79, 142, 162]  BBBY told investors that the inventory reduction would "'be accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator'" [*id.* ¶ 162], but warned that the company was still "in the early innings of starting that process" [10/2/19 Tr. at 12 (Ex. I)] and that the reduction would need to be "'managed thoughtfully'" to "'prevent cannibalization of sales'" [Compl. ¶ 162].  Indeed, Ms. Winston told investors that the "new promotional framework developed around the retail holiday calendar" was "bigger, bolder and beyond anything that we've done before."  [10/2/19 Tr. at 4 (Ex. I)]

6

Ms. Winston also addressed the risk that promotions and inventory reduction could erode margins and undercut sales [Compl. ¶ 63] and explained that, "'[t]o optimize this inventory off-load the company is employing markdown optimization software to facilitate and manage the inventory reduction process'" [*id.* ¶ 62]. As Plaintiffs note, BBBY used markdown-optimization software called Revionics, which helps companies "to optimize the reduction in selling price by recommending the best timing and depth of markdowns" and "avoid selling products too cheaply and, thus, cannibalizing sales of other higher-margin goods." [*Id.* ¶¶ 64-68] BBBY also used other software (JDA) for "general inventory management." [*Id.* ¶ 78]

### 2. January 2020 Disclosures

On January 8, 2020, BBBY reported lower earnings and margins for the third quarter and announced that it "'expect[ed] its sales and profitability to remain pressured during the fiscal 2019 fourth quarter.'" [*Id.* ¶ 172] "'Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month,'" BBBY chose "'to withdraw its fiscal 2019 full year financial guidance.'" [*Id.*]

During a conference call that day, Mr. Tritton stated that sales from Thanksgiving through Cyber Monday had increased over the prior year [1/8/20 Tr. at 5 (Ex. L)], but that BBBY had seen "real pressure on sales" during the quarter [*id.* at 12] and that quarterly performance had been "'impacted to some extent by self-inflicted issues, like [p]oor inventory management'" [Compl. ¶ 174] – although he also gave other reasons (which the Complaint ignores) for the disappointing performance: "noncompetitive pricing and a lack of convenient shopping options like BOPUS [*i.e.*, buy online, pick up in store]" [1/8/20 Tr. at 5 (Ex. L)].

Mr. Tritton stressed that BBBY was "experiencing short-term pain, some of which has been self-inflicted," as it was "making bold and broad-based changes to modernize our business." [*Id.* at 7]  As to the fourth quarter (which was underway), he stated:  "we're still in the middle of that and we're not going to be declaring any numbers there," but he made clear that "we continue to remain under pressure" [*id.* at 11] – a warning that Ms. D'Elia also gave [*id.* at 7 ("'we expect our sales and profitability to remain pressured during the fiscal 2019 fourth quarter")].

### 3.      February 2020 Disclosures

On February 11, 2020, the last day of the Class Period – and two months before its regular report on fourth-quarter results in mid-April [Compl. ¶ 198] – BBBY voluntarily disclosed preliminary, unaudited results for the first two months of the quarter.  [*Id.* ¶ 192] BBBY reported a "'decline in comparable sales driven primarily by store traffic declines combined with inventory management issues, and increased promotional activity and markdowns.'" [*Id.*]  "'Product availability leading into the holiday period was also a contributing factor, as inventory within certain key categories in the [BBBY] assortment was too low or out-of-stock during the period.'" [*Id.*]  BBBY added that it was "'immediately reforming its internal planning and inventory management procedures to master the fundamentals.'" [*Id.*]

On February 18, one week after the end of the Class Period, BBBY held a conference call with analysts.  Mr. Tritton discussed holiday sales and observed that, "'on that inventory side, we didn't have enough of the right stuff,'" but he considered that issue "'fully rectifiable in terms of the learning plan and implementation for 3rd and 4th [quarters] in 2020.'" [*Id.* ¶ 195]

### C.      The Complaint's Allegations

This lawsuit was filed two months later, on April 14, 2020.  The Complaint (as amended) alleges that BBBY's stock price was inflated during the Class Period because BBBY had misled investors about the implementation of the disclosed inventory-reduction program.  The

Complaint contends that BBBY's Class-Period statements were materially false and misleading because they did not disclose that the program was "not the product of adequate and careful planning," that changes in BBBY's management had "left the Company without key personnel," and that inventory reductions would erode BBBY's margins and cannibalize holiday sales. [*Id.* ¶ 4] In a conclusory fashion, the Complaint alleges that Defendants knew or recklessly disregarded that BBBY was experiencing inventory-management problems going into the holiday season, that it did not "'have price management floated properly,'" and that it was "out of its depth because it had never conducted markdown promotions like this before." [*Id.* ¶ 187] But the Complaint does not cite any contemporaneous, undisclosed information contradicting those statements; it relies only on after-the-fact developments to allege that those statements were knowingly or recklessly false when made.

## ARGUMENT

Plaintiffs challenge two different types of statements that fall into two time periods: (*i*) the September and October 2019 announcements of the new inventory-reduction program and (*ii*) the January 2020 third-quarter earnings report and withdrawal of guidance after the program had been operating for only one quarter. Because the underlying facts differ between those periods, this brief will begin with the legal principles applicable to both sets of statements.

As shown below, Plaintiffs have not pled an actionable misrepresentation or omission; nor have they pled particularized facts creating a strong inference that Defendants acted with the requisite scienter. The claim for violation of § 10(b) of the Exchange Act thus fails, and the claim for control-person liability falls with it.

## I.    APPLICABLE LEGAL PRINCIPLES

To plead a claim under Exchange Act § 10(b) and Rule 10b-5, Plaintiffs must establish (among other things) a material misrepresentation or omission and scienter. *Dura Pharms., Inc.*

*v. Broudo*, 544 U.S. 336, 342 (2005).  However, "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information."  *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (internal quotations omitted).  That duty arises only "when there is insider trading [which the Complaint here does not allege], a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure."  *Id.* (internal quotations omitted).

Certain statements are not actionable even if allegedly false.  Forward-looking statements are not actionable if they fall within the PSLRA's safe harbor.  Such statements include financial projections, "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services," and statements of future economic performance.  15 U.S.C. § 78u-5(i)(1).  The PSLRA "provides two distinct entrances to the safe harbor."  *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491 (3d Cir. 2016).  A statement is protected if it is accompanied by "meaningful cautionary" language, 15 U.S.C. § 78u-5(c)(1)(A)(i), *or* if the plaintiff fails to prove that the maker had "actual knowledge" that the statement was false or misleading, *id.* § 78u-5(c)(1)(B).  "Thus, any forward-looking statement is protected if it is *either* accompanied by substantive and tailored cautionary statements *or* if the plaintiff fails to show actual knowledge of falsehood."  *OFI*, 834 F.3d at 491 (emphasis added; internal quotations omitted).

Relatedly, statements of opinion are not actionable as false or misleading unless the speaker either (*i*) actually does not believe the opinion expressed (or supplies untrue supporting facts) or (*ii*) "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and . . . those facts *conflict* with what a reasonable investor would take

10

from the statement itself . . . ." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-87 (2015) (emphasis added).[2]

The securities laws do not allow two types of claims that pervade the Complaint. First, allegations of corporate "mismanagement . . . are not cognizable under federal law." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004) (internal quotations omitted); *In re Electronics for Imaging, Inc. Sec. Litig.*, 2019 WL 397981, at *6 (D.N.J. Jan. 31, 2019) ("Claims essentially grounded on corporate mismanagement are insufficient to plead recklessness.") (internal quotations omitted); *see also In re Newell Brands, Inc. Sec. Litig.*, 2019 WL 6715055, at *11 (D.N.J. Dec. 10, 2019) ("business decisions made in good faith that do not play out as hoped do not give rise to securities fraud"), *aff'd*, 2020 WL 7040968 (3d Cir. Dec. 1, 2020).

Second, the securities laws prohibit "attempts to plead fraud by hindsight." *Chubb*, 394 F.3d at 158. "[F]raud cannot be inferred merely because [a]t one time the firm bathes itself in a favorable light but later the firm discloses that things are less than rosy." *Id.* (internal quotations omitted). Similarly, a defendant's post-event statements do not prove that pre-event statements were false or misleading. *Winer Family Tr. v. Queen*, 503 F.3d 319, 331-32 (3d Cir. 2007). Instead, plaintiffs must plead particularized facts that a defendant's statements were knowingly or recklessly false *at the time they were made*. *E.g.*, *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.").

Liability under § 10(b) can lie only against a defendant who "made" a misstatement or omission. *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 141-42 (2011). A

---

[2]     *Omnicare* construed § 11 of the Securities Act of 1933, and the Third Circuit has not decided whether that analysis applies to § 10(b) claims. *OFI*, 834 F.3d at 493 n.11. This Court, however, has used *Omnicare* in a § 10(b) case, *see Hertz II*, 2017 WL 1536223, at *12 n.3, so Defendants will assume solely for purposes of this motion that *Omnicare* applies here.

person who does not actually speak or sign the statement cannot be deemed to have "made" it unless he or she had "ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142.  The Complaint does not plead any facts showing that Ms. Winston had ultimate authority over any statements made after November 4, 2019, when she was no longer interim CEO [Compl. ¶¶ 36, 89], or that Mr. Tritton had any such authority before November 4, 2019, when he became CEO [*id.* ¶ 89].  Thus, Ms. Winston cannot be liable for the January statements, and Mr. Tritton cannot be liable for the September/October ones.

In terms of pleading, "[a]ll securities fraud claims are subject to [Fed. R. Civ. P.] 9(b), which requires [a] plaintiff to state with particularity the circumstances constituting fraud or mistake." *Williams*, 869 F.3d at 240.  The claims also must satisfy the PSLRA's heightened standard, which "requires that the complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, specifically scienter . . . ." *OFI*, 834 F.3d at 490 (internal citations omitted).  "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Securities complaints also are subject to generally applicable pleading standards requiring courts to consider only well-pled factual allegations, not legal conclusions.  *See, e.g.*, *In re Electronics for Imaging*, 2019 WL 397981, at *5 ("the facts alleged must be 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))).

II.     **PLAINTIFFS HAVE NOT PLED A MATERIAL MISSTATEMENT OR OMISSION.**

The Complaint fails to plead a material misrepresentation or omission as to either the September/October 2019 statements or the January 2020 statements.

A.      **No Material Misrepresentations or Omissions in September/October 2019**

On September 4, 2019, BBBY announced its "aggressive" plan to reduce inventory over 18 months and promised to provide further details during the next earnings call, which occurred on October 2.  [Compl. ¶¶ 8, 9, 138-39; Ex. H at 5]  During that call (and in BBBY's second-quarter report for the period ended August 31), BBBY described how it expected to execute the new plan.  [Compl. ¶¶ 143, 162]  BBBY would reduce inventory through markdowns, clearance events, and the assistance of an independent liquidator, "'all to be managed thoughtfully to prevent cannibalization of sales,'" and would "'optimize'" the reduction by using "'markdown optimization software'" (*i.e.*, Revionics) to guard against margin erosion and sales cannibalization.  [*Id.* ¶¶ 9, 13-14, 145, 160, 162, 164]  BBBY expressed optimism about "'the progress we are making'" [*id.* ¶ 149] and maintained guidance for the fiscal year, which would end on February 29, 2020 [*id.* ¶¶ 15, 158].  None of those statements is actionable.

1.      **No False or Misleading Statements**

As an initial matter, nothing that BBBY said was false or misleading.  The inventory-reduction program was just being launched when the company issued the September 4 letter to shareholders, so nothing had yet happened.  And the October 2 and 9 financial statements concerned the second quarter, which had ended on August 31, before the new program began.[3]

---

[3]     The table attached as Appendix A lists the various alleged statements challenged in the Complaint and categorizes why they are not actionable.

13

BBBY did not have a duty in October 2019 to speak about the first month (September) of the third quarter, which would not be reported until January 2020.  *See* 17 C.F.R. § 240.13a-13; SEC Form 10-Q General Instructions A.1, https://www.sec.gov/forms (reports due 40-45 days from quarter end); *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) (no law requiring quarterly reports to be updated other than quarterly); *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539 (S.D.N.Y. 2010) (rejecting liability for "failure to disclose financial information about the third quarter before that quarter had concluded").

But in any event, the Complaint does not allege any facts showing that, by the end of September, the month-old program had yielded or projected bad results.  While the Complaint [¶¶ 75, 77] alleges that "weekly Revionics reports" contained "data on inventory levels, pricing, and margins" and that "weekly meetings" were held at headquarters, it does not plead *what* those data showed or that they revealed any cause for concern by the end of September.  *See Chubb*, 394 F.3d at 147 (plaintiff relying on internal reports must plead "who authored the alleged report, when it was authored, who reviewed the report, and what data its conclusions were based upon").  This case resembles *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43 (E.D.N.Y. 1998), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999), where the only allegations suggesting "the existence of known adverse information contemporaneous with the purported false statements [were] plaintiffs' general assertions that [the company] generated *monthly and weekly internal reports* on the company's performance and held *weekly meetings* with retail buyers."  75 F. Supp. 2d at 54 (emphasis added).  Those allegations were deficient

14

because "plaintiffs d[id] not identify specific reports or meetings, name the actors involved, or indicate the *substance of the data or conversations*." *Id.* (emphasis added).[4]

Similarly, in *In re Target Corp. Securities Litigation*, 275 F. Supp. 3d 1063 (D. Minn. 2017) ("*Target I*"), *reconsideration denied*, 2018 WL 1378755 (D. Minn. Mar. 19, 2018), *aff'd*, 955 F.3d 738 (8th Cir. 2020) ("*Target II*"), the court dismissed a securities class action arising from Target's effort to expand into Canada. The plaintiffs challenged Target's optimistic statements about the new venture even though Target Canada's "warehouse management system had troubles communicating with the central system," the "inventory replenishment system was 'dysfunctional,'" "the point-of-sale system 'often malfunctioned,'" and "customers were 'confronted with empty store shelves,' but, at the same time, Target Canada's 'three massive distribution centers were overwhelmed with excess products.'" 275 F. Supp. 3d at 1068. But the court held that the challenged statements were not false when made because the plaintiffs had not pled facts showing that the defendants had had contrary information when they made those statements. *Id.* at 1071; *accord Target II*, 955 F.3d at 743 (finding "no particularized explanation of how or when Target's executives learned this statement was false"). As here, the attacks on Target's alleged mishandling of the new venture were an impermissible attempt to "bootstrap a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach." *Target I*, 275 F. Supp. 3d at 1075 (internal quotations omitted).

---

[4]    *Accord In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004-05 (N.D. Cal. 2016) (failure to cite contents of specific reports or meetings that allegedly would have alerted defendants to problems about excess inventory); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 306-09 (D.N.J. 2001) (failure to specify what weekly reports defendants saw about inventory, or substance of reports); *see, e.g.*, *In re Newell Brands*, 2019 WL 6715055, at *3, *12 (alleged receipt of weekly "'Point of Sale'" data and "'perfect visibility'" into largest retailer's inventory position did not mean that defendants "were given internal warnings about the precise inventory issues that caused [company] to miss its predicted guidance figures").

Nor does the Complaint plead any facts to support its conclusory allegation [¶ 139(i)] that BBBY did *not* have price management in place by October. The Complaint concedes that BBBY used price-optimization and inventory-management programs (Revionics and JDA); it cites materials touting Revionics' ability to improve margins without cannibalizing sales; and it does not allege that those programs were defective or that BBBY misused them. [*Id.* ¶¶ 65-68]

Contrary to the Complaint's assertion [¶ 139(ii)], BBBY was not obliged to disclose the "risks" of the new program when announcing it in the September letter. The alleged nondisclosure did not make anything that BBBY said misleading, and Plaintiffs do not cite an affirmative disclosure obligation. *See* 17 C.F.R. § 240.13a-13 (quarterly disclosure obligations); *see also SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 2020 WL 6484310, at *9 (D. Del. Nov. 4, 2020) (company "had no duty to disclose a risk that had not actually materialized at the time of the allegedly misleading prior disclosure") (quoting *Williams*, 869 F.3d at 243).

Nevertheless, during the October 2, 2019 investor call, BBBY addressed the program's specific risks (cannibalization of sales) and explained how it hoped to manage them – as the Complaint admits. [Compl. ¶¶ 82-84, 145, 160, 162]

- Ms. Winston said in her opening remarks that the inventory-reduction program – with an expected reduction of $350 million of inventory at retail before the holiday season – would "be accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales." [10/2/19 Tr. at 5 (Ex. I)]

- Ms. D'Elia said: "We are in the early innings of starting that process of removing the inventory from the physical store locations. As we're working through that, we're mindful not to cannibalize sales during this holiday period." [*Id.* at 12]

- Responding to an analyst's question about "the margin impact as we take out the merchandise," Ms. D'Elia said: "we're mindful not to cannibalize sales during the holiday period. And we can, using a third-party liquidator, remove that merchandise from our stores but not have it out in the market competing against ourselves or be liquidating in a heavy fashion during this time frame." [*Id.* at 14]

16

BBBY thus disclosed the risks that Plaintiffs mention, as well as its expectations for addressing them.  And the quarterly report filed on October 9 also discussed various risk factors, including "risks associated with the ability to achieve a successful outcome for [BBBY's] business concepts and to otherwise achieve its business strategies."  [2Q 2019 10-Q at 27 (Ex. J)] *See, e.g.*, *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 562 (D.N.J. 1992) (alleged failure to disclose risks not actionable when disclosures "state[] exactly the fact that plaintiffs contend was covered up"), *aff'd*, 7 F.3d 357 (3d Cir. 1993).[5]

Despite Plaintiffs' allegation, BBBY was not obliged to disclose that it "had no experience executing or overseeing wide-scale markdowns and promotions and was out of its depth" [Compl. ¶ 139(ii)(c)].  *See, e.g.*, *Winer Family Tr. v. Queen*, 2004 WL 2203709, at *14 (E.D. Pa. Sept. 27, 2004) (no obligation to disclose executives' alleged inexperience with implementing companies' strategic plan), *aff'd*, 503 F.3d 319 (3d Cir. 2007).  "[C]ompanies do not have a duty to disclose uncharged, unadjudicated wrongdoing" – which is even more serious than the mere inexperience with which Plaintiffs charge BBBY.  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (internal quotation omitted).

Nevertheless, Ms. Winston did explain during the October 2 call that the "new promotional framework developed around the retail holiday calendar" was "bigger, bolder and beyond anything that we've done before."  [10/2/19 Tr. at 4 (Ex. I)]  The market thus was well aware that BBBY was embarking on a new approach – especially in light of Plaintiffs' insistence that BBBY had been known as a coupon discounter [Compl. ¶¶ 1, 43-45].

The Complaint's assertion [¶¶ 169-70] that BBBY made false statements about risk of "'a major disruption of the Company's information technology system'" is puzzling.  That risk

---

[5]     The October 2, 2019 investor call expressly incorporated the risk warnings in BBBY's SEC filings.  [10/2/19 Tr. at 2 (Ex. I)]

17

warning concerned "'power outages, telecommunications failures, cybercrimes, cybersecurity attacks and other catastrophic events'" [*id.*], but the Complaint does not allege any such disruptions of BBBY's IT systems.  The Complaint does not even allege that Revionics and JDA did not work as expected; in fact, it bases many of its allegations on the data that they purportedly provided [*id.*, *e.g.*, ¶ 141(ii)].

### 2.     Safe-Harbor Protection for Forward-Looking Statements

Regardless of the accuracy of the statements about the newly launched inventory-reduction plan, they are shielded under the PSLRA safe harbor for forward-looking statements.

The September and October announcements were based on BBBY's expectations of how the inventory-reduction program would play out over the next 18 months.  [9/4/19 8-K at 4 (Ex. H)]  And BBBY explained during the October 2 earnings call that more than approximately $350 million of inventory "'will be removed from our stores before the 2019 holiday season'" [Compl. ¶ 145] and that the process was only "'in the early innings'" [*id.* ¶ 164].

Such statements about management's "plans and objectives . . . for future operations" and about future economic performance are clearly forward-looking.  15 U.S.C. § 78u-5(i)(1).  So too are statements whose accuracy cannot be determined until sometime in the future.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 281-82 (3d Cir. 2010).[6]

The Complaint does not allege that Defendants *actually knew* that the program would not work.  And as shown above, Defendants adequately warned of the program's risks.  For both of those independent reasons, the PSLRA safe harbor applies.  *OFI*, 834 F.3d at 491.  Moreover, awareness of and making preparations for a risk does not constitute knowledge that it will occur.

---

[6]     *Accord, e.g.*, *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) ("a statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance"); *see, e.g.*, *In re Leapfrog Enter.*, 200 F. Supp. 3d at 1004 (statements about "expected inventory reduction were forward looking").

18

Relying on the risk's ultimate occurrence to show falsity of the statements when made is an impermissible attempt to prove "fraud by hindsight." *Id*. at 497 (internal quotations omitted).

The safe harbor also protects BBBY's reiteration of guidance for the fiscal year ending February 29, 2020. [Compl. ¶¶ 140-41, 158] Such projections are forward-looking, and the Complaint does not plead any facts suggesting that BBBY *actually knew* by the first days of October that future sales data would be so disappointing that the company would not achieve its full-year estimates. *See, e.g.*, *Williams*, 869 F.3d at 244-46 (revenue projections were not false when made and are within safe harbor in any event).

Contrary to the Complaint's assertion [¶¶ 141, 155], lack of a "reasonable basis" for a forward-looking statement such as earnings guidance cannot create liability. The PSLRA requires *actual knowledge* of falsity, 15 U.S.C. § 78u-5(c)(1)(B); *OFI*, 834 F.3d at 491, not merely lack of a "reasonable basis," and the Complaint does not allege any facts showing BBBY's *actual knowledge*. Nevertheless, BBBY did have a reasonable basis to believe that it could reduce inventory without cannibalizing sales. The Revionics and JDA software and the independent liquidator were supposed to enable BBBY to accomplish that goal. [Compl. ¶¶ 66-68, 78, 145] That BBBY "was in the middle of a management overhaul and search for a new CEO" [*id.* ¶ 141(iii)] does not mean that management did not exist. BBBY had an interim CEO [*id.* ¶ 36], and the market was fully aware of the CEO search. BBBY told investors on October 2 that it was "definitely down to the final weeks" of retaining a CEO [10/2/19 Tr. at 15 (Ex. I)], and it announced the new CEO just one week later, on October 9 [Compl. ¶ 88]. BBBY's quarterly report even included a risk factor about "the ability to attract and retain qualified employees . . . , including a permanent Chief Executive Officer." [2Q19 10-Q at 27 (Ex. J)]

19

Plaintiffs cannot use Mr. Tritton's post-Class-Period statement (on February 18, 2020) that BBBY "'didn't have [price management floated properly] coming into the third and fourth quarter'" [Compl. ¶ 196] to show that Defendants knew *in October 2019* that price management was not under control.  Mr. Tritton did *not* say that BBBY had known *in October* that it did not have "price management floated properly."  (In fact, Mr. Tritton had not even started at BBBY in October.)  Moreover, Plaintiffs' use of Mr. Tritton's after-the-fact assessment is classic – and impermissible – fraud by hindsight.  Post-period statements about reasons for class-period problems "say nothing about Defendants' knowledge or state of mind during the Class Period.  At most, they represent a post-hoc, speculative explanation . . . .  Hindsight statements such as these are insufficient to give rise to a strong inference of scienter" – much less to the *actual knowledge* required under the safe harbor.  *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *18-19 (D.N.J. July 22, 2015) ("*Hertz I*").

### 3.	Protection for Opinions

For similar reasons, Defendants' statements about their expectations for the new inventory-reduction program are inactionable expressions of opinion under *Omnicare*.  Some of those statements were expressly labeled as opinions – for example, Ms. Winston's assertion that "'[w]e believe this aggressive disposition of inventory will enable us to more quickly reset inventory levels . . . to allow for a faster refresh of our assortment, as well as to enable us to refocus store labor activity to better support our customers and drive sales'" [Compl. ¶ 162; *see also, e.g., id.* ¶¶ 147, 156].  But opinions need not use words such as "we believe" or "we think" to fall within *Omnicare*.  *See, e.g.*, *West Palm Beach Firefighters' Pension Fund v. Conagra Brands Inc.*, 2020 WL 6118605, at *16 (N.D. Ill. Oct. 15, 2020) ("[E]ven without qualifiers, the content of future predictions makes the distinction clear:  it is hard to express certainty about the

20

future.").[7]  The question is whether the statements relate to "aspirational goals" that are not

"'determinate' or 'verifiable.'"  *Howard v. Arconic, Inc.*, 395 F. Supp. 3d 516, 549 (W.D. Pa.

2019) (quoting *Omnicare*, 575 U.S. at 184).  BBBY's statements about its plans and hopes for

the inventory-reduction program fit that description.[8]

An opinion cannot be false unless the speaker actually disbelieved the opinion expressed

or the opinion contained false embedded facts.  *Omnicare*, 575 U.S. at 189.  The Complaint

contains no such allegations.  And an opinion cannot be misleading by omission unless it omits

material supporting facts that "*conflict* with what a reasonable investor would take from the

statement itself . . . ."  *Id.* (emphasis added).  A plaintiff "must identify particular (and material)

facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not

conduct or the knowledge it did or did not have – whose omission makes the opinion statement

at issue misleading to a reasonable person reading the statement fairly and in context.  That is no

small task for an investor."  *Id.* at 194 (citation omitted).  As shown above, Plaintiffs have not

pled that any such conflicting facts existed by the end of September 2019.

### 4.    Immaterial Statements of Puffery

Many of the challenged expressions of optimism about the new inventory-reduction

program also are inactionable because they are immaterial puffery:  statements that are "not

determinate [or] verifiable" and are "too imprecise to alter the total mix of available

information."  *Hertz II*, 2017 WL 1536223, at *10-11.  Defendants' statements about

---

[7]    *See also Fialkov v. Alcobra Ltd.*, 2016 WL 1276455, at *5-6 (S.D.N.Y. Mar. 30, 2016) (statements that program "will succeed" and "I'm not worried" about program's success were "merely statements of opinion, that is, expectations for the future rather than presently existing, objective facts") (internal quotations omitted).

[8]    *See, e.g.*, Compl. ¶ 149 ("'Our goal is to ensure our customers see a meaningful difference this critical holiday season while laying the foundation for transforming our company for long-term success.'").

21

"'[m]anag[ing] [the inventory-reduction program] thoughtfully'" [Compl. ¶ 145], BBBY's "'new data-driven insights'" [*id.* ¶ 147], "'feel[ing] good about the progress we are making'" [*id.* ¶ 149], and aspiring "'to ensure our customers see a meaningful difference'" [*id.*] are quintessential puffery.  *See, e.g.*, *Hertz II*, 2017 WL 1536223, at \*10-11 (statements that "'the strategies have been working,'" "'[w]e feel very confident the story is intact,'" and "'[o]ur profitability trend has been fairly significant'" are puffery).[9]

### 5.   No Violation of Item 303 or 105 of Regulation S-K

The Complaint [¶ 168] charges that BBBY and Ms. D'Elia violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, by failing to disclose "the trends and uncertainties" discussed above (the alleged failure to have "'price management floated properly,'" the "real-time data" showing cannibalization of revenues, and the lack of "adequate plans and personnel" to manage inventory reduction [*id.* ¶ 167]).  But it is not clear that this Circuit allows private parties to assert violations of Item 303.  Such alleged violations do not create "an independent cause of action for private plaintiffs" and do not "automatically give rise to a material omission under Rule 10b-5."  *Oran v. Stafford*, 226 F.3d 275, 287-88 (3d Cir. 2000).  Some courts have held that a plaintiff must show that "omissions under Item 303 . . . *independently* violate Section 10(b) and Rule 10b-5," *In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 389 (D.N.J. 2018) (emphasis added), while others have followed the Second Circuit's view that a violation of Item 303 "'can give rise to liability under Rule 10b-5 so long as the omission is material . . . and the other elements of Rule 10b-5 have been established,'" *Hertz I*, 2015 WL 4469143, at \*22 n.21 (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103-04 (2d Cir. 2015)).  In either case, however, Plaintiffs' effort to use Item 303 fails.

---

[9]   *See also, e.g.*, *Target II*, 955 F.3d at 743 n.2 ("'we feel really good about where we are today'" is puffery); *Aetna*, 617 F.3d at 284 ("'dedication to disciplined pricing'" is puffery).

Item 303 (which applies only to specified SEC filings, not to shareholder letters) requires disclosure only of "known" trends and uncertainties; it requires actual knowledge. *Howard*, 395 F. Supp. 3d at 569 ("Item 303 requires that the company have *actual knowledge* of trends or uncertainties when it files with the SEC.") (emphasis added). As explained above, however, the Complaint does not plead facts showing that BBBY *actually knew* in October 2019 about any adverse trends or uncertainties concerning the inventory-reduction program. The program was only one month old when BBBY issued its October 2 and 9 reports for the quarter ended August 31, 2019 (a period that did not cover the new program), so no "trend" could possibly have existed. "As a matter of law, a two-month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303," *Blackmoss Inv. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) – and here, only *one month* had passed since the program began. Moreover, to the extent the risks of sales cannibalization and margin erosion could be called "uncertainties" within the meaning of Item 303, BBBY disclosed those risks. [*E.g.*, Compl. ¶¶ 82-84, 145, 160, 162; *see also* 2Q 2019 10-Q at 27 (Ex. J)]

The Complaint's claim [¶ 171] under Item 105 of Regulation S-K, 17 C.F.R. § 229.105 – alleging BBBY's failure to disclose the "most significant factor relating to the risks in investing in BBBY" [*id.*], namely, the risks related to the inventory-reduction program – is also meritless. Like Item 303, Item 105 neither applies to shareholder letters nor creates an independent cause of action, *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 711 n.10 (3d Cir. 2020), and it requires disclosure only of "the most significant factors *known* to make an investment speculative or risky," *id.* at 711 (emphasis added). "[R]egistrants need not list speculative facts or unproven allegations, even if they fit within one of the identified factors" in Item 105. *Id.* at 713. As explained above, Plaintiffs have not pled any facts showing that, in October 2019, BBBY

23

*actually knew* of undisclosed risks that its new inventory-management strategy would not work as expected. BBBY explained the risks and its plans to address them (Revionics and JDA software and independent liquidator) and warned of its potential inability to achieve its strategic transformations (including inventory reduction). [Compl. ¶¶ 82-84, 145, 160, 162; 2Q 2019 10-Q at 27 (Ex. J); 2018 10-K at 8 (Ex. C) ("BBBY's "execution of the elements of its transformation strategy . . . presents a specific risk in the event [BBBY] is unable to successfully execute its plans or adjust them over time if needed.")]

The Complaint thus fails to plead an actionable misrepresentation in September or October 2019.

### B.    No Material Misrepresentations or Omissions in January 2020

On January 8-9, 2020, BBBY issued its third-quarter financial report. BBBY disclosed declines in quarterly earnings and margins [Compl. ¶¶ 172-73, 183], explained that performance had been affected "'to some extent by self-inflicted issues, like poor inventory management'" [*id.* ¶¶ 19, 174], and withdrew its guidance for fiscal 2019 because of "'headwinds reflected in the Company's results to date'" and "'pressure[s]'" on sales and profitability expected for the fourth quarter [*id.* ¶¶ 172] – but expressed optimism about the "'existing transformation work'" and the inventory-reduction plan [*id.* ¶¶ 177, 179, 186]. None of those statements is actionable.

#### 1.    No False or Misleading Statements

The Complaint [¶¶ 19, 172, 175] attacks the January statements as false or misleading for failing to disclose the "depth" or "full extent" of the inventory-management problems and "margin collapse." But once again, the Complaint does not allege any contrary information that was known at the time and *not* disclosed.

The allegation that Mr. Tritton reviewed "BBBY's inventory problems . . . 'hour by hour'" [*e.g.*, *id.* ¶ 176(i)(a)] does not plead *what* Mr. Tritton purportedly learned from that review

24

about "inventory problems" and why that supposed information made BBBY's January disclosures insufficiently dire.  Moreover, the Complaint misrepresents what Mr. Tritton said. He was not discussing inventory issues; he was explaining BBBY's "'sharp pivots'" in digital marketing when the company realized that its prior effort "'to remain independently profitable in that space and not thinking about the gateway experience on the Thanksgiving period . . . was distorting our true price value equation and what we could mean to the customer.'"  [*Id.* ¶ 96] Based on that realization, "'[w]e made really sharp pivots, . . . and we instantly saw key items we're winning share back.  We're watching it hour by hour.'"  [*Id.*]  The statement was about the interplay between in-store and digital marketing, not about the inventory-reduction program.

Nor did Mr. Tritton say, as the Complaint repeatedly alleges [¶¶ 24, 176(b), 198, 215], that "he knew of BBBY's inventory management problems, including unstocked and minimally stocked shelves, in December 2019 and January 2020."  Those allegations refer to a statement that Mr. Tritton made two months after the end of the Class Period, and they again misrepresent what he said.  Mr. Tritton spoke on April 15, 2020, after the COVID pandemic had hit, and he explained what BBBY had known *in March or April*:  "'it was tough to hit the COVID moment when we just saw some pivots happening in February.  We knew we were plagued by issues in December and January.'"  [Compl. ¶ 198]  Mr. Tritton thus said only that BBBY had known *in March or April* that it had been "plagued by issues in December and January."  He did not say that BBBY had known *in December and January* about those "issues."

Moreover, BBBY's January statements did not hide the "depth" and extent" of any problems or paint an unduly optimistic picture of the coming months.

- The January 8 press release noted the "'headwinds reflected in the Company's results to date'" and warned that BBBY "'expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter.'"  [*Id.* ¶ 172]

25

- Ms. D'Elia cautioned during the January 8 investor call that "we expect our sales and profitability to remain pressured during the fiscal 2019 fourth quarter." [1/8/20 Tr. at 7 (Ex. L)]

- When asked about the fourth quarter during that call, Mr. Tritton said: "[W]e're still in the middle of [Q4], and we're not going to be declaring any numbers there. But we have said that we continue to remain under pressure." [*Id.* at 11]

- He also acknowledged that, "[t]o some extent," BBBY's performance had been "impacted by self-inflicted issues such as poor inventory management" [*id.* at 5].

BBBY thus did not minimize the "'pressures'" and "'headwinds'" it expected to face in the near future. *See, e.g.*, *In re Leapfrog Enter.*, 200 F. Supp. 3d at 1003-04 (statements about "'continued headwinds'" and "'the headwind of the remaining clearance inventory'" "put the alleged misleading statements about carryover inventory in context" and warned investors).

Nor did BBBY minimize the potential problems ahead when it took what Plaintiffs call the "rare and draconian step" of withdrawing, rather than revising, full-year guidance in light of those "'pressure[s]'" and "'headwinds.'" [Compl. ¶¶ 18, 172] If the withdrawal of guidance was as dramatic a gesture as Plaintiffs say it was, it constituted a warning to the market and did not misleadingly downplay the "depth" and "full extent" of the situation [*id.* ¶ 172]. Plaintiffs thus have not pled any facts showing that BBBY was concealing any known problems.

Mr. Tritton's statement that BBBY was "'continuing to accelerate the existing transformation work that was put in place which is really solid, and we've been able to double down on that since me coming aboard'" [*id.* ¶ 177] also was not false or misleading. Plaintiffs appear to believe that continuing the "transformation" was ill-advised or badly handled, but, as shown above, alleged corporate mismanagement is not actionable under the securities laws. And calling the transformation work "'solid'" is immaterial puffery. *See Aetna*, 617 F.3d at 284 (statement touting "'solid and balanced growth'" is puffery); *see also Target II*, 955 F.3d at 743 n.2 ("'[w]e're right where we want to be right now'" is puffery).

26

Nor can Plaintiffs plead a fraud claim based on the statements that "'the team had done a great job in terms of keeping the lid on inventory and really culling through that aged and excess inventory side of the business'" [Compl. ¶ 179] or that BBBY "'has been further evaluating its product assortment and taking aggressive steps to rationalize the assortment and better manage its inventory'" [*id.* ¶ 186]. The Complaint does not plead any facts suggesting that BBBY was *not* culling and trying to manage its inventory. (In fact, Mr. Tritton told the market on February 18, 2020 that BBBY was "'closing at the moment with about 15% less in inventory. So we're operating leaner and getting better turns.'" [Compl. ¶ 195]) And characterizations such as "'great job'" and "'aggressive steps'" are puffery. *See Hertz II*, 2017 WL 1536223, at *10-11 ("'we've got a great track record'" is puffery).[10]

The Complaint [¶¶ 189-90] also attacks the Form 10-Q's risk factor concerning "'major disruption of the Company's information technology systems.'" That risk factor was the same as the one in the second-quarter Form 10-Q [*id.* ¶ 169] – and is irrelevant for the reasons discussed above. This case does not involve any of the issues discussed in that risk factor.

### 2. Safe-Harbor Protection for Forward-Looking Statements

Plaintiffs do not assert that the third-quarter results reported in January were inaccurate, so the allegations that BBBY did not disclose the "depth" of its "inventory problems" or "margin collapse" [Compl. ¶ 172] do not challenge historical data. Instead, they amount to contentions that BBBY misled the market about *future* financial results for the fourth quarter and, perhaps, beyond by not providing sufficient warnings. So too do the apparent allegations that BBBY

---

[10]  *See also, e.g.*, *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 487-88 (D. Del. 2019) (description of compliance program as "'very, very strong'" is puffery); *City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 823 (W.D. Mich. 2012) (statements "referencing 'aggressive marketing' are too squishy, too untethered to anything measurable to communicate anything that a reasonable person would deem important").

downplayed the problems by discussing its plans to "'continu[e] to accelerate the existing transformation work'" and to "'double[] down'" on the inventory-management program. [*Id.* ¶ 177] These statements about future plans and projections were forward-looking and fall within the PSLRA safe harbor, because, as shown above, (*i*) the Complaint does not plead any facts showing that Defendants *actually knew* that future performance would be worse than suggested and that the transformation plans ultimately would not succeed, and (*ii*) BBBY adequately warned investors about upcoming "pressures" and "headwinds," *see, e.g.*, *OFI*, 834 F.3d at 500 (acknowledgment of business implications and risks provided sufficient notice to investors).[11]

Moreover, even under the "no reasonable basis" standard that the Complaint [¶¶ 141, 155] erroneously used for the September/October statements (but does not use for the January ones), BBBY did have a basis for its long-term views about the inventory-reduction program and its belief that the problems experienced in the third quarter could "be rectified going forward" [1/8/20 Tr. at 5 (Ex. L)].

- Although 3Q19 net sales and gross profit were lower than in 3Q18, gross profit as a percent of net sales was identical in both quarters (33.1%). [Compl. ¶ 183] And while the gross-profit margin for the 9 months ended 11/30/19 was lower than for the 9 months ended 12/1/18, the decline resulted "'primarily'" from "'a decrease in merchandise margin, as a result of an incremental reserve for *future* markdowns . . . related to the Company's transformation initiatives.'" [*Id.* (emphasis added)] The decline thus was caused not by third-quarter issues, but by the reserve taken in the *second* quarter for *future* markdowns [*id.* ¶ 162].

- The decline in third-quarter sales resulted to some extent from differences in the calendar. The third quarter of 2018 had included Cyber Monday plus the rest of that week, but the third quarter of 2019 did not. After adjusting for this difference

---

[11]    If Plaintiffs mean that BBBY's accurate disclosure of historical financial data gave rise to a duty to say that *future* results would be worse, any such claim is meritless. *See, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) ("an accurate report of past successes does not contain an implicit representation that the trend is going to continue").

of one less week of holiday sales, comparable sales had declined by only 3.6% (not 8.3%) in the third quarter of 2019 versus 2018.  [1/8/20 Tr. at 6 (Ex. L)]

- In the five-day period from Thanksgiving through Cyber Monday, comparable sales had *increased* by 7.1% in 2019 versus 2018.  [*Id.* at 5]

- Mr. Tritton and Ms. D'Elia also observed that, when BBBY had made changes going into the Thanksgiving period to rebalance the interplay between in-store and digital sales, "we instantly saw key items we're winning share back," and "we were able to deliver positive results." [*Id.* at 12]  BBBY thus was learning lessons that it expected would help in future quarters.

Accordingly, the forward-looking statements involving the inventory-reduction program and its potential impact on future results are protected by the PSLRA's safe harbor.

### 3.    Protection for Opinions

A number of the challenged January statements were also statements of opinion – for example, BBBY's statement that "'[t]he Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter'" [Compl. ¶ 172], Mr. Tritton's calling "'really solid'" the "'existing transformation work that was put in place'" [*id.* ¶ 177], and his statement that "'I think one of the real strengths of the season when we're under pressure is that we were able to maintain our inventories and always look at the mix of sales growth versus inventory growth'" [*id.* ¶ 179].  Once again, the Complaint has not pled any facts showing that the speakers did *not* believe the expressed opinions.  Nor, as explained above, has the Complaint pled any omitted material facts that "conflict[ed] with what a reasonable investor would take from the statement itself" and thus made the opinions misleading.  *Omnicare*, 575 U.S. at 189.

### 4.    No Violation of Item 303 or 105 of Regulation S-K

Apart from the previously discussed legal issues concerning whether private plaintiffs may assert violations of Items 303 and 105, the Complaint's allegations [¶¶ 188, 191] are again deficient.  As explained above, those regulations require disclosure only of *known* trends, uncertainties, and risks, and the Complaint does not plead any facts showing that Defendants

29

*actually knew* in January 2020 that the inventory-management program would not succeed over time. Moreover, data from a single holiday season hardly constitute a "trend" under Item 303. *See Blackmoss Inv. Inc.*, 2010 WL 148617, at *10 ("As a matter of law, a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303."). Defendants also told investors that the Thanksgiving period showed only "a really tight microcosm of time with its hyper focus on price and value and discounts in the market. So it's not a long-running opportunity and not a massively repeatable one." [1/8/20 Tr. at 13 (Ex. L)]

In addition, Defendants were candid with investors when asked to give "some color" on the decision "to do the 25% off the entire purchase multiple times" (*i.e.*, a promotional rather than a coupon strategy). Mr. Tritton explained that the 2019 "Thanksgiving period . . . was the first time that we actually deployed an active mass promotional strategy, not a coupon strategy." That strategy "resonated freely with the customer about value," but, because the Thanksgiving period was not "massively repeatable," BBBY would try to "strike with a simple, effective promotion, and they won't be as steep as we've shown here . . . . [W]e'll balance that out with a portfolio of regular coupon and meaningful promotions. So we're currently reviewing the results that we've had and helping to shape how that becomes a more meaningful effort throughout our 2020 plan . . . ." [*Id.*] BBBY thus disclosed its views on any known trends and uncertainties.

The Complaint therefore does not plead an actionable misrepresentation or omission in January 2020.

## III.   PLAINTIFFS HAVE NOT PLED A STRONG INFERENCE OF SCIENTER.

In addition to failing to plead any actionable material misrepresentation or omission, the Complaint also fails to show that any such alleged misstatement or omission was made with scienter – "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs, Inc. v.*

30

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). While recklessness can meet that standard, it must involve "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading [investors] that is either known to the defendant or is so obvious that the actor must have been aware of it." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 n.4 (3d Cir. 2013) (internal quotations omitted).

To satisfy the PSLRA's scienter requirement, a plaintiff must plead "with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). A "strong inference" must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. *Tellabs* thus requires courts "to conduct a comparative analysis by considering both inferences favorable to the [plaintiff] as well as 'plausible, nonculpable explanations for the defendant's conduct[.]'" *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 114-15 (3d Cir. 2018) (quoting *Tellabs*, 551 U.S. at 324).

To establish scienter as to the Individual Defendants, Plaintiffs must plead facts creating a strong inference for each of them individually. Scienter cannot be pled on a group-wide basis. *E.g.*, *In re NutriSystem Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 575 (E.D. Pa. 2009); *In re Par Pharm. Sec. Litig.*, 2008 WL 2559362, at *9 (D.N.J. June 24, 2008). Nor can scienter be based on a person's corporate position. *In re Alpharma*, 372 F.3d at 149-50.

Where a plaintiff seeks to impose liability on a corporation such as BBBY, "'the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *In re Electronics for Imaging*, 2019 WL 397981, at *10 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap.*, 531 F.3d 190,

31

195 (2d Cir. 2008)).[12]  The Second Circuit recently confirmed that corporate officials' alleged scienter cannot be imputed to the corporation unless those persons "were involved in the dissemination of the fraud."  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).  A complaint must plead some "connective tissue between [the supposedly knowledgeable employees] and the alleged misstatements."  *Id.* at 99.

The Complaint focuses on the alleged scienter of the Individual Defendants:  BBBY's former interim CEO (Ms. Winston), its former CFO (Ms. D'Elia), and its current CEO (Mr. Tritton).  But Plaintiffs have not established a strong inference – or, indeed, *any* inference – of scienter as to any of them.

### A.     No Strong Inference of Conscious Misbehavior or Recklessness

Plaintiffs try to plead Defendants' conscious misbehavior or recklessness by alleging Defendants' access to reports and internal data, Mr. Tritton's "admissions," and Defendants' knowledge of vacancies in BBBY's managerial ranks.  None of those allegations – whether individually or collectively – creates any inference of scienter, and certainly not a strong one.

### 1.     Alleged Access to Reports and Data

Plaintiffs rely on CW-1 to allege that BBBY's CEO and CFO received weekly Revionics reports on inventory levels, pricing, and margins, and attended weekly meetings, all of which information purportedly shows that Defendants knew or recklessly disregarded that the inventory-management program "was cutting margins and cannibalizing sales."  [Compl. ¶¶ 74-77, 207-09]  For numerous reasons, these allegations fail to create an inference of scienter.

---

[12]     The Third Circuit "has neither accepted nor rejected" a "collective scienter" doctrine to show corporate scienter.  *In re Electronics for Imaging*, 2019 WL 397981, at *10.  This Court applied the Second Circuit's standard on the *assumption* that such a doctrine might exist.

First, CW-1 is not a credible witness under the Third Circuit's standard for confidential witnesses ("CWs"). A CW must be "'described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Chubb*, 394 F.3d at 148 (quoting *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000)). CW-1, however, left BBBY in July 2019 [Compl. ¶ 69], two months before the Class Period began in September, and four months before Mr. Tritton arrived as CEO in November, so there is no probability that he would have known what was happening during the Class Period, especially during the holiday season. (In addition, neither CW-1 nor any other witness pleads *any* facts showing what reports Mr. Tritton received or what meetings he attended, let alone what those reports said or what was discussed at those meetings.) Courts routinely disregard allegations of CWs who were not employed during the relevant period.[13]

Moreover, CW-1 was only a divisional merchandise manager in a financially insignificant division [*id.* ¶ 70] and thus was not in a position to have known which senior corporate officers received "weekly Revionics reports" and attended "weekly meetings" [*id.* ¶¶ 74-77, 207-09].[14] *See, e.g.*, *Chubb*, 394 F.3d at 149-53 (not sufficiently probable that CWs in branch offices knew what executives knew); *Hertz I*, 2015 WL 4469143, at *15, *19 (discounting allegations from "regional, low-level" employees not connected to management).[15]

---

[13]    *See, e.g.*, *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at *10 n.7 (D.N.J. July 3, 2019) (court may discount or draw negative inferences about allegations of CWs who left company before class period began); *see also, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 247 (8th Cir. 2008); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 177 (4th Cir. 2007).

[14]    CW-1's division allegedly had "$400 million in annual revenue" [*id.* ¶ 70] – only about 3% of BBBY's annual *net sales* of $12 billion [2018 10-K at 15 (Ex. C)]. The division's percentage of BBBY's "annual revenue" thus was presumably even smaller than 3%.

[15]    *See also Rahman*, 736 F.3d at 245 (no evidence that CWs "had any way of knowing what was discussed in those closed-door meetings"); *In re Synchronoss Techs., Inc. Sec. Litig.*, 2019

33

Second, as discussed above, even if one or more of the Individual Defendants received reports and attended meetings as alleged, CW-1 does not plead *what* those reports said or *what* was discussed at those meetings. The existence of undescribed reports and meeting says nothing about what *information* Defendants allegedly received. *See also In re Campbell Soup Co. Sec. Litig.*, 2020 WL 7022655, at *7 (D.N.J. Nov. 30, 2020) (rejecting scienter allegations for failure to plead "contrary . . . internal data known to the defendants").

Third, neither CW-1 nor any other witness pleads any facts suggesting that Defendants consciously or recklessly disregarded whatever they purportedly learned from the reports and meetings. The Revionics software that allegedly generated those reports was supposed to prevent promotions from eroding margins and cannibalizing sales [Compl. ¶¶ 66-68], and JDA was supposed to manage inventory [*id.* ¶ 78]. The Complaint does not specify any alarming data from Revionics or JDA that Defendants ignored; nor does it allege that those programs were defective or misused, or that Defendants' selection of them was negligent or wrongful. If Revionics and JDA did not prevent the problems that they were supposed to prevent, any such failure does not show Defendants' conscious or reckless misconduct. *See, e.g.*, *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1147 (D. Colo. 2011) (company's purchase of "enterprise resource planning system" to assist in ordering and sales, and creation of "project management team to evaluate [company's] inventory problems," are inconsistent with scienter), *aff'd*, 667 F. App'x 710 (10th Cir. 2016).

Moreover, Defendants' disclosure decisions show affirmative steps to be transparent with the market, not to misrepresent or conceal allegedly material information. As Plaintiffs admit, BBBY withdrew its FY2019 guidance in January 2020 – a move that the Complaint [¶ 18]

WL 2849933, at *10 (D.N.J. July 2, 2019) (discounting allegations by CW not "personally involved in the transaction" in question).

34

characterizes as "a rare and draconian step."  BBBY thus was not trying to hide anything; it took what Plaintiffs call an extreme measure.  Moreover, the next month, BBBY *voluntarily* announced preliminary financial results for the first two months of the quarter [*id.* ¶ 21, 102] – something it had no obligation to do, but nevertheless did to promote transparency.  BBBY could have waited until April, when its fourth-quarter report was due, but it chose to provide an interim report to the market two months earlier than required.  Indeed, one analyst expressed surprise during the ensuing conference call that BBBY had made three separate announcements within a one-week period between February 11 and 18, 2020, instead of rolling them together.  Mr. Tritton responded that, while it would have been desirable to combine disappointing news about sales with good news about other matters (the sale of a business and the capital-allocation plan), BBBY had wanted to report the preliminary fourth-quarter results "to manage [the market's] expectations" before the other two items were ready for disclosure.  [2/18/20 Tr. at 7 (Ex. M)]  This voluntary transparency hardly suggests an intent to deceive.  *See, e.g.*, *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 748 (N.D. Tex. 2018) (voluntary early disclosure of "disappointing sales" undercuts inference of scienter), *aff'd*, 935 F.3d 424 (5th Cir. 2019).

### 2.  Mr. Tritton's Alleged "Admissions"

Contrary to the Complaint's allegations [¶¶ 198, 215], Mr. Tritton did not "admit" in April 2020 that BBBY "knew of the inventory issues in December 2019 and January 2020."  As an initial matter, statements made *after* the Class Period do not show scienter *during* the Class Period.  *E.g.*, *Hertz I*, 2015 WL 4469143, at *19 (post-period statements "say nothing about Defendants' knowledge or state of mind during the Class Period.").  But more important, as discussed above, the Complaint misrepresents Mr. Tritton's comments.  Mr. Tritton was

speaking in April 2020 and said only that BBBY had known *in March or April* that it had been "'plagued by issues in December and January.'" [Compl. ¶ 198] He did not say that BBBY had known *in December and January* about those "'issues.'" [*Id.*]

Similarly, Mr. Tritton's purported post-Class-Period "admission" on February 18, 2020 that BBBY "'didn't have ["price management floated properly"] coming into the third and fourth quarter'" [*id.* ¶ 212] did not say that BBBY had known *coming into those quarters* that it did not have proper price management. He was providing a *post hoc* assessment of what had happened several months earlier. And even an admission of alleged mismanagement does not constitute scienter. *See, e.g.*, *Hertz II*, 2017 WL 1536223, at *16 ("although the Restatement [of financials] admits to mismanagement and admits that the mismanagement impacted company accounting decisions, that by itself is not actionable").

### 3.      Knowledge of "Critical Vacancies"

The Complaint's allegations [¶¶ 220-21] that Defendants knew about "critical vacancies" resulting from the termination or resignation of certain employees also do not create any inference of conscious misbehavior or recklessness. The vacated positions, even if "critical," were filled with "'interim leads'" [*id.* ¶ 91], and Plaintiffs do not allege that those leaders were incapable *and known to be so*. Moreover, the market was informed of the employees' departures. [*Id.*] And the departures of certain managers in December 2019 were hardly surprising, inasmuch as the new CEO had just arrived in November and had embarked on a leadership restructuring and transformation plan. [*Id.* ¶¶ 90, 91][16]

---

[16]      While the Complaint also alleges [¶¶ 26, 37] that BBBY's CFO resigned in May 2020 (three months after the Class Period ended), that allegation does not appear in the scienter section [¶¶ 203-37]. This Court has made clear that senior managers' resignations do not prove scienter, and the Third Circuit agreed. *Hertz II*, 2017 WL 1536223, at *20-21, *aff'd*, 905 F.3d at 121.

36

**B.      No Strong Inference of Scienter from "Motive and Opportunity" Allegations**

Plaintiffs also try to establish scienter by alleging that Defendants had "motive and opportunity" to commit fraud.  In this Circuit, however, allegations of motive and opportunity do not provide an independent, alternative way to plead scienter; they must simply be considered in combination with other allegations, which, as shown above, are deficient.  *E.g., Hoey v. Insmed*, 2018 WL 902266, at *21 (D.N.J. Feb. 15, 2018) (citing *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268 (3d Cir. 2009)); *see, e.g.*, *Patel v. Zoompass Holdings, Inc.*, 2018 WL 10154207, at *9 (D.N.J. Aug. 8, 2018) (because court rejected allegations of conscious or reckless misconduct, allegations of motive and opportunity could not satisfy PSLRA's pleading requirements).  But in any event, Plaintiffs' motive allegations are legally inadequate.

The Complaint [¶¶ 227-28] alleges that the Individual Defendants were "motivated to commit fraud" to address certain "Activist Investors' concerns about BBBY's stagnant and bloated inventory" and "low margins" because Defendants wanted "to maintain their jobs."  But the desire to maintain one's job is common to all corporate officials and thus is too generalized to constitute a legally cognizable motive to commit securities fraud.  *See, e.g.*, *In re Alpharma*, 372 F.3d at 152-53 (rejecting allegations of officers' desire to "maintain continued employment" and other motives that "could be made against virtually any for-profit entity") (internal quotations omitted).[17]  (The allegation is particularly weak as to Ms. Winston, who was only an *interim* CEO.  [Compl. ¶ 36])  Moreover, to the extent Defendants succeeded in addressing the "activists'" concerns about inventory and margins, they would have benefited *all* shareholders,

---

[17]      *See also In re Digital Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir. 2004) (same); *Party City*, 147 F. Supp. 2d at 314 (rejecting claims that defendants sought "to 'protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby'").

not just the "activists" or themselves. *E.g.*, *In re Digital Island*, 357 F.3d at 329 (no scienter where defendants stood to benefit "in the same manner as any other [company] shareholder").

The related allegation that, because BBBY had tried unsuccessfully to reduce inventory in 2018, Ms. Winston and Ms. D'Elia were "acutely aware of the need to make inventory reduction work this time" [Compl. ¶¶ 222-23] is similarly deficient. If an allegation that corporate officials were "acutely aware of the need to make [their plans] work" could show scienter, none of them would ever be safe from a securities class action. Courts routinely reject this type of universally applicable allegation. *See, e.g.*, *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) ("[m]otives that are generally possessed by most corporate directors and officers do not suffice") (internal quotations omitted).

The allegations [Compl. ¶¶ 229-37] that the Individual Defendants were "motivated to commit fraud" to increase the value of their stockholdings and to "maintain their exorbitant salaries" fail for the same reason: they are not specific enough to create, or even add to, a strong inference of scienter. *E.g.*, *In re Electronics for Imaging*, 2019 WL 397981, at *10 (rejecting allegations of defendants' "desire to increase their compensation, including through artificially inflating the value of the company's stock"); *accord In re Alpharma*, 372 F.3d at 152-53; *McLaughlin v. Cendant Corp. (In re Cendant Corp. Sec. Litig.)*, 76 F. Supp. 2d 539, 548 (D.N.J. 1999) (generalized allegations that individual defendant wanted to support stock price are insufficient). Where, as here, the Complaint does not plead that any Individual Defendant *sold* stock to take advantage of an allegedly inflated price, "inflating stock prices for personal financial gain . . . amounts to nothing more than general motives to aid the company." *In re Electronics for Imaging*, 2019 WL 397981, at *10 (internal quotations omitted). Indeed, the absence of any allegation that any Defendant personally benefited by selling stock at purportedly

38

inflated prices undercuts any inference of scienter. *Hoey*, 2018 WL 902266, at *21 ("[C]ourts have consistently weighed [a lack of insiders' stock sales] against an inference of scienter.").

C.    **Plaintiffs' Inferences of Scienter Are Not as Strong as an Opposing Inference of Nonfraudulent Conduct.**

Whether viewed separately or as a whole, Plaintiffs' allegations of scienter are neither cogent nor compelling; they are illogical. Securities cases usually involve allegations that the defendants tried to keep their alleged misconduct from becoming public so they could profit from it in some concrete way. But here, Defendants could not hope to hide the alleged "scheme." BBBY had to report its financial results every quarter, so the market was going to learn of the alleged "cannibalization" of revenues and mismanagement of inventory within three months. The Complaint does not allege that Defendants misrepresented BBBY's historical performance in quarterly reports or did anything to maximize their personal advantage *before* the accurate quarterly results became public. Defendants thus had nothing to gain from any alleged misconduct. And as shown above, BBBY's risk warnings in January 2020 and its voluntary preliminary disclosure of disappointing results for the first two months of the fourth quarter in February 2020 worked *against* any personal interests that the Individual Defendants allegedly had in preserving their positions, their compensation, and the value of their stockholdings. *See Int'l Bhd. of Elec. Workers Local 697 v. Limited Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011) ("[I]f Defendants' goal was to artificially inflate [retailer's] stock price, what would be the point of concealing the problems at the [new] distribution center and with the [new software program], but then still accurately reporting sales and financial results – results that were clearly being impacted by the problems with the initiatives?").

In contrast to the illogical inference of scienter that Plaintiffs seek to draw, the far more compelling inference is that, during a time of significant transformation at the BBBY,

39

Defendants initially expressed good-faith optimism about their ability to implement a new and ambitious strategy while acknowledging the strategy's potential risks, and then promptly and forthrightly disclosed to investors when that strategy experienced initial challenges.

Accordingly, Plaintiffs have failed to establish a strong inference of scienter as to the Individual Defendants. Their allegations of corporate scienter thus fail as well because Plaintiffs have not created a strong inference of scienter on the part of anyone whose knowledge could be imputed to BBBY under *Dynex* and *Jackson*.

## IV.   PLAINTIFFS HAVE NOT PLED A CONTROL-PERSON CLAIM.

The Complaint [¶¶ 272-75] asserts a control-person liability claim under Exchange Act § 20(a) against the Individual Defendants. That claim requires Plaintiffs to establish a primary violation by the controlled person (BBBY), the alleged controlling person's control over BBBY, and the controlling person's "culpable participa[tion]" in the underlying violation. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013) (internal quotations omitted).

As explained above, no primary violation occurred, and the Individual Defendants did not engage in any culpable conduct. Moreover, the Complaint does not allege any facts showing that Ms. Winston, who stepped down as interim CEO on November 4, 2019 [Compl. ¶¶ 36, 89], controlled BBBY's financial reporting and disclosures after that date – or that Mr. Tritton, who did not become CEO until November 4, 2019 [*id.* ¶ 89], controlled them before that date. Accordingly, the § 20(a) claim should be dismissed as to all Individual Defendants.

**CONCLUSION**

The Court should therefore dismiss the Complaint in its entirety and with prejudice.

Dated: December 21, 2020

/s/ Edna D. Guerrasio
Edna D. Guerrasio
Jonathan E. Richman (admitted *pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, New York  10036
(212) 969-3000
eguerrasio@proskauer.com
jerichman@proskauer.com

*Attorneys for Defendants*

41

120910466v2

# APPENDIX A

## Appendix A

| Complaint Paragraph (¶) | Allegedly False/Misleading Statement | Reason(s) Inactionable |
|---|---|---|
| | **September 4, 2019 8-K (Letter to Shareholders)** | |
| ¶ 138 | "The Board and management team are aligned around four key priorities . . . .  These priorities include . . . reviewing and optimizing the Company's asset base, including the portfolio of retail banners . . . ." <br><br> "Reviewing and Optimizing Our Asset Base – An aggressive reduction of up to $1 billion of inventory is expected to be executed over the next 18 months, including the removal of excess aged inventory from our stores anticipated before the 2019 holiday season.  This effort should allow us to quickly reset inventory levels in both our stores and distribution centers, as well as refresh our assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance." | • No duty to disclose additional information <br><br> • No misstatement; nothing materially false or misleading <br><br> • Forward-looking statement ("FLS") within safe harbor <br><br> • Opinion |
| | **October 2, 2019 8-K (2Q Earnings Release)** | |
| ¶ 140 | Updated Financial Outlook:  "Fiscal 2019 . . . net earnings per diluted share are estimated to be between $2.09 and $2.13" | • No misstatement; nothing materially false or misleading <br><br> • FLS within safe harbor <br><br> • Opinion |
| | **October 2, 2019 2Q Earnings Call** | |
| ¶ 143 | Winston:  "[W]e have provided a lot of transparency around the things that we are doing to advance our strategic priorities, including plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months, including the removal of aged inventory from our stores before the 2019 holiday season to refresh our assortment and support top line performance; the initiation of a rapid store refresh of nearly 160 of our highest volume and most profitable Bed Bath & Beyond stores to improve the in-store shopping experience . . . ." | • No misstatement; nothing materially false or misleading <br><br> • FLS within safe harbor |
| ¶ 145 | Winston:  "In the short term, more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season.  This will be | • No misstatement; nothing materially false or misleading |

| | | |
|---|---|---|
| | accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales." | • FLS within safe harbor<br>• Opinion<br>• Puffery |
| ¶ 147 | Winston: "A core component of our sales stabilization efforts and our transformation overall is based on new data-driven insights that we are using to identify opportunities for improving our customer value proposition . . . .<br><br>We continue to make strategic pricing decisions to deliver noticeable value to our customers. These strategies include refining our dynamic pricing algorithms and online and in-store pricing actions to address customer price perceptions. The implementation of markdown optimization software and processes is accelerating sell-through, resulting in less aged inventory and optimizing the profitability of our seasonal and fashion assortment. We believe that more effective pricing will drive both top line growth and profit improvement." | • No misstatement; nothing false or misleading<br>• FLS within safe harbor<br>• Puffery<br>• Opinion |
| ¶ 149 | Winston: "We feel good about the progress we are making against our 4 key near-term priorities, including . . . reviewing and optimizing the company's asset base, including the portfolio of retail banners . . . . Today, I would like to provide an update on the progress we have made against each of our 4 priorities as well as what this means for our path forward. Our goal is to ensure our customers see a meaningful difference this critical holiday season while laying the foundation for transforming our company for long-term success." | • No misstatement; nothing materially false or misleading<br>• FLS within safe harbor<br>• Puffery<br>• Opinion |
| ¶ 152 | D'Elia: "[T]hat merchandise margin, which I'm talking about on a consolidated basis, the trend in that has been improving due to some of the ongoing initiatives that we have in place. . . . And then we've also continued with some strategic pricing initiatives, which has helped benefit our margin. And we have more to come." | • No misstatement; nothing materially false or misleading<br>• FLS within safe harbor<br>• Opinion<br>• Puffery |
| ¶ 154 | D'Elia: "[W]e are shifting dollars into the back half for promotional and marketing support. Those dollars are being generated from ongoing transformation initiatives. And those dollars that we're planning to invest will be spent on promotional events during Thanksgiving week through Cyber Monday . . . . In terms of quantifying it, we've built it all in for the model, and those – the reinvestment of those dollars is allowing us to maintain | • No misstatement; nothing materially false or misleading<br>• FLS within safe harbor<br>• Opinion |

2

|  |  |  |
|---|---|---|
|  | our top line at around $11.4 billion [revenues] as well as maintain our bottom line within the previously guided range." |  |
| ¶ 156 | Winston: "So we believe, given the number of levers we have to pull and the number of opportunities we have in the business, that we can drive sales and we may be on promotion, of course, through the holiday season and be doing more advertising.  But we think we have other levers to pull to control the cost structure to maintain profitability." | • No misstatement; nothing materially false or misleading<br><br>• FLS within safe harbor<br><br>• Opinion |
| ¶ 158 | D'Elia:  BBBY was "maintaining our guidance of the sales around $11.4 billion and then EPS between $2.08 and $2.13." | • No misstatement; nothing materially false or misleading<br><br>• FLS within safe harbor<br><br>• Opinion |
| ¶ 160 | D'Elia:  "So on the inventory, you're asking about the margin impact as we take out the merchandise.  Again, we're mindful not to cannibalize sales during the holiday period.  And we can, using a third-party liquidator, remove that merchandise from our stores but not have it out in the market competing against ourselves or be liquidating it in a heavy fashion during this time frame." | • No misstatement; nothing materially false or misleading<br><br>• FLS within safe harbor<br><br>• Opinion |
| ¶ 162 | Winston: "[W]e have plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months. . . .  We believe this aggressive disposition of inventory will enable us to more quickly reset inventory levels . . . to allow for a faster refresh of our assortment . . . .  In the short term, more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season.  This will be accomplished through a series of markdowns and clearance events, as well as with the assistance of the independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales . . . ." | • No misstatement; nothing materially false or misleading<br><br>• FLS within safe harbor<br><br>• Opinion<br><br>• Puffery |
| ¶ 164 | D'Elia:  "From a timing perspective, in the short term, we are planning that – to have about $350 million of the inventory out of the stores before holiday.  We are in the early innings of starting that process and of removing the inventory from the physical store locations.  As we're | • No misstatement; nothing materially false or misleading<br><br>• FLS within safe harbor<br><br>• Opinion |

3

| | | |
|---|---|---|
| | working through that, we're mindful not to cannibalize sales during this holiday period." | |
| **2Q 2019 Form 10-Q** | | |
| ¶ 166 | Form 10-Q (signed by D'Elia): "This incremental reserve for future markdowns was the result of the Company's strategic decision to reduce inventory by up to $1.0 billion at retail over the next 18 months.  This reduction is being driven by the acceleration of the Company's inventory rationalization efforts, including reductions of aged and duplicative SKUs within the Company's assortment.  By taking this action, the Company is seeking to reset its inventory levels in both stores and distribution centers, as well as refresh its assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance." | • No misstatement; nothing materially false or misleading<br>• FLS within safe harbor<br>• Opinion<br>• No Item 303 violation; no known trends omitted |
| ¶ 169 | Form 10-K (incorporated in 2Q 10-Q):  "The Company's operating results could be negatively impacted by a major disruption of the Company's information technology systems.  The Company relies heavily on these systems to process transactions, manage inventory replenishment, summarize results and control distribution of products." | • No misstatement; nothing materially false or misleading<br>• No Item 105 violation; no known risks omitted |
| **January 8, 2020 8-K** | | |
| ¶ 172 | FY19 Results:  "The Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter.  Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton . . . , the Company believes it is appropriate to withdraw its fiscal 2019 full year financial guidance." | • No misstatement; nothing materially false or misleading<br>• FLS within safe harbor<br>• Opinion |
| **January 8, 2020 Earnings Call** | | |
| ¶ 173 | D'Elia:  "Th[e] 80 basis point decline is primarily due to a decrease in merchandise margin driven by a higher level of promotional activity in the quarter and was partially offset by a decrease in net direct-to-customer shipping expense." | • No misstatement; nothing materially false or misleading |
| ¶ 174 | Tritton:  "Performance was impacted to some extent by self-inflicted issues, like poor inventory management . . . .  We're experiencing short-term pain, some of which has been self-inflicted." | • No misstatement; nothing materially false or misleading<br>• Opinion |

4

| ¶ 177 | Tritton: "I want to be really clear here, continuing to accelerate the existing transformation work that was put in place which is really solid, and we've been able to double down on that since me coming onboard." | • No misstatement; nothing materially false or misleading<br>• FLS within safe harbor<br>• Opinion<br>• Puffery |
|---|---|---|
| ¶ 179 | Tritton: "I think one of the real strengths of the season when we're under pressure is that we were able to maintain our inventories and always look at that mix of sales growth versus inventory growth. And the team had done a great job in terms of keeping the lid on inventory and really culling through that aged and excess inventory side of the business." | • No misstatement; nothing materially false or misleading<br>• Opinion<br>• Puffery |
| **3Q 2019 Form 10-Q** | | |
| ¶¶ 182, 189 | Form 10-K (incorporated in 3Q 10-Q): "The Company's operating results could be negatively impacted by a major disruption of the Company's information technology systems. The Company relies heavily on these systems to process transactions, manage inventory replenishment, summarize results and control distribution of products." | • No misstatement; nothing materially false or misleading<br>• No Item 105 violation; no known risks omitted |
| ¶ 183 | Form 10-Q (signed by D'Elia): "This incremental reserve for future markdowns was the result of the Company's strategic decision to reduce inventory by up to $1.0 billion at retail from the end of the second quarter of fiscal 2019 through the end of fiscal 2020. This reduction is being driven by the Company's inventory rationalization efforts, including reductions of aged and duplicative SKUs within the Company's assortment. By taking this action, the Company is seeking to reset its inventory levels in both stores and distribution centers, as well as refresh its assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance." | • No misstatement; nothing materially false or misleading<br>• No Item 303 violation; no known trend<br>• FLS within safe harbor<br>• Opinion |
| ¶ 186 | Form 10-Q: "In other activity, the Company has been further evaluating its product assortment and taking aggressive steps to rationalize the assortment and better manage its inventory. These are among the early accelerated actions being taken to lay the foundation to create a new vision for the Company." | • No misstatement; nothing materially false or misleading<br>• FLS within safe harbor<br>• Opinion |

5

120549903v4