## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

STEPHEN AND JUNE VITIELLO,
Individually and On Behalf of All Others
Similarly Situated,

                        Plaintiffs,

     v.

BED BATH & BEYOND, INC., MARK J.
TRITTON, MARY A. WINSTON, AND
ROBYN M. D'ELIA,

                      Defendants.

No. 2:20-cv-04240-MCA-MAH

<u>JURY TRIAL DEMANDED</u>

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................3

ARGUMENT .............................................................................................................8

    I.      LEGAL STANDARDS .............................................................................8

    II.     PLAINTIFFS PLEAD ACTIONABLE MISSTATEMENTS AND OMISSIONS .........................................................................................8

            A.     Winston's Shareholder Letter Concealed the Program's Key Risks ..............................................................................................9

            B.     Defendants Introduce and Misrepresent the Program's Key Risks ............................................................................................10

            C.     BBBY's Projections are Actionable Because They Lacked A Reasonable Basis............................................................................15

            D.     Plaintiffs' Allegations Concerning Inventory Data Are Sufficient...............................................................................................17

            E.     The FAC Does Not Allege Fraud By Hindsight................................18

            F.     Most of Defendants' Statements Are Not Opinions; The Few That Are, However, Are Still Actionable Under *Omnicare* ................................................................................20

            G.     This Case Is Not About Mismanagement .........................................21

            H.     Defendants' January 8, 2020 Statements Were Also Misleading .......................................................................................21

            I.     Defendants Violated Regulation S-K ...............................................23

                 1.     Defendants Violated Item 303 ........................................23

                 2.     Defendants Violated Item 105 ........................................24

    III.    THE SAFE HARBOR DOES NOT IMMUNIZE DEFENDANTS ..........................25

            A.     Forward-Looking Statements ............................................................25

            B.     BBBY's Risk Warnings Were Insufficient........................................26

C.    Plaintiffs Allege Actual Knowledge As To Any Forward-Looking Statements ...............................................................27

IV.    PLAINTIFFS SUFFICIENTLY ALLEGE SCIENTER ...........................................28

A.    Plaintiffs Adequately Allege Conscious Misbehavior and Recklessness ...............................................................................29

1.    Defendants' Real-Time Access to and Receipt of Weekly Reports Concerning Inventory Data Strongly Support Scienter...................................................29

2.    Tritton's Admissions Also Support A Strong Inference of Scienter ..........................................................34

3.    Defendants' Discussions With Analysts Further Support Scienter.................................................................35

4.    Defendants Knew BBBY's Critical Management Vacancies Further Undermined the Program and Their Statements About It.....................................................37

5.    The Resignation of BBBY's CFO Shortly After Pulling Guidance and Slashing Margins Further Supports an Inference of Scienter .....................................37

B.    The Individual Defendants Were Also Motivated to Commit Fraud.......................................................................................38

1.    The Individual Defendants Wanted to Please the Activist Investors ...............................................................38

2.    Defendants Knew BBBY Tried To Reduce Inventory Before.................................................................................39

3.    The Individual Defendants Were Motivated to CommitFraud to Increase their BBBY Stock and Compensation ...................................................................39

C.    Plaintiffs' Allegations Collectively Show Scienter ............................40

CONCLUSION...............................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................... 8

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ......................................................... 24

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) *("Chubb")* ................................................. 17, 19, 31, 33

*Cats v. Prot. One, Inc.*,
   2001 WL 34070630 (C.D. Cal. June 4, 2001) ...................................................... 39

*Chan v. New Oriental Educ. & Tech. Grp. Inc.*,
   2019 WL 2865452 (D.N.J. July 3, 2019) .............................................................. 32

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014) ..................................................................................... 8

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) .............................................. *passim*

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
   442 F. App'x 672 (3d Cir. 2011) ........................................................................... 37

*Curran v. Freshpet, Inc.*,
   2018 WL 394878 (D.N.J. Jan. 12, 2018) ...................................................... passim

*Employees Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
   2020 WL 3026536 (D.N.J. June 5, 2020) ....................................................... 13, 16

*Fialkov v. Alcobra Ltd.*,
   2016 WL 1276455 (S.D.N.Y. Mar. 30, 2016) ...................................................... 20

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018) .................................................................. 16

*Glover v. DeLuca*,
   2006 WL 2850448 (W.D. Pa. Sept. 29, 2006) ..................................................... 33

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019) ................................................................. 29

*Hoey v. Insmed Inc.*,
2018 WL 902266 (D.N.J. Feb. 15, 2018) ................................................................... 40

*Howard v. Arconic Inc.*,
395 F. Supp. 3d 516 (W.D. Pa. 2019) ....................................................................... 20

*Hull v. Glob. Digital Sols., Inc.*,
2017 WL 6493148 (D.N.J. Dec. 19, 2017) ................................................................. 28

*I.B.E.W. v. Ltd. Brands, Inc.*,
788 F. Supp. 2d 609 (S.D. Ohio 2011) ...................................................................... 37

*Ieradi v. Mylan Labs., Inc.*,
230 F.3d 594 (3d Cir. 2000) ........................................................................................ 9

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) ...................................................................................... 13

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020) ............................................................ passim

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999) ......................................................................... 14, 15, 28

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010) ...................................................................................... 22

*In re Alpharma Inc. Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004) ................................................................................ 21, 39

*In re Anadigics, Inc., Sec. Litig.*,
2011 WL 4594845 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012) ............... 33

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ....................................................... 34, 35

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) .................................................................................... 15

*In re Campbell Soup Co. Sec. Litig.*,
2020 WL 7022655 (D.N.J. Nov. 30, 2020) ................................................................ 31

*In re Ceridian Corp. Sec. Litig.*,
542 F.3d 240 (8th Cir. 2008) ..................................................................................... 32

*In re Constar Int'l Inc. Sec. Litig.*,
585 F.3d 774 (3d Cir. 2009) ........................................................................ 8

*In re CPI Card Grp. Inc. Sec. Litig.*,
2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ........................................................ 24

*In re Craftmatic Sec. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989) ........................................................................ 15

*In re Crocs, Inc. Sec. Litig.*,
774 F. Supp. 2d 1122 (D. Colo. 2011), *aff'd sub nom.*
*Sanchez v. Crocs, Inc*, 667 F. App'x 710 (10th Cir. 2016) ........................................ 31

*In re Digital Island Sec. Litig.*,
357 F.3d 322 (3d Cir. 2004) ........................................................................ 39

*In re Elecs. for Imaging, Inc. Se*c. Litig.,
2019 WL 397981 (D.N.J. Jan. 31, 2019) ....................................................... 21, 28

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2015 WL 4469143 (D.N.J. July 22, 2015) (*"Hertz I"*) ...................................... 33, 34, 35

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2017 WL 1536223 (D.N.J. Apr. 27, 2017*) ("Hertz II"), aff'd,*
905 F.3d 106 (3d Cir. 2018) ............................................................... 22, 35, 38

*In re Hertz Glob. Holdings Inc*,
905 F.3d 106 (3d Cir. 2018) ................................................................... 22, 40

*In re Horsehead Holding Corp. Sec. Litig.*,
2018 WL 4838234 (D. Del. Oct. 4, 2018), *report and recommendation adopted by*
2019 WL 1409454 (D. Del. Mar. 28, 2019) ........................................................ 20

*In re Landry's Seafood Rest., Inc.*,
2001 WL 34115784 (S.D. Tex. Feb. 20, 2001) ..................................................... 13

*In re Leapfrog Enter., Inc. Sec. Litig.*,
200 F. Supp. 3d 987 (N.D. Cal. 2016) ......................................................... 18, 22

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005) ........................................................................ 32

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2002) ...................................................................... 19

*In re Newell Brands, Inc. Sec. Litig.*,
2019 WL 6715055 (D.N.J. Dec. 10, 2019), *aff'd,*
No. 20-1292, 2020 WL 7040968 (3d Cir. Dec. 1, 2020) ...................................... 18, 21

*In re Party City Sec. Litig.*,
  147 F. Supp. 2d 282 (D.N.J. 2001) ................................................................. 18

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ............................................................... 29, 32

*In re RAIT Fin. Tr. Sec. Litig.*,
  2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ............................................... 29

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ......................................................................... 13

*In re Synchronoss Techs., Inc. Sec. Litig.*,
  2019 WL 2849933 (D.N.J. July 2, 2019) ..................................................... 34

*In re Sturm, Ruger & Co. Inc. Sec. Litig.*,
   2011 WL 494753 (D. Conn. Feb. 7, 2011) ........................................... 13, 29

*In re Target Corp. Sec. Litig.*,
  275 F. Supp. 3d 1063 (D. Minn. 2017) ....................................................... 18

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) .......................................................... 32

*In re Valeant Pharm. Int'l, Inc. Sec. Litig.*,
  2017 WL 1658822 (D.N.J. Apr. 28, 2017) .................................................. 38

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ................................................................ passim

*Jaroslawicz v. M&T Bank Corp.*,
  962 F.3d 701 (3d Cir. 2020), *cert. denied*,
  2021 WL 231655 (U.S. Jan. 25, 2021) ........................................................ 25

*Levy v. Gutierrez*,
  2017 WL 2191592 (D.N.H. May 4, 2017) ................................................... 38

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011) ................................................. 29

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ................................................................................. 24, 40

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016) ....................................................................... 17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) .............................................................................. passim

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) .................................................................... 24

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) .......................................... 23

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013) .............................................................. 33, 34

*Ressler v. Liz Claiborne, Inc.*,
75 F. Supp. 2d 43 (E.D.N.Y. 1998), *aff'd sub nom.*
*Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999) ................ 18

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)....................................... *passim*

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977).................................................................................. 21

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000) ................................................................. 9, 27

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
2020 WL 6484310 (D. Del. Nov. 4, 2020) .............................................. 10

*Sun v. Han*,
2015 WL 930454 (D.N.J. 2015)……………………………………………………..8

*Tanaskovic v. Realogy Holdings Corp.*,
2021 WL 211049 (D.N.J. Jan. 21, 2021).................................................. 20

*Teachers' Ret. Sys. Of LA v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ................................................................... 32

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................. 3, 28, 38, 41

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................. 38

*Town of Davie Police Pension Plan v. Pier 1 Impo*rts, Inc.,
325 F. Supp. 3d 728 (N.D. Tex. 2018*), aff'd sub nom.*
*Mun. Employees' Ret. Sys. of Mich. v. Pier 1 Imports,* Inc.,
935 F.3d 424 (5th Cir. 2019) ................................................................... 37

*United States ex rel. Wilkins v. United Health Grp., Inc.*,
659 F.3d 295 (3d Cir. 2011) ...................................................................... 8

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
2020 WL 6118605 (N.D. Ill. Oct. 15, 2020) ........................................................ 17, 20

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2015 WL 3755218 (E.D. Pa. June 16, 2015) ............................................................. 38

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017) ..................................................................................... 14

*Winer Family Tr. v. Queen*,
503 F.3d 319 (3d Cir. 2007) ..................................................................................... 19

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ................................................................................... 32

## **Statutes**

15 U.S.C. § 77z–2(c)(1)(A)(i)..................................................................................... 25

Lead Plaintiff Kavin Bakhda, and additional named plaintiff Richard Lipka ("Plaintiffs") submit this memorandum of law in opposition to Defendants' motion to dismiss (the "Motion" or "Mot." or "Br.") the Amended Class Action Complaint (the "FAC").[1]

## PRELIMINARY STATEMENT

Defendants' Motion should be denied because the FAC sufficiently alleges Defendants knowingly or recklessly made misstatements and omissions of material fact about BBBY's $1 billion inventory reduction program (the "Program"). Defendants first omitted the Program's key risks – revenue cannibalization and undermining margins (the "Key Risks") – then belatedly misrepresented that these risks were under control ahead of BBBY's "critical" holiday season (the "Holidays"). Defendants also issued projections they knew or recklessly disregarded were unachievable. At all times relevant, Defendants had real-time access to, and received weekly reports containing, detailed data about BBBY's inventory and margins (the "Inventory Data") that went to the heart of the Program and contradicted their public statements. In the end, the Key Risks Defendants claimed to have addressed materialized with a vengeance, burning BBBY's margins and cannibalizing revenues during the Holidays. As the market learned the truth, BBBY stock fell (twice), about 20% each time, causing investors to lose hundreds of millions of dollars. CEO Tritton later admitted that the Program was never planned properly.

In their Motion, Defendants challenge Plaintiffs' allegations of falsity, materiality, and scienter, but none of their arguments warrant dismissal of the FAC. First, Defendants claim Plaintiffs have not alleged enough detail about the Inventory Data to show their statements were misleading. Wrong. CW-1, BBBY's former divisional merchandise manager, explained that the

---

[1] Definitions herein are incorporated from the Motion. "Defendants" are Bed Bath & Beyond, Inc. ("BBBY" or the "Company"), Interim CEO Mary Winston, CEO Mark Tritton, and CFO Robyn D'Elia. Undefined terms are defined in the FAC and paragraph cites are to the FAC.

Inventory Data (from Revionics software) was comprehensive and included inventory levels, pricing, and margins down to the SKU level as well as product color and size. CW-1 also stated that weekly reports with this Inventory Data were sent to BBBY's CEO and CFO. These are sufficiently specific allegations at this stage – particularly when viewed collectively with BBBY's acknowledgment that it used Revionics software; Winston's acknowledgement that BBBY used such software to facilitate the Program; and Revionics' website touting the software's "real-time" access to detailed inventory, pricing, and optimization data. Defendants' comparison to cases involving general references to internal reports is, thus, groundless.[2]

Second, Defendants claim their purported risk language insulates them, and that almost all their statements are protected "opinions" under *Omnicare*, *Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Wrong again. Defendants initially concealed the Program's Key Risks from investors, and only belatedly disclosed them by claiming that the Key Risks were "thoughtfully" addressed. *See infra* at 10. That is not a risk warning; it's the very opposite. Further, Defendants' claim that the risks of BBBY's "bold" business transformation and $1 billion Program were "self-evident" (Br. 1, 2) falls flat because Defendants cannot escape liability by claiming investors generally know some problems might appear along the way – the securities laws do not work that way. It is well established that general or boilerplate risk language cannot insulate defendants, nor can unrelated, cherry-picked risk language from months before the Program was even announced. *See infra* at 27. Defendants spoke at length about the Program, radically overselling it and understating its risks. That is actionable. As to Defendants' purported opinion statements, opinions are actionable when, as here, they do not align with current information. *See infra* at 20. The Inventory Data

---

[2] Defendants' mischaracterization of the FAC as a fraud-by-hindsight pleading fails for the same reason. Plaintiffs here detailed contemporaneous facts in the FAC.

here provided Defendants with contemporaneous data contradicting their "opinions". Further, many of the statements Defendants claim are opinions are not, in fact, opinions. *See id*. at 20.

Third, as to scienter, Defendants repeatedly suggest motive is required, but the U.S. Supreme Court has held otherwise. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (scienter can be pled in "absence of motive allegation"). Ignoring *Tellabs*, Defendants claim the inference that they knowingly or recklessly made misstatements and omissions when they would not "profit from [them] in some concrete way" is "illogical". Br. 39. Their argument fails. The FAC has detailed motive allegations. *See infra* at 38-40. Defendants mischaracterize them as boilerplate but they are particular – including the motive to placate certain activist investors who restructured BBBY in mid-2019. Also, Plaintiffs' conscious misbehavior and recklessness scienter allegations – including real-time access to and weekly receipt of the Inventory Data and Tritton's admissions – alone plead scienter.

Finally, Defendants repeatedly make their own factual assertions, tacitly asking the Court to adopt their own inferences from the FAC's allegations. *E.g.*, Defendants claim Tritton's admission that BBBY knew of inventory issues in "December and January" of 2019 meant something entirely different. It is black letter law that Defendants are not entitled to their own inferences here. Thus, all of Defendants' competing inferences should be rejected.

For these reasons and those discussed below, the Motion should be denied in its entirety.

**STATEMENT OF FACTS**

**Background**

BBBY is a retailer of domestic merchandise and furnishings. Prior to the Class Period, BBBY was underperforming, in part because it relied too heavily on coupon mailers. ¶44. In early 2019, Activist Investors demanded BBBY address weak sales, improve margins, and optimize inventory. ¶¶50-53. In response, BBBY began to overhaul management and

3

implement a new strategy focused on promotions and markdowns. ¶45. This strategy depended on BBBY's ability to manage and optimize inventory, especially during the Holidays. ¶43.

**BBBY Announces the $1 Billion Inventory Reduction Program But Conceals Its Key Risks**

On September 4, 2019, the first day of the Class Period, Winston issued a letter to BBBY shareholders addressing the Activist Investors' concerns. ¶58. In that letter, Winston introduced the Program, claiming it would "reduce up to $1 billion of inventory" over 18 months, including by removing excess aged inventory before the Holidays. Winston stressed that the Program would prioritize sales of higher-margin goods, and "allow us to quickly reset inventory levels in both our stores and distribution centers, as well as refresh our assortment, providing for newness and higher-margin products, all…to…support top-line performance." *Id. See also* ¶138. The letter did not identify key risks with the Program. After the September 4 letter, BBBY's stock price jumped 7%, as the market viewed the Program as essential to BBBY's turnaround. ¶59.

**Defendants Introduce the Program's Key Risks by Claiming They Were Addressed**

During an earnings call on October 2, 2019, Winston and D'Elia first introduced the Key Risks of the Program by claiming that these risks had been "thoughtfully" addressed, including through the use of industry software. ¶¶46, 62-64, 67. Defendants relied heavily on this software, which provided them with "real-time" access to detailed Inventory Data. *Id.* CW-1 also confirmed that the Inventory Data from this software was compiled into weekly reports sent to BBBY's CEO and CFO, who also attended weekly meetings at BBBY's headquarters. *See* ¶¶46-47, 49, 67-68, 73, 75-76.[3] According to CW-1, the weekly reports were "very detailed", including data on inventory levels, pricing, and margins, all the way down to the SKU level,

---

[3] CW-1 was a divisional merchandise manager for BBBY from Summer 2017 to July 2019 at BBBY's Union, NJ headquarters. ¶69.

which included product color and size. ¶75. This Inventory Data went to the very heart of the Program, revealing its successes and failures to Defendants.

During the October 2 call, D'Elia and Winston assured investors that the newly-introduced Key Risks were nothing to worry about. D'Elia represented that "on the inventory, you're asking about the margin impact as we take out the merchandise. Again, we're mindful not to cannibalize sales during the holiday period." ¶160. D'Elia also stated that the Program was protecting BBBY's margins when, in fact, it was undermining them. ¶¶160-161.

Winston likewise claimed BBBY was removing aged inventory through the Program to "refresh" BBBY's assortment and make room for high volume, higher margin goods before the Holidays. ¶80. Winston trumpeted BBBY's "new data-driven insights" and industry software, stating that these were fueling the Program. ¶¶82, 147. Winston further claimed BBBY would remove over "$350 million of inventory" and that "[t]his will be accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales" (¶81).

**BBBY Issues Misleading Guidance and Conceals the Negative Impact of the Program**

On October 2, 2019, BBBY also slightly lowered its FY2019 net earnings per share guidance to between $2.08 and $2.13, and claimed, as part of the Program, it would remove $350 million in inventory by year-end.[4] ¶61. This was not the full picture because, as Tritton later admitted, BBBY did not even "have price management [a central facet of the Program] floated properly" as of September 1, 2019. ¶196. Moreover, BBBY's Inventory Data already showed by this time that the Program was causing inventory shortages in higher-margin products,

---

[4] On April 10, 2019, BBBY issued FY2019 net earnings per diluted share of $2.11 to $2.20. On July 10, 2019, BBBY estimated it to be toward the lower end of the range. ¶¶56-57.

cannibalizing revenues, and reducing margins ahead of the Holidays. ¶141. In other words, the Program was doing exactly what Defendants said it would not: expose BBBY to the Key Risks.

**Defendants Conceal That Management Vacancies Further Undermined the Program**

Management vacancies also impeded the Program. In December 2019, BBBY disclosed that Tritton fired six senior managers, including the Chief Merchandise Officer (CMO) – a role critical to the Program that went unfilled until March 2020. ¶91. Defendants did not disclose BBBY lacked adequate personnel to execute the Program. *See* ¶¶121, 87-91.

**BBBY Pulls Guidance And Begins to Reveal Falling Margins, But Not Their Full Extent**

On January 8, 2020, BBBY announced an adjusted net loss of $.38 per share (far below the $.02 consensus), withdrew its guidance, and reported falling margins. ¶92. While executives often revise guidance when warranted, pulling it altogether is a rare and draconian step. ¶93.

On a January 8, 2020 conference call, D'Elia further revealed that BBBY's gross margins fell by 80 basis points "primarily due to a decrease in merchandise margin driven by a higher level of promotional activity in the quarter[.]" ¶94. Analysts realized the significance of BBBY's plunging margins, which they noted were its "largest adjusted EPS loss in [] history". ¶100. *See also* ¶101. On the same call, when discussing BBBY's problems at the end of 2019, Tritton confirmed that BBBY monitored inventory "hour-by-hour". ¶96. After the adverse January 8 revelations, BBBY's share price plummeted almost 20%. ¶20. However, BBBY still did not reveal the extent of its inventory problems or how profoundly the Program cut margins.

**The Full Truth is Revealed: The Key Risks Ravage BBBY**

On February 11, 2020, BBBY disclosed that the Program did precisely what Defendants represented it would not – cannibalize revenues and collapse margins (far more than revealed on January 8, 2020). ¶102. BBBY reported lower sales caused by "inventory management issues, and increased promotional activity and markdowns" and admitted that "inventory within certain key categories…was too low or out-of-stock..." *Id*. BBBY even conceded the need to

"immediately reform[] its…inventory management procedures to master the fundamentals." *Id*.

BBBY stock fell 20% after these disclosures. ¶103. Analysts again pounced on BBBY and noted that the Program's promotions caused the largest margin decline in over 10 years.[5]

**Post-Class Period Admissions Reveal Defendants Knew of Problems Early On**

On February 18, 2020, after the close of the Class Period, Tritton admitted that going forward "[w]e're going to have price management floated properly, ***which we didn't have coming into the third and fourth quarter***", *i.e.*, September 1, 2019. ¶23. The Program was about reducing $1 billion in inventory through price reductions and markdowns. If BBBY could not manage prices since September 1, 2019, then the Program was fatally flawed from inception.

On April 15, 2020, BBBY held a conference call to discuss its FY2019 results – which included FY2019 diluted earnings per share of only $.46, radically below BBBY's repeated guidance of $2.08 to $2.13. ¶113. Tritton admitted during the call that "***[w]e knew we were plagued by issues in December and January***,…[s]ome of it was self-inflicted." *Id*. Tritton also admitted BBBY's inventory management was in such a shambles that customers "just couldn't find [] product in stock." *Id*. As a result, Tritton conceded that the Program "burn[ed]…the margin and we burn[ed] a lot of inventory and weren't prepared to get back into stock." ¶121.

**BBBY's CFO Resigns and BBBY Announces the Program Will Take Twice As Long**

On April 30, 2020, BBBY announced that CFO D'Elia had resigned. ¶26.

On July 14, 2020, BBBY stated it "expect[ed] further improvement in working capital through the removal of about $1 billion of inventory at retail…***over the next 24 months***." ¶27. Thus, the Program would take twice as long as claimed back in September. ¶27.

---

[5] *See* ¶104 (BBBY's gross margins had plunged by 300 basis points – the "largest decline in 10+ years"); ¶106 ("[w]e think BBBY's increased promotions heavily impacted its GM (this line was down -300 bps in Dec/Jan vs. the cons. of -50 bps for 4Q)"); ¶194 ("[h]igher promotional activity drove the gross margin weakness"). *See also* ¶¶104, 107.

**ARGUMENT**

## I. LEGAL STANDARDS

A complaint defeats a 12(b)(6) motion by alleging a facially plausible claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[P]lausibility…is not akin to… probability…[but] asks for more than a sheer possibility that…defendant…acted unlawfully." *Iqbal*, 556 U.S. at 678. The Court's role on a 12(b)(6) motion is not to determine whether the non-moving party "will ultimately prevail", but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). Moreover, this Court has recognized that defendants cannot "dispute [a complaint's] allegations" because "at the motion to dismiss stage, the Court is obliged to accept all factual allegations in the Complaint as true." *Curran v. Freshpet*, 2018 WL 394878, at *6 (D.N.J. 2018) (Arleo, J.). Plaintiffs are entitled to all reasonable inferences on a motion to dismiss. *See Sun v. Han*, 2015 WL 930454, at *8 (D.N.J. 2015).

To state a claim under Section 10(b), a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase of a sale or security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council*, 754 F.3d 159, 167 (3rd Cir. 2014). Here, Defendants contest falsity, materiality, and scienter. As discussed below, their arguments fail, and Plaintiffs' FAC should be sustained.

## II. PLAINTIFFS PLEAD ACTIONABLE MISSTATEMENTS AND OMISSIONS

Plaintiffs adequately plead that Defendants made misstatements and omissions of material fact. A misstatement or omission is material "if there is a substantial likelihood that a

8

reasonable shareholder would consider it important in making an investment decision." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 783 (3d Cir. 2009).  This Court has noted that "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law".  *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *8 (D.N.J. July 27, 2018) (Arleo, J.).[6]  Here, Defendants' misrepresentations and omissions were not "so clearly unimportant" as to be immaterial as a matter of law.  *See id.*  To the contrary, Defendants' misrepresentations and omissions were highly material because they prevented investors from understanding the true nature and risks of the $1 billion Program, including the impact of the Program on the Holidays.

### A.  Winston's Shareholder Letter Concealed the Program's Key Risks

Winston announced the Program via a shareholder letter on September 4, 2019, but omitted to disclose that there were any particular risks to the Program at that time. Winston's "vague" and "blanket" risk disclaimers did not suffice.  *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000).[7]  ¶¶138-139.  Defendants claim Winston's letter is not misleading because "nothing had happened yet" as the Program was new and "the alleged nondisclosure did

---

[6] *See also Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 599 (3d Cir. 2000) (with "room for differing opinions on the issue of materiality, the question should be left for jury determination").

[7] The September 4, 2019 letter only warned of general risks that cannot insulate Defendants from liability.  *See* September 4, 2019 8-K (warning of "risks associated with the ability to achieve a successful outcome for business concepts and to otherwise achieve its business strategies; the impact of goodwill and intangible asset impairments; disruptions to the Company's information technology systems including but not limited to security breaches of systems protecting consumer and employee information or other types of cybercrimes or cybersecurity attacks; reputational risk arising from challenges to the Company's or a third party product or service supplier's compliance with various laws, regulations or standards, including those related to labor, health, safety, privacy or the environment; reputational risk arising from third-party merchandise or service vendor performance in direct home delivery or assembly of product for customers").

not make anything that BBBY said misleading". Br. 13, 16. Not so. The letter falsely claimed that the Program was all upside with no particular risk, *i.e.*, it "include[ed] the removal of excess aged inventory…anticipated before the [Holidays,]" which "should…provid[e] for newness and higher-margin products" (138).[8] Defendants were surely aware of the Key Risks at that time.[9]

## B. Defendants Introduce and Misrepresent the Program's Key Risks

Approximately one month after the shareholder letter, Winston casually introduced the Key Risks of the Program – but represented that BBBY had "thoughtfully" addressed them so they would not be an issue. Specifically, Winston stated during the October 2 call that over "$350 million of inventory at retail will be removed from our stores before the [Holidays]" through "a series of markdowns and clearance events [and] the assistance of a… liquidator, all to be managed thoughtfully to prevent cannibalization of sales." ¶145. *Cf.* ¶162.

Winston also touted that "[t]he implementation of markdown optimization software and processes is accelerating sell-through, resulting in less aged inventory and ***optimizing the profitability*** of our seasonal and fashion assortment." ¶147. Moreover, D'Elia stated that BBBY's margin "trend [was] improving [with] more to come." ¶152. After an analyst "wanted to clarify" that inventory issues "would not have a gross margin impact towards the rest of the year", D'Elia reassured him: "[O]n the inventory, you're asking about the margin impact as we take out the merchandise…we're mindful not to cannibalize sales during the [Holidays]." ¶160.

---

[8] Defendants claim that as of September 4, 2019 there were no key risks to disclose. On the contrary, since the start of the Program, there were risks of revenue cannibalization and margin collapse – and BBBY's touted software showed they were inevitable. Tritton also admitted that BBBY lacked proper price management since September 1, 2019. ¶196. Defendants' citation on this point falls flat. *See SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 2020 WL 6484310, at *9 (D. Del. Nov. 4, 2020) (risk of *possible* future adverse legal decision had not materialized).

[9] Defendants argue that Plaintiffs do not link Winston to statements after she left BBBY, or Tritton to statements before he became CEO (Br. 12), but Plaintiffs do not seek to.

These statements were materially false and misleading when made. At the time they were made, BBBY's software contemporaneously exposed the materialization of the Program's Key Risks, including that BBBY's promotions and markdowns were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the Holidays. *See* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201. *See also* ¶¶94, 102, 104, 106-108. The Inventory Data from this software was not only accessible to Defendants in real-time – it was digested for them in detailed weekly reports, as related by CW-1, who also stated that the CEO and CFO would attend weekly meetings together at BBBY's headquarters. ¶¶75-76. Because this data was so important to BBBY, and to the success of the Program, it was closely watched (as Tritton admitted, "hour by hour") or recklessly disregarded by Defendants.

This Court's decision in *Curran*, 2018 WL 394878, at *1, is instructive here. In *Curran*, the plaintiffs alleged that defendants issued misleading statements and guidance about pet food manufacturer Freshpet's branded refrigerators; namely, they failed to disclose that "issues with its largest customers and most popular products…ultimately stunted the growth of its Fridges." *Id*. This Court found defendants' statements misleading because the defendants "***received production updates*** from Freshpet's Bethlehem facility reflecting the alleged manufacturing problems with Freshpet's shredded product". 2018 WL 394878, at *4. Here, Defendants received weekly reports "reflecting the alleged [inventory] problems". *See id*. Plaintiffs' allegations are even stronger as Defendants also had real-time access to Inventory Data. ¶¶47, 62-68, 96.

The Third Circuit's decision in *Avaya*, is also on point. In *Avaya*, the CEO "repeatedly assured analysts… that although there was pressure in the market, there were no significant changes to the pricing environment" – despite the fact that "competition was forcing unusually large 20% to 40% price discounts that were hurting profit margins." *Institutional Inv'rs Grp. v.*

11

*Avaya Inc.*, 564 F.3d 242, 268 (3d Cir. 2009) (*"Avaya"*). The Court held that the "[s]hareholders have pled unusual price discounting with the particularity required by the PSLRA". *Id*. at 264. Here too, Defendants' statements were misleading because they did not disclose that, as reflected in the Inventory Data, "price discounts [] were hurting [BBBY's] profit margins." *Id*. at 268.

Other courts have upheld analogous allegations. For example, in *City of Providence v. Aeropostale, Inc*., 2013 WL 1197755 (S.D.N.Y. March 25, 2013), Aeropostale addressed bloated inventory by "discounting slow-moving merchandise and offering various promotions." *Id*. at *2. The defendants represented that "[w]e feel like we are appropriately attacking the inventory problem." *Id.* at *4. In addition, one Aeropostale executive gave "an evasive answer about margin pressure" in response to an analyst question. *Id*. Like BBBY, Aeropostale had an "***information management system…used to track inventory levels, sales data, pricing and margins (all in real-time)***" that plaintiffs alleged showed defendants that margins would be undermined. *Id*. at *2. The plaintiffs alleged these statements were misleading because defendants "failed to disclose…the sales and inventory problems would only get worse[.]" *Id*. at *5. The court found defendants' "ability to track sales on a daily basis" allowed them to "surmise relatively early" that inventory problems would undermine margins. *Id*. at *11.

Here, Defendants had more than "the ability to track sales on a daily basis" – they actually did so, as related by Tritton, on an "hour-by-hour" basis, and Defendants were also given an accounting of detailed Inventory Data through weekly reports. ¶¶75-76. Despite continual access to, and reception of, this adverse information, Defendants "understated [BBBY's] sales and inventory problems [and concealed that] the markdowns and promotions

would adversely affect the company's margins and earnings more substantially than Defendants advise[d]". 2013 WL 1197755, at *6.[10]

Courts have also found similar representations misleading in the context of revenue cannibalization. In *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267, 271-72 (3rd Cir. 2004), defendants represented that Adams Golf sold its goods only to select distributors, although the company knew Costco (not one of these distributors) was selling certain Adams Golf clubs. The Third Circuit found that defendants had concealed the danger that Costco was cannibalizing Adams Golf's revenues, holding that defendants' statements "may have…led a reasonable investor to conclude that the selective distribution model was functioning properly." 381 F.3d 277-78. *See also In re Landry's Seafood Rest., Inc.*, 2001 WL 34115784, at *3, 7 (S.D. Tex. Feb. 20, 2001) (upholding statements involving cannibalization of revenues). Here, Defendants stated they were "thoughtfully" ensuring that the Program did not cannibalize BBBY's revenues ahead of the Holidays.[11] As in *Adams Golf*, Defendants' statements "may have…led a reasonable investor to conclude that the [Program] was functioning properly" with regard to revenue cannibalization. 381 F.3d 277-78. Indeed, Defendants told investors they were addressing this particular risk through sophisticated inventory software.

---

[10] *See also In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *7 n.4 (D. Del. Feb. 7, 2020) (statements that "for 2017, we will deliver positive sales comp growth and a modest increase in operating margin" and "we're going to close the margin gap versus our competition" actionable); *In re Sturm, Ruger & Co., Inc. Sec. Litig.*, 2011 WL 494753, at *3 (D. Conn. Feb. 7, 2011) (statement that "liquidation…will not have a material impact" misleading where "negative consequences" of liquidation were undisclosed); *Employees Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *6-7 (D.N.J. 2020) (statements implicating inventory actionable); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 70 (2d Cir. 2001) (statement that returns were at "normal" levels misleading where returns increased markedly).

[11] *See*, *e.g.*, ¶145 (Winston stated BBBY would manage the markdowns and clearance "thoughtfully to ***prevent*** cannibalization of sales"); 160 (with respect to the Program, D'Elia stated that "we're mindful ***not to cannibalize sales*** during the holiday period").

It is also well-settled that "[o]nce a company has chosen to speak on an issue…it cannot omit material facts…[rendering] its disclosure misleading." *Williams v. Globus Med., Inc*., 869 F.3d 235, 241 (3d Cir. 2017). Defendants made representations about the Program, including that they were guarding against the Key Risks. But after putting the issues in play, they concealed that the Program had already begun to and would continue to cannibalize revenues and cut margins. *See supra* at 11. These omissions render Defendants' statements actionable.[12]

Defendants offer other numerous unavailing arguments. For example, they try to escape liability by claiming that their October 2 and 9, 2019 statements technically related to the second quarter, which ended on August 31, 2019 (before the Program began). Br. 13. This argument fails for the same reasons already discussed *supra* at 9, as well as because as of October 2019, Winston and D'Elia had been steadily receiving Inventory Data about the Program's adverse effects. *See*, *e.g.*, ¶¶141, 144, 146. Relatedly, Defendants argue they did not have a duty to speak about the first month of 3Q19 (September 2019) in October 2019 (Br. 14). However, once Defendants discussed the Program and downplayed its Key Risks (which they did on the October 2 call), they had a duty to speak completely about those risks – which they did not do since their statements directly contradicted what the Inventory Data showed at that time. Thus, Defendants' reliance on cases holding no duty to disclose intra-quarter information is misplaced. *See* Br. 14.

Defendants also claim that certain of their statements are inactionable "puffery", which is defined as "vague and general statements of optimism ... [that] are understood by reasonable investors as such." *In re Advanta Corp. Sec. Litig*., 180 F.3d 525, 538 (3d Cir. 1999). For example, Defendants mischaracterize as puffery Winston's statement that "more than

---

[12] Defendants' claim that they had no duty to disclose their inexperience with markdowns and promotions (compared to coupons) misses the mark. Plaintiffs do not allege Defendants had a duty to disclose such information in a vacuum; rather, Plaintiffs allege such inexperience was one of many reasons ***why the statements Defendants made*** were misleading. *See, e.g*., ¶139.

approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season [through] a series of markdowns and clearance events…all to be managed thoughtfully to prevent cannibalization of sales." ¶145. This is hardly a "vague and general statement of optimism" (*see Advanta*, 180 F.3d at 538) as Winston specified how much inventory would be removed and assured that cannibalization of sales – one of the chief risks of the Program – would not be an issue. Further, Winston was referring to the *$1 billion* Program – material by any measure. Defendants' other examples relate to the vitally important Holidays or trumpet BBBY's key software. *See* ¶149 ("Our goal is to ensure our customers see a meaningful difference this [Holidays]"); ¶147 (boasting of "new data-driven insights").[13]

### C. BBBY's Projections are Actionable Because They Lacked A Reasonable Basis

Defendants also cannot escape liability for their guidance projections here because it is settled law in the Third Circuit that a projection is actionable when issued "without a reasonable basis." *Advance Auto*, 2020 WL 599543, at *2 (citing *In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645–46 (3d Cir. 1989)). *See also In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1427, 1429 (3d Cir. 1997). Significantly, a projection lacks a reasonable basis and is actionable if it was made, as it was here, with "an inadequate consideration of the available data". *Advance Auto*, at *2 (citing *Burlington*, 114 F.3d at 1429).

*Aeropostale* is again on point. While liquidating inventory, defendants issued 1Q EPS guidance "of $0.35 to $0.38…which reflect[ed] the impact of the…markdown liquidation" and issued 2Q guidance "reflect[ing] [] plans to aggressively clear through spring inventories[.]" 2013 WL 1197755, at *4, 6. The plaintiffs alleged that these, among other, statements were misleading because Aeropostale's inventory and margin tracking system showed "sales and

---

[13] Defendants also cite as puffery a statement Plaintiffs do not allege is misleading. *See* Br. 22 (citing Winston's statement that BBBY was "feeling good about the progress we are making").

inventory problems [and that] the markdowns and promotions would adversely affect…margins …more…than… advise[d]". *Id*. at *6. The court found defendants' projections actionable:

> [Plaintiffs allege] facts that I must presume are true—that, if proved, demonstrate that Defendants knew that this was not a problem limited to inventory overhang for 4Q2010, or even 1Q2011, at the time those statements were made…. [Defendants] had the ability to track sales on a daily basis, and so could undoubtedly surmise relatively early [that inventory problems would continue to undermine earnings guidance]. *Id.* at *11.

Similarly, Defendants here repeatedly issued unachievable EPS guidance. On October 2, 2019, BBBY issued FY2019 EPS guidance of $2.08 to $2.13, which it reiterated on the October 2 call. ¶¶61, 154. This guidance was misleading because, like in *Aeropostale*, BBBY's software provided detailed Inventory Data showing Defendants that the Program was cutting into margins and materially undermined the guidance. *See also Conduent*, 2020 WL 3026536 at *10 (guidance actionable where defendants had "no reasonable basis to believe that Conduent could achieve these results in light of the issues that eventually caused Conduent to miss its projections – issues of which they were aware throughout the Class Period").[14]

Defendants claim BBBY's guidance had a reasonable basis because BBBY's software was reliable. Br. 19. This argument fails. First, Defendants' spin is inappropriate at this stage. *See supra* at 8. Second, the FAC alleges the software and weekly reports show Defendants knew the guidance lacked a reasonable basis – not the opposite. Indeed, BBBY's software provided detailed Inventory Data about inventory, pricing and ***plummeting*** margins – which BBBY only partially disclosed in January and then fully disclosed in February 2020. The software was not a magic panacea to ensure the Program did not undermine margins or cannibalize revenues.[15]

---

[14] *See also Galestan v. OneMain Holdings, Inc.,* 348 F. Supp. 3d 282, 299 (S.D.N.Y. 2018) (earnings guidance actionable where CWs reported that a loan originator knew or recklessly disregarded increased loan delinquencies).

[15] Defendants wrongly claim lack of a reasonable basis cannot support allegations that a projection was misleading (Br. 19). *See Advance Auto*, 2020 WL 599543 at *3 ("[c]ourts have

### D. Plaintiffs' Allegations Concerning Inventory Data Are Sufficient

Defendants argue to no avail that Plaintiffs do not allege enough specificity about BBBY's Inventory Data to support the FAC's claims. *See*, *e.g.*, Br. 14 (FAC "does not plead what those data showed or that they revealed any cause for concern by the end of September"). First, the FAC alleges that, based on CW-1, the weekly reports from Revionics included detailed information on inventory levels, pricing, and margins, all the way down to the SKU level, which included product color and size – all of which go to the heart of the Program and tracking its progress (or lack thereof). ¶74.[16] This is more than sufficient specificity, especially given Defendants' own acknowledgement that they used this software (¶¶46, 47, 49, 67, 68), including for the Program (¶¶73-76), and that revenue cannibalization, price optimization, and promotions are the precise issues the software was designed to address (¶¶65, 67). *See Curran*, 2018 WL 394878, at \*4 (this Court found that "production updates…reflecting the alleged manufacturing problems with Freshpet's shredded product" that were sent to individual defendants were sufficiently specific to support a finding that the defendants' statements were misleading).

Defendants' case citations on this point only undermine their argument. In *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) (*"Chubb"*), the plaintiffs relied on a single internal memorandum. Here, Plaintiffs allege that Defendants had real-time access to Inventory Data (¶¶47, 96); received *weekly* reports with "very detailed" Inventory Data

---

found that projections lack a reasonable basis where defendants were aware of contradictory internal forecasts"). Defendants' own authority agrees. *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 2020 WL 6118605, at \*16 (N.D. Ill. Oct. 15, 2020) ("standard for forward-looking statements" requires "specific facts" showing predictions "lacked a reasonable basis"). Even if lack of reasonable basis was insufficient (which it is not), Plaintiffs also allege Defendants *knew* their statements lacked a reasonable basis, satisfying the safe harbor's actual knowledge standard. *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491 (3d Cir. 2016) (cited by Defendants, *see* Br. 19).

[16] The SKU contains a code referring to "price" and "product details". *See* https://www. investopedia.com/terms/s/stock-keeping-unit-sku.asp.

such as inventory levels, pricing, and margins (¶75); and attended *weekly* meetings (¶14). Plaintiffs also allege who received these reports and their source (Revionics). *See* ¶¶75-76. This is more than enough under *Chubb*. 394 F.3d at 147. (plaintiffs must "specify the internal reports, who prepared them and when,…or which company officers reviewed them").[17]

### E.   The FAC Does Not Allege Fraud By Hindsight

Defendants mischaracterize this case as fraud by hindsight, but that does not survive analysis. Plaintiffs allege detailed contemporaneous facts showing Defendants' statements were materially misleading when made; namely, through BBBY's Inventory Data (*see supra* at 17), which showed the Program's promotions and markdowns were having material adverse consequences, *e.g.*, cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the Holidays (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201). The Inventory Data further showed BBBY was selling higher margin

---

[17] Defendants other citations on reports are also unavailing. *See Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 53 (E.D.N.Y. 1998) (rejecting "unsupported general claim…of confidential company reports"; here, a former senior BBBY employee specified the software used, the level of detailed data, and who received weekly reports from it, and BBBY separately confirmed its use of the software), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999); *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004-05 (N.D. Cal. 2016) (rejecting allegations that failed to "mention…contents of reports, or to allege their sources of information about any reports"; Plaintiffs here did both); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 306-09 (D.N.J. 2001) (unlike here, plaintiffs did not provide enough information about CWs who purportedly supported allegations – and CWs were not even mentioned until opposition brief); *In re Newell Brands, Inc. Sec. Litig.*, 2019 WL 6715055, at *3, 12 (D.N.J. Dec. 10, 2019) (reports with sales data did not amount to "internal warnings about the precise inventory issues that caused Newell to miss its predicted guidance figures"; here, Revionics reports warned of the "precise inventory issues" plaguing BBBY; namely, plummeting margins and cannibalized revenues), *aff'd*, No. 20-1292, 2020 WL 7040968 (3d Cir. Dec. 1, 2020). Defendants' reliance on *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1068 (D. Minn. 2017), also fails. *See id.* (rejecting "general" allegations containing adverse information and "not connect[ed] [to] specific problems to any specific statements"). Plaintiffs do both.

goods and that such goods could not be restocked ahead of the Holidays (*see* ¶¶94, 102, 104, 106-108).[18]

Defendants' case authorities on fraud by hindsight underscore how different this case is. For example, in *Chubb*, 394 F.3d at 158, the Third Circuit rejected allegations relating to an initiative to turn around defendant Chubb. The *Chubb* plaintiffs characterized defendant's statement that "it is a big ship and it does take a while to turn" "as amounting to a representation that the initiative was already 'contributing to a strong bottom line in the first quarter'". 394 F.3d at 158. Here, in contrast, Defendants made concrete statements about the Program, including about preventing revenue cannibalization and increasing margins. *See supra* at 10. More importantly, the Third Circuit in *Chubb* characterized as fraud-by-hindsight the plaintiffs' attempt "to infer that Chubb's reported prior combined ratios were fraudulent from the fact that Chubb's reported combined ratio increased to 130% in the third quarter". *Id*. at 158 n.20. Plaintiffs here allege Defendants statements were misleading not because of a later rise in a financial metric, but because, *inter alia*, Revionics provided BBBY's CEO and CFO with real-time, and weekly, information that contradicted their public statements.[19] Thus, Defendants' claim that Plaintiffs "do[] not cite any contemporaneous information contradicting [their] statements" and "relies only on after-the-fact developments" (Br. 9) is inaccurate.[20]

---

[18] Defendants also argue Plaintiffs do not allege Revionics software did not work. Br. 18. Defendants miss the point. Plaintiffs allege Revionics software provided Defendants with real-time data, and weekly reports, on margins and inventory, and that Defendants either consciously or recklessly ignored this data showing the Program's negative impact. ¶¶47, 73-76, 96.

[19] Tritton also later admitted "hour-by-hour" awareness of inventory issues. ¶96.

[20] Defendants' other fraud-by-hindsight cases fare no better. *See Winer Family Tr. v. Queen*, 503 F.3d 319, 331-32 (3d Cir. 2007) (Third Circuit held that, as here, "a complaint is actionable if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement"); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (rejecting

**F.** **Most of Defendants' Statements Are Not Opinions; The Few That Are, However, Are Still Actionable Under *Omnicare***

Defendants claim certain of their statements were opinions protected under *Omnicare*, but even opinions that do not "fairly align[] with the information in the [defendant's] possession" are actionable. 575 U.S. at 189. Courts in this Circuit have agreed. *See, e.g., Tanaskovic v. Realogy*, 2021 WL 211049, at *19 (D.N.J. Jan. 21, 2021) ("even if an opinion is sincerely held, [it] may still be actionable if the speaker omitted facts concerning the basis for the opinion and those facts conflict with what a reasonable investor would take from the statement itself'").

First, Defendants cite two purported "opinion" statements that Plaintiffs do not even allege are misleading. *See* Br. 20 (citing ¶¶162, 147). Second, Defendants cite two statements (*see id.* citing ¶¶149, 156) which, if they were even opinions, are still misleading because they do not "fairly align" with the Inventory Data Defendants had at the time. *See supra* at 11.[21]

---

claims based solely "on events that took place after Wasserstein's allegedly fraudulent statements"; Plaintiffs' claims are based on *contemporaneous* facts).

[21] At one fell swoop, Defendants argue almost all the other alleged misstatements are also opinions because they were supposedly all mere "aspirations" about the Program. Br. 21. Wrong. First, Defendants made specific, not merely aspirational, statements about the Program. *See supra* at 10. Second, Defendants do not even try to explain why these are opinions – they simply lump them all together in an "Appendix A". This is impermissible. *See, e.g., In re Horsehead Holding Corp. Sec. Litig.*, 2018 WL 4838234, at *18 (D. Del. Oct. 4, 2018) (rejecting defendants' "blanket assertion that 'the alleged misstatements are not material'"), *report and recommendation adopted by* 2019 WL 1409454 (D. Del. Mar. 28, 2019). Defendants should not be allowed to characterize all their statements as opinions in an attempt to avoid liability. Defendants' citations on this issue, two of which are outside this Circuit, fall flat. *See Howard v. Arconic*, 395 F. Supp. 3d 516, 549 (W.D. Pa. 2019) (statements that we "supply and use safe and reliable products and services" and "comply with all laws and set higher standards for ourselves" were "aspirational" opinions); *Conagra Brands*, 2020 WL 6118605, at *16 ("future *predictions*" were opinions); *Fialkov v. Alcobra Ltd.*, 2016 WL 1276455, at *5-6 (S.D.N.Y. Mar. 30, 2016) (statement that company "will succeed" was opinion). Regardless, even if the law in this circuit stated that any statement relating to the future was an opinion – which it does not – Defendants' "opinions" would still be misleading because they do not "fairly align[] with the information in the [defendant's] possession". *Omnicare*, 575 U.S. at 189.

### G. This Case Is Not About Mismanagement

Defendants try to write off this case as nothing more than mismanagement of the Program. That won't work. Defendants affirmatively stated that they had their arms around the Program; that the Program would increase margins; and that they would prevent cannibalization of revenue ahead of the Holidays – all while having real-time access to Inventory Data and receiving weekly reports and attending weekly meetings showing that was not reality. *See supra* at 18. That is not mismanagement; that is knowingly or recklessly making misstatements.[22]

### H. Defendants' January 8, 2020 Statements Were Also Misleading

Even when Defendants began to disclose the truth, it was not the whole truth. On January 8, 2020, BBBY pulled its FY2020 EPS guidance and, during a call that day, Tritton acknowledged that "[p]erformance was impacted…by self-inflicted issues, like [p]oor inventory management." ¶174. *See also id*. ("We're experiencing short-term pain, some of which has been self-inflicted").[23] Tritton also represented that BBBY was "doubl[ing] down" on the "existing transformation work", *i.e.*, the Program, which he claimed was "really solid". *See*

---

[22] Defendants' case citations on this point are, thus, of no moment. *See, e.g., In re Elecs. for Imaging, Inc. Sec. Litig.*, 2019 WL 397981, at *8 (D.N.J. Jan. 31, 2019) (Arleo, J.) (this Court found plaintiffs plead "absolutely no corroborative facts" supporting allegation that defendants knew internal controls were deficient, rendering alleged fraud at most mismanagement); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 470-71 (1977) (claim that "majority [shareholders have] breach[ed] [their] fiduciary duty…by effecting [a] merger without any justifiable business purpose" did not state 10(b) claim); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004) (lack of scienter supporting that defendants knew of inflated revenue from Brazilian subsidiary rendered allegations "little more than mismanagement"); *Newell*, 2019 WL 6715055, at *11 (unlike here, plaintiffs alleged only "*ex post facto*" reasons statements were misleading, rendering them "good faith business decisions").

[23] Defendants claim that since Plaintiff alleges that withdrawing guidance was "rare", then the market must have understood the full extent of the truth in January 2020. Br. 26. That does not follow. Withdrawing guidance is rare – but withdrawing guidance is not mutually exclusive with Defendants concealing the gravity of BBBY's inventory problems and falling margins. Defendants also claim that Tritton gave numerous reasons for pulling guidance (Br. 7), but that is irrelevant. The point is that Tritton admitted the inventory problems. *See id*.

¶177 ("I want to be really clear here, continuing to accelerate the existing transformation work that was put in place which is really solid, and we've been able to double down on that since me coming onboard"). These statements were misleading when made because they concealed the full extent of the inventory management and cannibalization and margin problems. ¶¶176, 178.[24]

Defendants further claim Tritton's admission that he reviewed BBBY's inventory problems "hour by hour" (¶176) does not support a finding that his January 2020 statements were misleading because it does not show what Defendants knew. Br. 24. Defendants cherry-pick the allegation. The FAC alleges Tritton's admission that he reviewed inventory hour-by-hour in November 2019, together with many other allegations – including other admissions and detailed allegations about BBBY's software – collectively show "what" Defendants knew. Namely, that BBBY had "unstocked and minimally stocked shelves[,]" as well as plummeting margins and cannibalized revenues. *See* ¶176. In addition, Tritton's acknowledgment of sales pressure was not the whole truth in light of the 300 basis point margin collapse revealed one month later on February 10, 2020 – the "largest in 10+ years". ¶¶102, 104.[25]

---

[24] Defendants claim the word "solid" makes this statement immaterial puffery. Br. 26. Not so. Tritton wanted to be "really clear" and claimed to "double down" on "transformation work" – in the face of plummeting margins. These are specific statements, not puffery. Defendants' citations on this point fall flat. *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010) ("disciplined" pricing policy was puffery); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *10-11 (D.N.J. Apr. 27, 2017) (*"Hertz II"*) (Arleo, J.) (this Court found statements about "strong" and "record" financial results puffery), *aff'd*, 905 F.3d 106 (3d Cir. 2018).

[25] Defendants claim Tritton was discussing "the interplay between in-store and digital marketing" when he made his "hour-by-hour" statement. Br. 25. First, Defendants are not entitled to their own spin on the facts in the FAC. *See supra* at 8. Second, Tritton's admission further shows he (and BBBY) could access real-time data about sales and inventory – whether they also had real-time data about different marketing means is irrelevant. *Leapfrog*, 200 F. Supp. 3d at 1003-04, is not to the contrary. *See id.* (stating that inventory "may not get sold in the second quarter" "substantially mitigat[ing]" alleged misstatements). Defendants here did not mitigate their January 2020 statements by mentioning "sales pressures". Similarly, Defendants' claim that the margin plunge resulted "primarily" from future markdowns (*see* Br. 28) is

## I.    Defendants Violated Regulation S-K

SEC Regulation S-K contains various disclosure requirements for SEC filings. Regulation S-K includes Item 303 and Item 105.  ¶131.  Defendants violated these regulations, further supporting Plaintiffs' allegations that Defendants violated Section 10(b).

### 1.    Defendants Violated Item 303

Item 303 required that BBBY's October 2019 and January 2020 Forms 10-Qs "describe any known trends or uncertainties" that could materially affect earnings between March 31 and August 31, 2019 for the October 2019 Form 10-Q, and March 3 and November 30, 2019 for the January 2020 Form 10-Q.  132, 135.  Defendants did not do so and violated Item 303.

BBBY's October 9, 2019 Form 10-Q discussed the Program without disclosing its known uncertainties and adverse trends; namely, plummeting margins and cannibalized revenues.  *See* ¶166.  BBBY and D'Elia knew or recklessly disregarded that these statements violated Item 303 because they failed to disclose the trends and uncertainties discussed in ¶167(i)-(iv).  ¶168. BBBY's January 9, 2020 Form 10-Q contained similar misleading statements.  ¶¶183, 185, 186, 188.[26]  *See Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *8 (S.D.N.Y. Apr. 14, 2020) (upholding Item 303 violation for failure to disclose trend of increasing inventory that was cannibalizing sales). *Cf. Aeropostale, Inc.*, 2013 WL 1197755, at *11 (defendants could "surmise" problems "relatively early" with tracking software).

---

puzzling – that is Plaintiffs' point.  And Defendants' claim that those future markdowns related to 2Q, not 3Q, does not make sense since the paragraph Defendants cite (¶183) states that "the decrease in the gross profit margin for the nine months ended November 30, 2019" stemmed primarily from markdowns in the "second *and third quarters* of fiscal 2019." Defendants also stress the different 2018 calendar year (Br. 28), but that is a red herring.  This case concerns margins and revenue cannibalization, not comparable sales decline.  And even after backing out the week of Cyber Monday, comparable sales still declined significantly.  *See* Br. 29.

[26] Contrary to Defendants' claim, Tritton's statements in January 2020 that the Program was a departure from BBBY's past coupon offers did not reveal the extent of the adverse trend; namely, margins were plummeting and inventory management was in a shambles.  *See* Br. 30.

Defendants claim there was no trend at the time of their statements because as of October 2019, the Program was only one month old, and as of January 2020, only one "holiday season" had passed. Br. 23, 30. First, the length of a trend is not ripe for adjudication on a 12(b)(6) motion. *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597 at \*2 (S.D.N.Y. Oct. 30, 2017). Second, four weeks (which had elapsed as of the October 2019 statements) was enough time for the "aggressive" (*see*, *e.g.*, ¶¶80, 138) Program to start undermining margins and cannibalizing revenues, and 4½ months (as of the January 2020 statements) is ample time. *Cf. Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) ("Item 303's disclosure obligations, like materiality…do not turn on restrictive mechanical or quantitative inquiries"); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38-41 (2011) (problem with "bright-line" and "categorical" rules is that they "would artificially exclude information that would otherwise be considered significant to the trading decision of a reasonable investor").[27] Moreover, in light of Defendants' real-time access to the Inventory Data, identifying a trend – negative or positive – was something that could have be accomplished quickly.

> 2. **Defendants Violated Item 105**

Item 105 required a discussion in BBBY's October 2019 and January 2020 Forms 10-Q of the most significant factors that made investing in BBBY risky or speculative and that each risk factor adequately describe the risk. ¶136. BBBY's October 9, 2019 Form 10-Q stated:

> The Company's operating results could be negatively impacted by a major disruption of the Company's information technology systems. ***The Company relies heavily on these systems to process transactions, manage inventory replenishment***, summarize results and control distribution of products…. ¶169.

---

[27] Defendants' citation to *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at \*10 (S.D.N.Y. Jan. 14, 2010), is unavailing. *See id.* (two-month trend of increased foreclosures insufficient; here, one of only three months before Holidays had elapsed).

BBBY and D'Elia knew these statements violated Item 105 because they failed to disclose the "most significant factor" relating to the risks in investing in BBBY; namely, that promotions and markdowns would decimate margins and cannibalize revenues. *See* ¶167(i)-(iv); 171. BBBY's January 2020 Form 10-Q contained similar misleading statements. ¶¶183, 185, 189, 191.

Defendants' reliance on *Jaroslawicz* on this point is misplaced. *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 711 n.1 (3d Cir. 2020), *cert. denied*, 2021 WL 231655 (U.S. Jan. 25, 2021). Br. 23. The Third Circuit there held the issue was whether an Item 105 violation "constitutes a material omission or misrepresentation under the" Exchange Act. Here, Defendants' violations of Item 105 also violated 10(b). *See* ¶¶171, 191.[28]

## III.    THE SAFE HARBOR DOES NOT IMMUNIZE DEFENDANTS

The PSLRA provides a safe harbor for statements that are forward-looking and also "accompanied by meaningful cautionary statements[.]" 15 U.S.C. § 77z–2(c)(1)(A)(i). As discussed below, many of Defendants' statements were not forward-looking; Defendants' purportedly cautionary language was inadequate; and, for the statements that can be deemed forward-looking, Plaintiffs sufficiently allege actual knowledge.

### A.    Forward-Looking Statements

In the Third Circuit, a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Avaya*, 564 F.3d at 255. *See also Curran*, 2018 WL 394878, at *4 (this Court found certain statements were not forward-

---

[28] Defendants claim they are "puzzl[ed]" by Plaintiffs' allegation that the first and third sentences of ¶169 are misleading. Br. 17. Defendants misread the FAC. Plaintiffs allege only that the bolded, italicized language in the second sentence (which was highlighted in the FAC) was misleading. *See* ¶¶169-70. Defendants also argue that Item 105 does not apply to shareholder letters. Br. 23. Plaintiffs did not allege otherwise. *See* ¶¶136-137, 171, 191.

looking because they "encompass[ed] representations of present fact").[29]  This Court has also

noted an exception to the safe harbor when forward-looking statements were "misleading by

virtue of omission of existing facts." *Id*.  Many of Defendants' statements were either not

forward looking or omitted "existing facts." *Id*.  Thus, they are not protected by the safe harbor.[30]

## B.  BBBY's Risk Warnings Were Insufficient

For the statements that are forward-looking, Defendants' cautionary language was either

not meaningful or was itself misleading.  As discussed above, BBBY's purported "warnings"

about the Key Risks were actually representations that they essentially eliminated these risks

with software, personnel, and oversight.  *See supra* at 11. Thus, Defendants claim that they

warned that the Program "***could lead*** to the 'cannibalization of sales'" (Br. 1; *see also id.* 16) is a

mischaracterization.[31]  The most reasonable inference (to which Plaintiffs are entitled) from

Winston's statement is that BBBY was ahead of the concern and ***preventing*** cannibalization –

not warning that it could be a significant problem.  In other words, cannibalization was not a risk

---

[29] This included such statements as "[w]e expect continued demand for our Freshpet Fridge".  *Id*.

[30] *See*, *e.g.*, ¶147 ("[t]he implementation of markdown optimization software and processes *is accelerating sell-through, resulting in* less aged inventory *and optimizing* the profitability of our seasonal and fashion assortment"); ¶152 ("merchandise margin, which I'm talking about on a consolidated basis, the trend in that *has been improving*…we've also continued with some strategic pricing initiatives, which *has helped* benefit our margin"); ¶164 ("[a]s we're working through that, *we're mindful* not to cannibalize sales during this holiday period.

[31] Defendants claim Winston's statement that the Program would "be accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales" is a real risk warning.  *See* Br. 16.  *See also id*. (mischaracterizing as risk warnings D'Elia's statements that "[w]e are in the early innings of starting that process of removing the inventory from the physical store locations. As we're working through that, we're mindful not to cannibalize sales during this holiday period" and "we're mindful not to cannibalize sales during the holiday period").  But these are not risk warnings; they are misrepresentations and omissions because they downplay the risks rather than intelligently warn about them.  They are the opposite of a risk warning.

for investors to be concerned about. Defendants also generally warned of "pressures" and "headwinds" in January 2020 when they knew margins were plummeting. *See supra* at 21-22.

Defendants also trumpet BBBY's "warning" of "risks associated with the ability to achieve a successful outcome for [BBBY's] business concepts and to otherwise achieve its business strategies" (Br. 17), but these general warnings are insufficient. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) ("vague or…blanket disclaimer[s] which merely warns the reader that the investment has risks will ordinarily be inadequate...cautionary statements must be substantive and tailored to the [alleged misstatements]").[32]

Defendants also point to risk language from well before the Class Period, and before they even announced the Program – including back to January 2019. *See* Br. 1, 2. These citations only show how profoundly they failed in warning investors of the real risks of the Program.

Finally, Defendants' claim that their financial projections are protected by the safe harbor also fails because Plaintiffs allege Defendants ***knew*** BBBY's guidance was unachievable when issued. ¶¶141, 155. Plaintiffs' actual knowledge allegations render BBBY's purported cautionary language about projections itself misleading. *See infra* at 29-38.

### C. Plaintiffs Allege Actual Knowledge As To Any Forward-Looking Statements

As discussed below in the scienter section, Plaintiffs adequately allege actual knowledge as to any genuinely forward-looking statements alleged in the FAC. Thus, Defendants cannot seek safe harbor protection under this prong either.

---

[32] Defendants also confuse the issues by arguing that their statements in September and October 2019 are protected by the safe harbor because Plaintiffs do "not allege that Defendants *actually knew* that the program would not work." Br. 18. Plaintiffs do not allege the Program did not work; rather, Plaintiffs alleges that it contained material undisclosed risks and undermined margins and cannibalized revenues, particularly during the Holidays. Whether the Program did reduce inventory is irrelevant. Plaintiffs also allege facts showing Defendants failed to disclose the Program's risks in September and October 2019 and that by October 2019, Defendants began to learn that the Program was undermining margins and cannibalizing revenues.

## IV. PLAINTIFFS SUFFICIENTLY ALLEGE SCIENTER

Plaintiffs can sufficiently plead scienter by alleging conscious misbehavior or recklessness. *Avaya*, 564 F.3d at 265, 267-68. A plaintiff alleging conscious misbehavior must "stat[e] with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." *Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148, at *20 (D.N.J. Dec. 19, 2017). Recklessness involves "not merely simple [or] inexcusable negligence, but an extreme departure from the standards of ordinary care." *Avaya*, 564 F.3d at 268 n.42. Recklessness serving as a sufficient basis for liability "promotes the policy objective[ ] of discouraging deliberate ignorance". *Advanta*, 180 F.3d at 535.

This Court has noted that a plaintiff can allege a "strong inference of scienter from circumstantial evidence" by pleading "Defendants' knowledge of facts or access to information contradicting their public statements .... [*i.e.*, that] ***Defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation***.'" *Elecs. for Imaging*, 2019 WL 397981, at *6. *See also Avaya*, 564 F.3d at 267 (Third Circuit permits plaintiffs to utilize circumstantial evidence for either conscious or reckless behavior). Although this Court has noted that "there need not be a 'direct link' between the allegations and the Defendants to sustain a finding of scienter" (*Papa*, 2018 WL 3601229 at *23), as discussed below, the links between Defendants and the Inventory Data here is direct and strong.

In addition, the scienter inquiry concerns "whether *all* of the facts alleged, taken collectively [support] scienter, not whether any individual allegation [does]." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of scienter "must be cogent and compelling," but "need not be…the 'most plausible of competing inference[s],'" – only "*at least as likely* as any plausible opposing inference." 551 U.S. at 308, 324, 328. Thus, a tie will go to the plaintiff. *Avaya*, 564 F.3d at 273. Here, when Plaintiffs' detailed scienter

allegations are viewed collectively (as they must be) the inference that Defendants acted consciously or recklessly is at least as strong as the inference that they acted innocently.[33]

### A. Plaintiffs Adequately Allege Conscious Misbehavior and Recklessness

#### 1. Defendants' Real-Time Access to and Receipt of Weekly Reports Concerning Inventory Data Strongly Support Scienter

Courts in this Circuit have repeatedly found that access to, or regular receipt of, reports containing information undermining public statements supports a strong inference of scienter. *See*, *e.g.*, *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *25 (D.N.J. Dec. 27, 2019) ("defendants had access to information which would have alerted them to the allegedly misleading nature of their statements"); *Local 731 LB. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (scienter adequately alleged where "[d]efendants had access to sales data and internal reports"); *In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164, at *12-13 (E.D. Pa. Dec. 22, 2008) (finding scienter where plaintiff alleged that the individual defendants were senior executives with access to information contradicting their public statements); *Advance Auto*, 2020 WL 599543, at *8.[34]

Here, CW-1 reported that Winston and D'Elia, as BBBY's CEO and CFO, had access to real-time Inventory Data, received detailed weekly reports from Revionics, and met weekly at BBBY headquarters. *See* ¶75-77. As CEO after Winston, Tritton would have had the same access and reports (and attended the same weekly meetings, *see* ¶77) as his predecessor to ensure

---

[33] Defendants note that the Third Circuit has neither accepted nor rejected a "collective scienter" doctrine (where courts will impute scienter to a corporate defendant through a non-named officer). Br. 32. That is irrelevant here as Plaintiff does not allege collective scienter.

[34] *See also Aeropostale*, 2013 WL 1197755, at *5 (access to inventory reports probative of scienter); *Sturm, Ruger & Co.*, 2011 WL 494753, at *8 ("The first [CW] [] claimed that Sturm Ruger used a custom-made system of spreadsheets to track inventory, **and senior management saw** these spreadsheets"); *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (CW "established the existence of 'funnel reports' and sales forecasts" through the Salesforce software that were available to executives [which] raise[d] a strong inference of scienter").

the continuity of the relatively new Program. These weekly reports analyzed and detailed optimized promotions and markdowns, provided real-time, in-depth knowledge about consumer buying influences and cannibalization, and identified the most compelling vehicles and offers for different shoppers. *See* ¶¶62-68. These allegations strongly support scienter.

As they argued in relation to falsity (*see supra* 17-18), Defendants argue that Plaintiffs' allegations about the Inventory Data are not granular enough to support a finding of scienter. Br. 34. In *Curran*, this Court found the plaintiffs alleged a strong inference of scienter where the individual defendants "were presented with production updates from the Bethlehem production facility that reflected manufacturing problems with the shredded product." *Id.*, 2018 WL 394878, at *5. Here, likewise, Plaintiffs allege that the Individual Defendants received weekly, detailed Revionics reports with Inventory Data that "reflect[ed] the alleged [inventory] problems" that were at the heart of the Program. *See id.* Indeed, Plaintiffs' allegations are even stronger here because Plaintiffs alleges that Defendants also had real-time access to the Inventory Data through Revionics software. ¶¶ 47, 62-68, 96.

The real-time Inventory Data and weekly reports digesting the Inventory Data for Defendants were highly detailed (*see* ¶75) and supported by BBBY's acknowledgement that it used Revionics before, during and after the Class Period and Winston's acknowledgment that BBBY would be using such software to facilitate the Program. ¶¶67, 68. This is sufficient detail to support a strong inference that Defendants knew or recklessly ignored that BBBY had significant inventory and margin problems during the Class Period, especially for the closely-watched Holidays. *See also Advance Auto Parts*, 2020 WL 599543, at *8 (defendants "received consistent reports of declining comp store sales growth, operating margin misses, and declining

sales across the country").[35]

Defendants also confuse the issues relating to Inventory Data. Defendants argue that "[i]f Revionics and JDA did not prevent the problems that they were supposed to prevent," that is not Defendants' fault. Br. 34. But neither Revionics nor JDA could "prevent" problems on their own – they had to be implemented by Defendants; which, indeed, is what Defendants said they would do to eliminate cannibalization risk. *See, e.g*., ¶145 (Winston stated that BBBY would *manage* the markdowns and clearance "*thoughtfully* to prevent cannibalization of sales").[36]

Defendants also attack CW-1's credibility, but CW-1 is a reliable source. To make allegations based on a confidential source, a plaintiff must "describe[ ] [the witness] with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged." *Chubb*, 394 F.3d at 148. Where the complaint "adequately describe[s] the duration of each [CW's] employment, the time period during which the CWs acquired the relevant information, and how each CW had access to such information," the information will be credited. *Avaya*, 564 F.3d at 263. This Court has noted that "[CWs] whose positions afforded them firsthand knowledge of the underlying facts" "provide circumstantial evidence of at least reckless behavior". *Papa*, 2018 WL 3601229, at *23.

CW-1's allegations are reliable. As a merchandise manager, it is reasonable that CW-1 would know about BBBY's inventory and markdown optimization software – all of which

---

[35] Defendants' reliance on *In re Campbell Soup Sec. Litig.*, 2020 WL 7022655, at *7 (D.N.J. Nov. 30, 2020), on the issue of internal reports falls flat. The plaintiffs there alleged that internal data showed defendants' statements about a new fresh foods division, C-Fresh, showed scienter. *See id*. The court disagreed because plaintiffs "focuse[d] on…only one of…several C-Fresh products [that] made up a small percent of Bolthouse revenues." *Id*. at *8. Here, the Inventory Data relate to inventory and margins; it is undisputed that those were BBBY's problem areas.

[36] Defendants' reliance on *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1147 (D. Colo. 2011), *aff'd sub nom. Sanchez v. Crocs, Inc.*, 667 F. App'x 710 (10th Cir. 2016), is misplaced. There, the plaintiffs alleged Crocs's growth outpaced a *flawed* inventory management system.

inherently concern merchandise, and that CW-1 would know that BBBY's CEO and CFO received reports from such software. *See ¶¶*73, 76. CW-1 is corroborated by BBBY's own public statements about its use of Revionics; by Revionics website, which trumpets its "real-time" inventory software; and by Tritton's admission of hour-by-hour inventory monitoring. *See ¶¶*47, 65, 67-69, 96.

Defendants also claim the Court should ignore CW-1 because CW-1 left two months before the Class Period, but that argument fails. Courts have found pre-class period CWs credible and reliable, particularly where, as here, the CWs left the company only shortly before the class period. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649 n.2 (E.D. Pa. 2015) (crediting CW accounts "[a]lthough two of the [CWs] were no longer [employed] by the start of the Class Period"); *Quality Sys.*, 865 F.3d at 1145 ("[a]lthough CW6 was not at QSI during the Class Period…CW6 had personal knowledge of executive-level management's real-time access to Salesforce reports forecasting quarterly sales").[37]

Indeed, it is well-settled in the Third Circuit that pre-class period information is relevant in the scienter analysis. In *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005), the Third Circuit held that the district court erred on excluding allegations of pre-class data showing a statement misleading, and found that such data could be used to "confirm what a

---

[37] Defendants cite one decision in this circuit, *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at \*10 n.7 (D.N.J. July 3, 2019), concerning pre-class period CWs, but it is factually distinct. In *Chan*, one pre-class period CW was employed four years before the class period and two others weakly found it "'difficult to imagine' that management did not know" and "'scoffed at the idea' that management did not know" because "of course management knew". *Id*. at \*11. These allegations bear no relation to Plaintiffs'. Defendants' other cases fare no better. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (CWs lacked firsthand knowledge of accounting and financial reporting and those that did were based on vague hearsay); *In re Ceridian Sec. Litig.*, 542 F.3d 240, 247 (8th Cir. 2008) (CW left three years before the class period and allegations lacked detail about specific projects); *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 177 (4th Cir. 2007) (officer's service ended three years before the class period began and had no basis for assertions).

defendant should have known during the class period." *See also id.* ("any information that sheds light on whether class period statements were false or misleading is relevant").[38] Here, CW-1's allegation that Winston and D'Elia received weekly reports about Inventory Data, and attended weekly meetings, are relevant to BBBY's Class Period practices because BBBY confirmed that it continued to use Revionics software throughout and even after the Class Period. *See ¶¶67, 68* (January 2020 and March 2020 articles discussing BBBY's use of Revionics). Further, Revionics' website details the purpose of the software (*i.e.* inventory management and optimization). ¶¶47, 65, 67. Likewise, although CW-1 was not employed by BBBY when Tritton took over as CEO, the strongest inference is that he, like his predecessor, received the same data and attended the same meetings, especially given the importance of inventory management and holiday sales to BBBY and to ensure continuity of execution of the new Program.

Defendants also claim that CW-1's statements are not credible because CW-1's division was only responsible for $400 million in revenue, which is not material for BBBY. Br. 33. This does not follow. CW-1 was a merchandising manager and would, thus, know about inventory and inventory software and reports, which inherently relate to merchandising, and who would receive such reports. CW-1's allegations about Revionics reports are also credible. *See ¶¶49, 67, 68.* In sum, the size of CW-1's division is irrelevant as to CW-1's credibility.[39]

---

[38] *See also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 n.11 (3d Cir. 2013) ("[b]oth post-class-period data and pre-class data could be used to confirm what a defendant should have known during the class period"); *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at \*16 (D.N.J. Sept. 30, 2011) (same), *aff'd*, 484 F. App'x 742 (3d Cir. 2012); *Glover v. DeLuca*, 2006 WL 2850448, at \*5 (W.D. Pa. Sept. 29, 2006) (rejecting Defendants' argument that "allegations related to conduct before or after the Class Period should be rejected categorically" for scienter).

[39] In their attempts to explain away the significance of CW-1, Defendants rely on numerous cases, none of which support their argument. *See Chubb*, 394 F. 3d at 149-53 (plaintiff unable to allege when the sources were employed, when they obtained information they allegedly possess, and whether their knowledge was first or second hand; most of plaintiff's sources not employed in relevant business sector); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at

### 2. Tritton's Admissions Also Support A Strong Inference of Scienter

In the Third Circuit, post-class period statements "may be relevant…to confirm what a defendant should have known during the class period." *See Avaya*, 564 F.3d at 249 n.13, 264. *See also In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *9 (N.D. Cal. Nov. 4, 2020) (CEO's "post-class admission that Apple saw…traffic…[and] industry contracting…bolster[ed] [] inference [of scienter and] plausibly suggests that defendants saw troubling signs in October").

Tritton made numerous admissions during and after the Class Period that support an inference of Defendants' scienter. On a January 8, 2020 call, Tritton admitted that at "Thanksgiving time" he had been "watching [the Company's sales and inventory] hour by hour", confirming Defendants' real-time access to data bearing *on the success or failure of the Program*. ¶96. On a February 18, 2020 call, Tritton admitted that BBBY lacked "proper" "price management" *as of September 1, 2019*. ¶212. In other words, Tritton admitted that the Program had serious undisclosed flaws from the start of the Class Period. Tritton also admitted on an April 15, 2020 call that "we really didn't lay down the plans [on promotional activity] to get there in the right way". *See* ¶121.[40] Further, Tritton admitted on the April 15, 2020 conference call that Defendants knew of the inventory problems in December 2019 and January 2020, conceding that "*[w]e knew* we were plagued by [inventory] issues *in December [2019] and January [2020]"* (¶113) and "[w]e did some intel work [in December 2019 and January 2020] on that, *saw the customers were coming in*, and they just couldn't find the product in stock" (*id.*).

---

*15, 19 (D.N.J. July 22, 2015) (*"Hertz I"*) (Arleo, J.) (this Court noted that plaintiff relied on outside accountant and low-level employees with only "anecdotal experience concerning sales" and showed no connection between CW's knowledge and that of defendants); *Rahman*, 736 F. 3d at 245 (low-level CWs in shipping department unable to provide dates of officer meetings); *In re Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at *10 (D.N.J. July 2, 2019) (CW's testimony amounted to "second-hand retelling and generalized rumor").

[40] This admission further supports an inference that BBBY, D'Elia and Winston knew their statements about the Program, inventory, and margins were misleading when made because, as shown by the Company's inventory software, they knew they "didn't lay down the plans" underlying the Program "in the right way". Moreover, since the Program departed from BBBY's usual coupon discounts, and BBBY adopted unprecedented markdowns and promotions, Defendants knew robust planning was necessary to execute and oversee the Program.

*Cf. Apple*, 2020 WL 6482014, at *9. These numerous admissions support a strong inference that Defendants knew or recklessly disregarded that their statements were misleading when made.

Defendants make several unavailing arguments about Tritton's admissions. For example, Defendants claim that Tritton's April 2020 admission that BBBY knew of inventory issues in "December and January" (*see* ¶198) actually means that BBBY knew in "March or April" that there were issues in December and January. Br. 25. First, Defendants once again are not entitled to this inference on this motion. *See supra* at 8. Second, the full context of Tritton's statement belies Defendants' interpretation.[41] Defendants also argue that Tritton's admission that "[w]e're going to have price management floated properly, which we didn't have coming into the third and fourth quarter [September 1, 2019 and December 1, 2019]" can be ignored since it was post-Class Period. Br. 19. That is not the law in the Third Circuit. *See supra* at 33.[42]

3.     **Defendants' Discussions With Analysts Further Support Scienter**

The Third Circuit has held that statements made "in response to [] analysts" are "[a]mong the most powerful evidence of scienter." *See Avaya*, 564 F.3d at 269. In *Avaya*, "one

---

[41] Tritton stated that BBBY began to "rectify" the inventory problems in January – showing that Defendants' claim that Tritton's statement only admits to knowing of problems in March and April does not make sense: "[I]t was tough to hit the COVID moment when we just saw some pivots happening in February. We knew we were plagued by issues in December and January, would be transparent around that. Some of it was self-inflicted. I mean when we don't have best sellers in stock, we've got discounting and we don't have our inventory. I mean some of the sales decline we saw in our stores wasn't necessarily traffic. We did some intel work on that, saw the customers were coming in, and they just couldn't find the product in stock. So we were shooting ourselves in the foot. ***That is easily rectifiable, and we started to do that straight at the end of January***. We saw positive comps coming through or more positive comps in terms of churn rate in February." *See* attached Exhibit A at 12.

[42] Defendants' citation (Br. 35) to *Hertz I*, 2015 WL 4469143, at *18-19, is not to the contrary. There, this Court found that the Hertz CEO's post-class period statement "that the Sequester *seemed* to have had a greater impact on Hertz" was at most "a post-hoc speculative explanation for the Sequester's impact." Here, Tritton was not speculating; he flatly admitted that BBBY did not have proper price management as of September 1, 2019. Likewise, in *Hertz II*, 2017 WL 1536223, at *17, the plaintiffs failed to allege (in addition to mismanagement) that "red flags were present, which would've put them on notice of their mismanagement." Here, Tritton admitted more than red flags – he admitted that management closely monitored data "hour-by-hour (¶96), yet still did not have proper price management.

of…analysts' central questions about Avaya was whether it could sustain and expand its margins in the face of a very competitive market" and significant discounting. *Id*. The Third Circuit found that such repeated analyst inquiries, coupled with the "steep decline in Avaya's all-important margins in the second quarter of 2005[,] bolsters the inference that [defendant] would have been alerted to the discounting." *See id*. *See also Papa*, 2018 WL 3601229, at *21 (this Court found defendant's repeated responses to analyst questions indicating knowledge about drug pricing "would have made Defendants aware of the importance of generic drug pricing").

Here, the Individual Defendants repeatedly engaged in lengthy colloquies with analysts (who then wrote detailed reports)[43] about BBBY's inventory and the Program. *See* ¶¶79-85, 95-97, 99-101, 104-111, 113-117, 120-121. This shows they were well aware of these issues. As in *Avaya*, analysts repeatedly asked about BBBY's margins.[44] And as in *Avaya*, BBBY's "steep margin decline", together with the repeated discussions with analysts about margins, "bolsters the inference" that Defendants knew or recklessly disregarded that their representations, including about margins, were misleading. *See also* ¶¶83, 145, 160 (analysts also asked about the Program's aspects beyond margins, including sales cannibalization).

Defendants try to shift the narrative about their interactions with the market. Defendants claim they were transparent by pulling guidance in January 2020 and then announcing preliminary guidance early in February 2020. Br. 35. Not so. BBBY only had to pull the

---

[43] *See*, *e.g.*, ¶100 (noting "negative EBIT margins"; ¶101 ("3Q results were disappointing as EBIT margin turned negative for the first time in recent history"); 104 ("Roughly -300bps of gross margin pressure (the largest decline in 10+ years) owing to heightened promotional activity and mix shift to lower margin (online) channels"); ¶107 ("surprise was…in both gross and SG&A margins. Gross margins declined ~-300 bps through the first two months of the quarter").

[44] *See* ¶152 (analyst asked about "the progress you're making in improving the margin structure", D'Elia replied that "we've… continued with some strategic pricing initiatives, which has helped benefit our margin. And we have more to come"); ¶156 (analyst stated "[c]an you just talk about what sort of impact you expect on profit margins or profitability…", Winston replied that "we can drive sales and we may be on promotion, of course, through the holiday season…we think we have other levers to pull to control the cost structure to maintain profitability"); ¶160 (analyst "wanted to clarify" that inventory issues would "not have a gross margin impact towards the rest of the year"; D'Elia replied that "you're asking about the margin impact…we're mindful not to cannibalize sales during the holiday period").

guidance because it had no basis to begin with. And they may have tried to placate the market by reporting early in February after giving it an unpleasant surprise in January. Regardless, neither of these claims supports a finding that they innocently issued misleading statements.[45]

#### 4. Defendants Knew BBBY's Critical Management Vacancies Further Undermined the Program and Their Statements About It

BBBY's vacancies further support scienter as they made a flawed Program worse. On December 17, 2019, three months into the Program, BBBY disclosed that Tritton had fired five senior management members, including the CMO, Chief Marketing Officer, Chief Digital Officer, Chief Legal Officer & General Counsel, and Chief Administrative Officer. *See* ¶ 91. The sixth member, the Chief Brand Officer, resigned the prior week. *See id.* BBBY did not replace its CMO – a role critical to the Program, until March 2020. BBBY had five vacancies, including one critical one, between December 17, 2019 and the end of the Class Period – during the Holidays that were at the heart of the Program. Such departures are rarely immediate.[46]

#### 5. The Resignation of BBBY's CFO Shortly After Pulling Guidance and Slashing Margins Further Supports an Inference of Scienter

The Third Circuit has noted that the departure of corporate executive defendants can strengthen the inference of scienter. *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 Fed. App'x 672, 679 (3d. Cir. 2011). *See also Papa*, 2018 WL 3601229, at *20 (this Court noted that "resignation of key executives…[can] bolster" scienter). Here, CFO D'Elia

---

[45] Defendants' case citations on this issue are unavailing. *See Town of Davie Police Pension Plan v. Piere I Imports, Inc.*, 325 F. Supp. 3d 728, 748 (N.D. Tex. 2018) (defendants "repeatedly disclosed…inventory growth, increased costs and expenses, and disappointing sales to investors and analysts" during the class period), *aff'd sub nom. Mun. Employees' Ret. Sys. of Mich. v. Pier I Imports, Inc.*, 935 F.3d 424 (5th Cir. 2019); *I.B.E.W. v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011) (defendants consistently "releas[ed] negative information about the distribution center throughout the class period"). Here, Defendants only pulled guidance once some of the negative information – contrary to their Class Period statements – was revealed.

[46] Defendants claim these vacancies were meaningless because BBBY had "interim leads" in these positions and that Plaintiff does not allege that these interim leads were incapable. Br. 36. Defendants miss the point – the inference from six senior departures in the middle of the Holidays is that Defendants had further reason to know that their statements were misleading.

resigned just two months after BBBY announced that the Program decimated 4Q2019 margins. Because D'Elia was CFO and in charge of BBBY's finances, and because as CW-1 stated, he had access to Inventory Data, received weekly reports, and attended weekly meetings, all demonstrating his involvement in the Program, his resignation after the disclosure of significant adverse financial information further supports his scienter. *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *14-15 (E.D. Pa. June 16, 2015).[47]

**B.     The Individual Defendants Were Also Motivated to Commit Fraud**

Although not required (*Tellabs*, 551 U.S. at 323), Plaintiffs' motive allegations further support a strong inference of scienter.[48]  Plaintiff alleges that the Individual Defendants wanted to satisfy the Activist Investors, avoid a repeat of BBBY's failed attempt to reduce inventory, inflate their BBBY stock, and keep their huge salaries. These allegations further support scienter.

**1.     The Individual Defendants Wanted to Please the Activist Investors**

After five years of poor results, the Activist Investors succeeded in restructuring BBBY's board and replacing its CEO in May 2019.  *See* ¶51.  These investors had criticized BBBY for its inventory management problems and low margins in April and May 2019.  The Individual Defendants were motivated to commit fraud to address these investors' concerns about BBBY's

---

[47] *See also In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *8 (D.N.J. Apr. 28, 2017). This Court's decision in *Hertz II*, 2017 WL 1536223, at *20-21, is not to the contrary.  In *Hertz II*, the CFO resigned "months before Hertz discovered its accounting was off." *Id*. Here, D'Elia resigned after BBBY came clean. Also, "after Hertz discovered control deficiencies, it hired new people to remedy those issues" but BBBY's CMO was vacant until March 2020.  ¶91.

[48] *Cf. Thomas v. Magnachip Semiconductor Corp.,* 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016) (scienter was "established [even though] officers …did not sell stock"); *Levy v. Gutierrez*, 2017 WL 2191592, at *13 (D.N.H. May 4, 2017) ("securities laws prohibit foolish frauds along with clever ones" including "invest[ing]…resources into an effort they knew was doomed to failure").

stagnant and bloated inventory, as well as BBBY's low margins.  *See* ¶¶224-228.  D'Elia and Tritton were also motivated to avoid the fate of ousted CEO Stephen Temares.[49]

### 2.    **Defendants Knew BBBY Tried To Reduce Inventory Before**

As early as the beginning of 2018, BBBY had tried to reduce inventory.  As explained by CW-1, this effort "never got off the ground".  ¶222.  When BBBY doubled down in September 2019 and announced the Program, Winston and D'Elia were acutely aware of the need to make inventory reduction work this time.  Courts have found allegations of past problems support scienter.  *See Cats v. Prot. One, Inc.*, 2001 WL 34070630, at *16 (C.D. Cal. June 4, 2001) ("evidence of past practice may indeed be probative of present practice").[50]

### 3.    **The Individual Defendants Were Motivated to Commit Fraud to Increase their BBBY Stock and Compensation**

D'Elia, Winston, and Tritton had large BBBY stock awards and salaries during the Class Period. D'Elia received $1,559,469 in BBBY stock and Winston received $1,900,000 in restricted stock award on November 4, 2019, the day Tritton became CEO.  ¶230.  D'Elia and Winston were, thus, motivated to inflate BBBY's stock.  D'Elia and Winston were also motivated to continue to receive their salaries. ¶¶232-33.  Tritton, having received a huge $11.2 million compensation package, was also motivated to inflate BBBY's stock.  ¶236.  Tritton was

---

[49] Defendants compare Plaintiffs' motive allegations to the boilerplate ones courts often reject (Br. 37).  But the Individual Defendants had a particular motivation to placate the Activist Investors – who were the impetus behind restructuring the Board in April 2019 – not a general motive to succeed.  Thus, Defendants' citation to *Alpharma*, 372 F. 3d at 152-53, does not apply. Defendants also argue that even if they were motivated to satisfy the Activist Investors, that would help "all shareholders".  Br. 37.  Defendants miss the point.  The point is Defendants were motivated to embark on a reckless inventory reduction Program – and to oversell it and understate its risks – to show the Activist Investors they were quickly responding to their concerns. *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 (3d Cir. 2004), is not to the contrary. There, disclosure of allegedly undisclosed facts would have *increased* share value.

[50] Defendants' comparison of Plaintiffs' past practice allegations to a general allegation that defendants knew they had to "make their plans work" (Br. 38) fails because Plaintiffs allege particular facts concerning BBBY – not any boilerplate motive for any corporate executive.

also motivated to commit fraud to continue these lavish BBBY benefits. While motive to inflate stock and maintain salaries do not alone plead scienter, they strengthen scienter when supported by other allegations. *See In re Hertz Global Holdings Inc.*, 905 F.3d 106, 119 (3d Cir. 2018).[51]

### C. Plaintiffs' Allegations Collectively Show Scienter

Courts must review scienter allegations holistically. *Matrixx Initiatives Inc.*, 563 U.S. at 48-49. Plaintiffs allege detailed allegations that collectively demonstrate scienter:

- Defendants Received Detailed, Weekly Revionics Reports With, And Had Access To, "Real-Time" Inventory, Pricing, and Margins Data

- Defendant Tritton made numerous admissions during and after the Class Period

- Defendants Repeatedly Discussed The Program With Analysts

- Defendants Knew BBBY Management Had Critical Class Period Vacancies

- Defendants Winston and D'Elia Knew BBBY Tried To Reduce Inventory Before

- Defendants Were Motivated to Commit Fraud to Satisfy the Activist Investors

- Defendants Were Motivated to Commit Fraud to Inflate Their Stock and Maintain Exorbitant Salaries

204-237. These allegations collectively provide an inference that Defendants knowingly or recklessly made misleading statements about the Program that is at least as strong as the inference of innocence. *Tellabs*, 551 U.S. at 308, 324, 328.

### CONCLUSION

For all these reasons, Defendants' motion to dismiss should be denied in its entirety.[52]

---

[51] Stock sales are not required to plead scienter, as Defendants' own case authority shows. *See Hoey*, 2018 WL 902266, at \*21 (failure to plead insider trading "not determinative").

[52] Because Plaintiff sufficiently pleads violations of Section 10(b), Plaintiff also sufficiently pleads 20(a) claims. Plaintiff does not have to plead culpable participation for 20(a). *See Papa*, 2018 WL 3601229, at \*24 n.24. To the extent culpable participation allegations are required to plead a 20(a) claim, Plaintiff has done so by sufficiently alleging scienter. *See supra* at Section IV.

DATED: February 12, 2021

Respectfully submitted,

**LAW OFFICES OF JAN MEYER &
ASSOCIATES, P.C.**
Jan Meyer
Richard Elem
1029 Teaneck Road
Second Floor
Teaneck, New Jersey 07666
Tel: (201) 862-9500
Email: jmeyer@janmeyerlaw.com
relem@janmeyerlaw.com

*Liaison Counsel for Lead Plaintiff and the
Proposed Class*

**BERNSTEIN LIEBHARD LLP**

/s/ Matthew E. Guarnero

_____

Stanley D. Bernstein
Laurence J. Hasson (admitted pro hac vice)
Joseph R. Seidman, Jr. (admitted pro hac vice)
Matthew E. Guarnero
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
bernstein@bernlieb.com
lhasson@bernlieb.com
seidman@bernlieb.com
mguarnero@bernlieb.com

*Lead Counsel for Lead Plaintiff and the Proposed
Class*

## CERTIFICATE OF SERVICE

I hereby certify that February 12, 2021 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Matthew Guarnero*
MATTHEW GUARNERO