Edna D. Guerrasio
Jonathan E. Richman (admitted *pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, New York  10036
(212) 969-3000
eguerrasio@proskauer.com
jerichman@proskauer.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **STEPHEN AND JUNE VITIELLO,** **Individually and on Behalf of All Others Similarly Situated,** | **No. 2:20-cv-04240-MCA-MAH** |
| **Plaintiffs,** | |
| **v.** | |
| **BED BATH & BEYOND INC.,** *et al.*, | |
| **Defendants.** | |

### DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS <u>PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT</u>

March 15, 2021

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES .........................................................**Error! Bookmark not defined.**

I. THE OPPOSITION TURNS ON MISSATEMENTS OF LAW AND PLEADING.................................................................................................2

    A. Incorrect Pleading Standard for PSLRA Exchange Act Case ....................2

    B. No *Factual* Allegations Showing Existence of Adverse Information ................................................................................................2

    C. No Admissions by BBBY of Contemporaneous Knowledge of Problems ...................................................................................................6

II. PLAINTIFFS HAVE NOT PLED FALSITY.............................................8

    A. September/October 2019 Statements Not False or Misleading ..................8

    B. January 2020 Statements Not False or Misleading...................................13

III. PLAINTIFFS HAVE NOT PLED A STRONG INFERENCE OF SCIENTER. .......................................................................................14

    A. No Evidence of Conscious Misbehavior or Recklessness.........................14

        1. No Strong Inference from Undescribed Reports ............................14

        2. No Admissions of Scienter .............................................................15

        3. No Support from Discussions with Analysts...................................15

        4. No Support from "Critical Management Vacancies" ......................16

        5. No Support from CFO's Resignation .............................................16

    B. No Legally Cognizable Motive to Commit Securities Fraud ....................18

        1. No Motive from Alleged Desire to Please "Activists"...................18

        2. No Motive from Knowledge of Prior Effort to Reduce Inventory.......................................................................................19

        3. No Motive from Desire to Increase Value of Stock and Compensation ...............................................................................19

    C. No Holistic Showing of Scienter ..............................................................20

CONCLUSION........................................................................................................20

## TABLE OF AUTHORITIES

*Page(s)*

**CASES:**

*Abrams v. Baker Hughes, Inc.*,
292 F.3d 424 (5th Cir. 2002) ..................................................................................................3

*Cats v. Protection One, Inc.*,
2001 WL 34070630 (C.D. Cal. June 4, 2001) ........................................................................19

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................................5

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
442 F. App'x 672 (3d Cir. 2011) ......................................................................................17, 20

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) ................................................................................5

*Emps. Ret. Sys. of P.R. Elec. Power Auth. v. Conduent, Inc.*,
2020 WL 3026536 (D.N.J. June 5, 2020) ...............................................................................4

*Exkae Ltd. v. Domo, Inc.*,
2020 WL 7352735 (D. Utah Dec. 15, 2020)............................................................................9

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)......................................................................................5

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019)..............................................................................4

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ...............................................................................................11

*IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*,
660 F. App'x 850 (11th Cir. 2016) ........................................................................................10

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)....................................................................................................4

*In re Advance Auto Parts, Inc. Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020)...........................................................................4, 11

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010)..................................................................................................14

*In re Alpharma, Inc. Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004)................................................................ 18-19

*In re Anadigics, Inc., Sec. Litig.*,
  2011 WL 4594845 (D.N.J. Sept. 30, 2011),
  *aff'd*, 484 F. App'x 742 (3d Cir. 2012)..............................................6

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .........................................7

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 3d 833 (N.D. Cal. 2000) ...................................................3

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)................................................................11

*In re CPI Card Group Inc. Sec. Litig.*,
  2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017)........................................13

*In re Digital Island Sec. Litig.*,
  357 F.3d 322 (3d Cir. 2004)...........................................................18, 19

*In re Electronics for Imaging, Inc. Sec. Litig.*,
  2019 WL 397981 (D.N.J. Jan. 31, 2019)................................................2

*In re Hertz Global Holdings, Inc.*,
  905 F.3d 106 (3d Cir. 2018)......................................................16, 19, 20

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  2015 WL 4469143 (D.N.J. July 22, 2015)..............................................7

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017),
  *aff'd*, 905 F.3d 106 (3d Cir. 2018) ......................................................17

*In re Humphrey Hospitality Tr., Inc. Sec. Litig.*,
  219 F. Supp. 2d 675 (D. Md. 2002) ......................................................12

*In re Landry's Seafood Rest., Inc.*,
  2001 WL 34115784 (S.D. Tex. Feb. 20, 2001) ......................................5

*In re Merck & Co. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005)...................................................................6

*In re Prudential Fin., Inc. Sec. Litig.*,
  2020 WL 7706860 (D.N.J. Dec. 29, 2020).............................................3

iii

*In re Quality Sys. Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...................................................................................4, 6

*In re RAIT Fin. Tr. Sec. Litig.*,
  2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ..................................................................5

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..............................................................................................4

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) ..........................................................................3

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*,
  2011 WL 494753 (D. Conn. Feb. 7, 2011) ......................................................................5

*In re Synchronoss Techs., Inc. Sec. Litig.*,
  2020 WL 2786936 (D.N.J. May 29, 2020).....................................................................11

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
  2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ...............................................................14

*In re Triangle Cap. Corp. Sec. Litig.*,
  ___ F.3d ___, 2021 WL 667085 (4th Cir. Feb. 22, 2021) ..............................................7

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ..............................................................................6

*In re Valeant Pharms., Int'l Sec. Litig.*,
  2017 WL 1658822 (D.N.J. Apr. 28, 2017) ....................................................................17

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)...............................................................................3, 4, 7, 15

*Johnson v. Costco Wholesale Corp.*,
  2019 WL 6327580 (W.D. Wash. Nov. 26, 2019).............................................................14

*Local 731 Int'l Bhd. of Teamsters Pension Tr. Fund v. Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011)......................................................................5

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010),
  *aff'd*, 430 F. App'x 63 (2d Cir. 2011).............................................................................3

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  2021 WL 517934 (S.D.N.Y. Feb. 10, 2021)................................................................4, 14

*Nasyrova v. Immunomedics, Inc.*,
  2015 WL 4388310 (D.N.J. July 15, 2015).........................................................................8

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ...............................................................................14, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).....................................................................................................12

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020).............................................................13

*Rahman v. Kid Brands, Inc.*,
    2012 WL 12294490 (D.N.J. Oct. 17, 2012),
    *aff'd*, 736 F.3d 237 (3d Cir. 2013) ............................................................................18

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013)......................................................................................5, 6

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)....................................................7, 15, 17

*Sapir v. Averback*,
    2016 WL 554581 (D.N.J. Feb. 10, 2016) ....................................................................8

*Se. Pa. Trans. Auth. v. Orrstown Fin. Svcs.*,
    2015 WL 3833849 (M.D. Pa. June 22, 2015)...................................................... 10-11

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000).........................................................................................9

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
    2020 WL 6484310 (D. Del. Nov. 4, 2020) ..................................................................9

*Tanaskovic v. Realogy Holdings Corp.*,
    2021 WL 211049 (D.N.J. Jan. 21, 2021) ................................................................3, 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................8, 14

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    2020 WL 6118605 (N.D. Ill. Oct. 15, 2020)..............................................................10

*West Palm Beach Police Pension Fund v. DFC Global Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015)..............................................................17

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)....................................................................................9, 11

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ......................................................................................17

v

**STATUTES AND RULES:**

15 U.S.C. § 78j(b) ............................................................................................ *passim*

15 U.S.C. § 78u-4(b) ....................................................................................... *passim*

15 U.S.C. § 78t(a) .................................................................................................20

Fed. R. Civ. P. 9(b) ........................................................................................ *passim*

Nothing in Plaintiffs' Opposition Brief ("Opp.") suggests that the Amended Complaint ("Complaint" or "Compl.") pleads anything other than impermissible claims of mismanagement and fraud by hindsight.  As Defendants' brief ("Br.") showed, Bed Bath & Beyond Inc. ("BBBY") embarked in 2019 on a well-publicized transformation of its governance and operations:  an almost-complete turnover of its Board of Directors, numerous changes in executive management (including a new CEO), a substantial reduction in staff, and an "aggressive" effort to reduce inventory and focus on higher-margin products.  Whether these transformational efforts resulted in some short-term disappointments is beside the point.[1] Plaintiffs cannot state a *securities-fraud* claim without alleging particularized *facts* – not guesses – showing that the information available to Defendants was inconsistent with their public statements and that, for forward-looking statements, Defendants *actually knew* that their expectations would not materialize.  But the Complaint contains no such factual allegations.

Instead, Plaintiffs try to evade the Private Securities Litigation Reform Act's (the "PSLRA's") heightened pleading standards by ignoring them.  They also cite a blizzard of inapposite cases in which, unlike here, the plaintiffs had pled *facts* showing that the defendants had had information inconsistent with their public statements.  And Plaintiffs repeatedly misconstrue BBBY's candid, after-the-fact evaluations of what had gone wrong as "admissions" of prior knowledge.  None of these tactics succeeds.  Plaintiffs have not shown that Defendants made any false or misleading statements; nor have they pled facts creating a strong inference of the requisite scienter.  The Court should dismiss this case with prejudice.

---

[1]    Over the longer term, Defendants had reason to believe in the transformation process's viability.  On September 4, 2019, the first day of the Class Period, BBBY's stock closed at $9.46.  On March 12, 2021, it closed at $30.16, an increase of more than 200% in 18 months. *See https://www.nasdaq.com/market-activity/stocks/bbby/historical*.

I.     **THE OPPOSITION TURNS ON MISSATEMENTS OF LAW AND PLEADING.**

Plaintiffs' brief misstates the law on pleading standards and the need to plead *facts* supporting allegations of knowledge.  It also misrepresents CEO Mark Tritton's statements.

A.     **Incorrect Pleading Standard for PSLRA Exchange Act Case**

Plaintiffs' Argument section begins [at 8] by reciting the relaxed *Twombley/Iqbal* pleading standard, ignoring that this is a *fraud* case under the Securities Exchange Act (the "Exchange Act") and is governed by the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA.  *See In re Electronics for Imaging, Inc. Sec. Litig.*, 2019 WL 397981, at *5 (D.N.J. Jan. 31, 2019) ("In addition to the customary pleading requirements under Rule 8, plaintiffs alleging securities fraud must meet the heightened pleading requirements set forth by [Rule] 9(b) and the [PSLRA].").  Rule 9(b) and the PSLRA require Plaintiffs to plead fraud with particularity, and allegations based on information and belief (as Plaintiffs' are) must "state with particularity *all facts* on which that belief is formed," 15 U.S.C. § 78u-4(b)(1) (emphasis added). Plaintiffs' generic allegations and speculations unsupported by particularized facts do not do so.

B.     **No *Factual* Allegations Showing Existence of Adverse Information**

The Opposition [at 10-11] contends that BBBY's CEO and CFO saw reports about revenues, inventory, and margins, so they must have known that the inventory-reduction program was cannibalizing revenues and undermining margins at the time of the challenged statements.  But Plaintiffs never allege *what* those reports showed, and *when*.

Plaintiffs cannot fill that void by alleging Defendants' access to or review of reports containing generic *categories* of information without alleging the *substance* of that information. Every company generates reports on revenues, inventory, and margins, and executives might see those reports.  If a plaintiff could establish an issuer's knowledge of problems without pleading facts showing that those reports revealed those problems, no court would ever grant a motion to

2

dismiss.  *See In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 3d 833, 844 (N.D. Cal. 2000) (allegations about sales reports insufficient without "specific allegations . . . about the contents of the reports"; allowing "a case based on general allegations of negative internal reports would expose virtually all public companies to potential litigation") (internal quotations omitted).  The Exchange Act's standard, which Plaintiffs ignore, instead requires a complaint to plead "the *reason or reasons why* [a challenged] statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief [as Plaintiffs' are], the complaint shall state *with particularity* all *facts* on which that belief is formed."  15 U.S.C. § 78u-4(b) (emphasis added); *see Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) ("when allegations are made on information and belief, the complaint must not only state the allegations with factual particularity, but must also describe the sources of information with particularity, providing the who, what, when, where and how of the sources, *as well as the who, what, when, where and how of the information those sources convey*") (emphasis added); Br. at 14-15.[2]

Thus, courts have routinely held that a plaintiff cannot satisfy these heightened pleading standards merely by citing the existence of internal reports on the assumption that those reports contained contrary information, but without specifying the *contents* of those reports.[3]  Indeed, in

---

[2]    *See also, e.g.*, *Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *6-13 (D.N.J. Jan. 21, 2021) (no *factual* allegations showing that defendants should have known statements about expectations were false when made); *In re Prudential Fin., Inc. Sec. Litig.*, 2020 WL 7706860, at *10, *12 (D.N.J. Dec. 29, 2020) (same).

[3]    *See, e.g.*, *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient . . . .  Such allegations must have corroborating details regarding the contents of the allegedly contrary reports, their authors and recipients"); *Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) (allegations about reporting system showing credit and performance data insufficient because "the existence of channels of information is not enough"; complaint "must provide specificity about the[] conclusions" in reports), *aff'd*, 430 F. App'x 63 (2d Cir. 2011); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1070 (N.D. Cal. 2001)

3

another case brought by Lead Counsel here alleging undisclosed inventory issues at another

retailer, a court last month granted a motion to dismiss on those very grounds. *See Maloney v.*

*Ollie's Bargain Outlet Holdings, Inc.*, 2021 WL 517934, at *5 (S.D.N.Y. Feb. 10, 2021)

(allegations about "access to the Daily Sales Flash Report, which tracked store sales," and

existence of "'technology . . . to provide real-time information . . . regarding [company's]

inventory'" "fail[] to specify exactly what information was contained in the report or how said

information contradicted Defendants' public statements"). *Id.* So too here.

None of Plaintiffs' cases [at 11-12, 17, 29-31] about "access" to reports and information

lacked factual allegations about the *substance* of those materials. The courts upheld allegations

of access to or review of reports and information because the plaintiffs had pled *what* those

reports showed or *what* was discussed at meetings, not merely the *categories* of information at

issue. The shorthand references to "access to" information came only after the courts had recited

factual allegations about the *contents* of those reports or discussions.[4] But Plaintiffs here have

---

(allegations of access to reports insufficient where "not supported by any specific facts
concerning . . . the content of the reports").

[4]    *See Avaya*, 564 F.3d at 250-51, 260-61, 263, 266, 268 (complaint pled CW testimony,
internal data, and customer information showing that price discounting was hurting margins); *In
re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 271-72 (3d Cir. 2004) (complaint pled knowledge
of gray-marketing based on company's press release and its filing of bill of discovery against
unauthorized dealer); *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1138-39 (9th Cir. 2017)
(CWs alleged that "recurring revenue model" existed, slowdown had started before class period,
CEO had said "market for new systems 'had become saturated,'" and targets had been missed
during class period); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 71-72 (2d Cir. 2001)
(complaint pled internal reports showing specific decrease in book sales and percentage increases
in book returns); *Emps. Ret. Sys. of P.R. Elec. Power Auth. v. Conduent, Inc.*, 2020 WL 3026536,
at *2, *4, *6-7 (D.N.J. June 5, 2020) (complaint pled facts and CW testimony showing known
issues with IT infrastructure and vendor performance, service issues, penalties from IT problems,
and CEO's meetings with complaining customers); *In re Advance Auto Parts, Inc. Sec. Litig.*,
2020 WL 599543, at *3, *8 (D. Del. Feb. 7, 2020) (complaint pled content of reports showing
negative growth, declining comp-store results and nationwide sales, and discussions of negative
comps); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *3-7, *25 (D.N.J. Dec. 27, 2019)
(complaint pled facts about tests since 1969 showing asbestos in talc, efforts to prevent

4

not alleged any particularized facts about the contents of Revionics and JDA reports to support their conclusory allegation that, starting as early as September, those data showed that the inventory-reduction program was cannibalizing revenues and eroding margins.

Nor does CW-1 plead any such facts.  He left BBBY two months before the new program began [Compl. ¶ 69], so he could not have known what the sales and inventory data showed *after* his departure.  *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) (rejecting CW allegations about meetings and discussions that occurred outside employment period and in which CWs did not participate, because no "personal knowledge" of relevant information).

Plaintiffs' cases [at 32-33] about CWs who left before the class period are inapposite. First, unlike the present case, none of those cases involved *new*, previously untried business

---

consideration of talc as carcinogen, numerous lawsuits alleging link between talc and cancer, several jury verdicts against defendant, and inquiries from FDA); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 288-89, 299 (S.D.N.Y. 2018) (CWs alleged reports, spreadsheets, and underwriting platform showing increasing loan-delinquency rates, and conference calls and meetings discussing delinquency increases); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *5 (D.N.J. Jan. 12, 2018) (complaint pled facts showing that problems had begun *before* class period and continued; defendants were given production updates showing problems, were aware of manufacturing issues because of customer reprimands, and knew of key customers' financial difficulties); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *2-3, *17-18 (S.D.N.Y. Mar. 25, 2013) (complaint pled facts showing that problems had begun before class period, were widely known, and would continue because company ordered products 6-9 months in advance; CWs alleged "content" of internal reports about sales and inventory data that showed problems and were discussed in meetings that one CW attended); *Local 731 Int'l Bhd. of Teamsters Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *2, *7-8, *12 (D. Del. June 14, 2011) (complaint pled documents and CW testimony showing "'secular shift' away" from company's products, substantial discounting, increasing bad debt, increasing receivables); *In re Sturm, Ruger & Co., Inc. Sec. Litig.*, 2011 WL 494753, at *7-8 (D. Conn. Feb. 7, 2011) (complaint pled that management had seen internal reports comparing daily production goals to actual production and showing missed targets, and held daily meetings about failure to meet goals); *In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164, at *7, *13 (E.D. Pa. Dec. 22, 2008) (complaint pled CW testimony about management's real-time knowledge that issuers of certificates that company held were "financially distressed and likely to default"); *In re Landry's Seafood Rest., Inc.*, 2001 WL 34115784, at *5 (S.D. Tex. Feb. 20, 2001) (complaint pled specific data about management understaffing, significant increases in management turnover and compensation, flat/declining sales, and reduction in revenues and profits because of clustering).

strategies initiated *after* the CWs had departed.  Second, some of them involved multiple CWs, many of whom had been employed *during* the class period – not a single CW who had left *before* the period began.[5]  Third, some addressed objective *data* from before the class period.[6] Historical, pre-period data do not change over time, so whether the reporting CW remained an employee during the class period is not necessarily significant.[7]

## C.    No Admissions by BBBY of Contemporaneous Knowledge of Problems

Plaintiffs cite a number of Mr. Tritton's after-the-fact statements between January and April 2020 to try to show that BBBY had known in 2019 that the new inventory-reduction plan would cannibalize revenues and erode margins.  But Plaintiffs repeatedly distort what Mr. Tritton said.  None of those statements suggests that BBBY had known *in advance* that the

---

[5]    *In re Quality Sys.*, 865 F.3d at 1138-39 (five of seven CWs employed during class period); *Rahman*, 736 F.3d at 239, 241 (five of six); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 644 (E.D. Pa. 2015) (four of six); *In re Anadigics, Inc. Sec. Litig.*, No. 3:08-cv-5572 (D.N.J.) (FAC ¶¶ 37-42 (ECF No. 68)) (five of six).

[6]    *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005); *Rahman*, 736 F.3d at 245 n.11; *Urban Outfitters*, 103 F. Supp. 3d at 649 n.2; *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *16 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012).

[7]    Plaintiffs' reliance [at 31] on unspecified problematic information that Revionics and JDA purportedly revealed is inconsistent with the Complaint.  As Plaintiffs admit, Revionics and JDA were designed to prevent revenue cannibalization and margin erosion.  Faced with that inconsistency, Plaintiffs now contend [at 31] that BBBY did *not* "implement" Revionics and JDA, so the programs could not have prevented revenue cannibalization and margin erosion.  But the *Complaint* never pleads that BBBY failed to "implement" Revionics and JDA or that Defendants misrepresented that they would do so.  To the contrary, the Complaint alleges that BBBY did implement the programs.  [*E.g.*, Compl. ¶ 46 ("Both before and during the Class Period, BBBY *used* industry software from, among others, Revionics") (emphasis added); *accord id.* ¶ 47 ("At all times relevant, BBBY *utilized* inventory management software supplied by Revionics, among others.") (emphasis added); *id.* ¶ 67 ("BBBY *continued to use* software, including . . . Revionics, during the Class Period, but began to focus on utilizing that software to manage markdowns and track the Program's progress *in addition to utilizing it* for inventory management.") (emphasis added).]  So the only factual allegations are:  (*i*) BBBY said it would – and did – use Revionics and JDA, (*ii*) the programs were meant to prevent the problems that ultimately emerged, (*iii*) the programs generated data (the substance of which is not alleged), and (*iv*) revenue cannibalization and margin erosion nevertheless occurred during the holiday season. Those allegations do not support an inference that BBBY *knew* starting in September that the adverse financial impact that the software was designed to prevent would occur months later.

problems would occur or were occurring despite the company's efforts to avoid them by using software (Revionics and JDA) and an independent liquidator [Compl. ¶¶ 62-64, 162]. *See, e.g.*, *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *19 n.20 (D.N.J. July 27, 2018) (alleged "admission" of material weakness in internal controls is "improperly based on hindsight . . . because Plaintiffs fail to allege any facts demonstrating Defendants' knowledge of the weakness . . . at the time of the alleged misstatements") (internal quotations omitted).  For example:

- Several of Mr. Tritton's statements were simply *post hoc* assessments of what had happened, not "admissions" of prior knowledge.  Mr. Tritton's February 18, 2020 statement that BBBY had not had "'price management floated properly'" "'coming into the third and fourth quarter'" did not imply that BBBY had known *in the third or fourth quarter* that price management had not been "'floated properly.'"  [Opp. at 5, 7, 10 n.8, 34, 35; Compl. ¶¶ 187, 196]  His April 15 statement about BBBY's failure to "'lay down plans [at the "end of the third quarter, start of the fourth quarter"] to get there in the right way'" did not suggest that BBBY had known *in the third or fourth quarter* about that failure.  [Opp. at 34; Compl. ¶ 121]  And his April 15 statement that "'[w]e knew we were plagued by [inventory] issues in December and January'" did not suggest that BBBY had known *in December 2019 or January 2020* about those issues.  [Opp. at 7, 34, 35 n.41]  Rather, Mr. Tritton was speaking about BBBY's perceptions in March 2020, after Covid had hit.  [Br. at 25, 36; Compl. ¶ 198; Pl. Ex. A at 12] *See, e.g.*, *Avaya*, 564 F.3d at 275 (CFO's April statement that he had heard about discounting "'admits' only that he was, in April, aware of a discount," not that he had been told of it "at any particular point in the past") *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *19 (D.N.J. July 22, 2015) ("post-hoc, speculative explanation" says "nothing about Defendants' knowledge or state of mind during the Class Period"); *see also In re Triangle Cap. Corp. Sec. Litig.*, ___ F.3d ___, 2021 WL 667085, at *7 (4th Cir. Feb. 22, 2021) (same).[8]

- As to another supposed "admission," Plaintiffs [at 34] invented the timeframe by adding the bracketed phrase "[in December 2019 and January 2020]" to Mr. Tritton's April 15 statement about BBBY's having done "'intel work'" on in-

---

[8]    *In re Apple Inc. Securities Litigation*, 2020 WL 6482014, at *9 (N.D. Cal. Nov. 4, 2020), which Plaintiffs cite [at 34-35], held that the CEO's post-period statement arguably admitted knowledge *during* the class period because the CEO had discussed sales deceleration even *before* the period had begun, and his statement plausibly admitted knowledge *during* the first month of the quarter. *Id.* at *1, *6, *9-10.  But the court made clear that "an after-the-fact statement must *contradict*[] the substance of an earlier statement and essentially state[] 'I knew it all along' to constitute an admission." *Id.* at 10 (internal quotations omitted; emphasis added).  Mr. Tritton's statements cannot be so interpreted and did not contradict any prior statements.

store customers.  Mr. Tritton did not say *when* that work had been done.  [Compl. ¶ 113]  And his comment suggests that the work likely had been done after the holiday season, because, as he explained, the issue was "'easily rectifiable, and we started to do that straight at the end of January.'"  [Pl. Ex. A at 12]

- Another "admission" was not about inventory at all.  Contrary to Plaintiffs' contention [at 6, 11, 12, 19 n.19, 22, 32, 34; Compl. ¶ 96], Mr. Tritton did not say on January 8, 2020 that BBBY had been watching *inventory* "'hour by hour.'"  As Defendants' Brief explained [at 25], Mr. Tritton was addressing BBBY's "'hour by hour'" watching of the interplay between in-store and digital sales, which is not what this case is about.  Moreover, the Complaint does not contain any factual allegations of *what* BBBY purportedly saw through its "'hour[ly]'" watching.  And in any event, the statement addressed only what BBBY had been "'watching'" during and after "'the Thanksgiving period'" [Compl. ¶ 96], so it could not have concerned BBBY's knowledge in September or October.

Contrary to Plaintiffs' assertions [at 8, 22 n.23, 35], Defendants are not disputing alleged facts; they are correcting Plaintiffs' misreadings of the Complaint and the public, judicially noticeable record, as is appropriate at the pleading stage.  *See, e.g.*, *Sapir v. Averback*, 2016 WL 554581, at *10 (D.N.J. Feb. 10, 2016) ("When allegations contained in a complaint are contradicted by the document it cites, the document controls"; considering "SEC filings, press releases, and earnings call transcripts") (internal quotations omitted).[9]

## II.    PLAINTIFFS HAVE NOT PLED FALSITY.

Plaintiffs' brief does not establish a materially false or misleading statement or omission in either September/October 2019 or January 2020.

### A.    September/October 2019 Statements Not False or Misleading

Plaintiffs have not shown that the September and early-October 2019 statements were false when made.

---

[9]    *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (on Rule 12(b)(6) motion, "courts *must* consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice") (emphasis added); *Nasyrova v. Immunomedics, Inc.*, 2015 WL 4388310, at *3 (D.N.J. July 15, 2015) (court need not accept factual allegations as true when they are contradicted by documents on which claims are based).

8

First, the September 4 letter announcing the new inventory-reduction program did not "conceal[]" the program's risks or "falsely claim[] that [it] was all upside with no particular risk." [Opp. at 9-10]  It said only that BBBY "*expected*" to execute a program that "*should* allow us to quickly reset inventory levels" [9/4/19 Letter (Def. Ex. H at 4) (emphasis added)], and it promised "a more fulsome update" on October 2 [*id.* at 5].  This was an aspirational, interim announcement.  Plaintiffs' effort [at 10 n.8] to distinguish *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 2020 WL 6484310, at *9 (D. Del. Nov. 4, 2020), which found no duty "to disclose a risk that had not 'actually materialized' at the time of the allegedly misleading prior disclosure," is unavailing, because Plaintiffs do not plead any facts showing that the risk of cannibalization *had* materialized by September.[10]  And the letter's cautions about the "early stages [of] the transformation" and "the risks associated with [BBBY's] ability to achieve a successful outcome for business concepts and to otherwise achieve its business strategies" [Def. Ex. H at 4, 6] sufficed to warn shareholders of the risks inherent in the new program.

Second, Plaintiffs [at 10] mischaracterize Defendants' October 2020 statements as "casually" introducing the risks of the inventory-reduction program and assuring that they would not eventuate.  Those statements said only what BBBY was *trying* to do: "'manage[] [the new program] thoughtfully to prevent cannibalization of sales'" [Compl. ¶ 145].  Nor were the statements about use of software to implement the program false or misleading when made,

_____

[10]     *Accord Williams v. Globus Med., Inc.*, 869 F.3d 235, 242-43 (3d Cir. 2017) (no disclosure duty where "plaintiffs have failed to adequately plead that the risk . . . had actually materialized at the time" of challenged statement); *see also Exkae Ltd. v. Domo, Inc.*, 2020 WL 7352735, at *7 (D. Utah Dec. 15, 2020) (rejecting claim that defendant "should not only have disclosed its business strategy as it did, but also should have disclosed that these strategies were bad ideas and/or doomed to fail").  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182-83 (3d Cir. 2000), which Plaintiffs cite [at 9], held only that generalized risk warnings did not sufficiently warn of "specific numbers" in a preliminary restatement; it did not address the sufficiency of warnings about the *future* prospects of *general business strategies*, as here.

9

because, as explained above, Plaintiffs have not pled any *facts* to support their claim [at 11] that the software had "contemporaneously exposed the materialization of the [inventory-reduction program's] [k]ey [r]isks."[11]  *See* section I.B *supra*.  And although Plaintiffs charge [at 12] that Defendants had "continual access to, and reception of, this adverse information," the Complaint never alleges *what* this "adverse information" was and *when* it became available.[12]

Third, Plaintiffs' assertion [at 14-15] that the challenged statements do not constitute puffery ignores the use of vague, generalized terms that do not convey anything "specific, measurable, or concrete . . . ."  *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 2020 WL 6118605, at *21 (N.D. Ill. Oct. 15, 2020).  For example, use of the term "'thoughtfully'" to describe how BBBY intended to manage the inventory-reduction program is puffery.  *See IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir. 2016) (description of share-repurchase program as "thoughtful" is nonactionable puffery).  So are characterizations such as "'*meaningful* difference'" and "'*data-driven* insights'" [Opp. at 15 (quoting Compl. ¶¶ 147, 149)], which "are too vague to be capable of verification, and are therefore accurately characterized as puffery," *Se. Pa. Trans. Auth. v.*

---

[11]  None of the cited Complaint paragraphs [Opp. at 11] alleges any *data* that Defendants had received by October 2019 showing that the inventory-reduction program was eroding margins or cannibalizing sales.  [Compl.¶¶ 46-49 (describing software's capabilities), 62-68 (same), 69-78 (describing what Revionics and JDA reports *generally* provide), 115 (post-class-period statements about experience in fourth quarter 2019), 121 (same), 123-130 (generic allegation that Revionics disclosed unspecified problems "throughout the Class Period"), 197 (quoting February 2020 analyst report), 201 (post-class-period statements).  As explained above in footnote 4, Plaintiffs' case citations [at 11-12] are inapposite because, unlike here, the complaints in those cases alleged *specific* information that the defendants had received about ongoing problems before the challenged statements were made.

[12]  The Complaint paragraphs that Plaintiffs cite [at 14] to assert that, "as of October 2019, Winston and D'Elia had been steadily receiving [data] about the [p]rogram's adverse effects" simply repeat the unsupported allegation that "BBBY's software . . . provided [Defendants] with real-time data" showing that "the [p]rogram's promotions and markdowns were having material adverse consequences," without specifying *what* the data showed.  [Compl. ¶¶ 141, 144, 146]

10

*Orrstown Fin. Svcs.*, 2015 WL 3833849, at *19 (M.D. Pa. June 22, 2015) ("'sound credit practices and stringent underwriting standards'" is puffery).

Fourth, many of the challenged statements are shielded by the PSLRA's safe harbor. Plaintiffs' claim [at 15] that forward-looking statements are "actionable" if issued "without a reasonable basis" misstates governing law and depends on a single case (*Advance Auto Parts*, 2020 WL 599543, at *2), which relied on two *pre-PSLRA* cases.[13]  Under the PSLRA, a forward-looking statement is not actionable unless the plaintiff establishes both (*i*) defendants' "actual knowledge" of falsity and (*ii*) lack of adequate cautionary language – which Plaintiffs here have not done.  [Br. at 10, 18-19]  *See, e.g.*, *In re Synchronoss Techs., Inc. Sec. Litig.*, 2020 WL 2786936, at *20 (D.N.J. May 29, 2020) (under PSLRA's "exacting pleading standard," "'it is not enough merely to identify a forward-looking statement and assert as a general matter that the statement was made without a reasonable basis'" (quoting *Williams*, 869 F.3d at 244)).  But even under a "reasonable basis" standard, Defendants' projections would be protected.  That standard requires showing that Defendants "inadequate[ly] consider[ed] the available data" [Opp. at 15 (citing *Advance Auto*, 2020 WL 599543, at *2)], but the Complaint does not allege any data that Defendants received, let alone whether the data showed revenue cannibalization or margin erosion by late September 2019.  Plaintiffs' assertion [at 27] that the September/October projections were not protected by safe harbor "because Plaintiffs allege Defendants *knew* BBBY's guidance was unachievable when issued" fails for the same reason.

Plaintiffs' other arguments against safe-harbor protection also fail.  As Defendants' Brief explained [at 18], statements whose truth or falsity cannot be discerned when made are forward-looking.  *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999).  Even if portions of those

---

[13]    Although *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir. 1997), was decided in 1997, it was not governed by the PSLRA, *see id.* at 1418 n.6.

disclosures "contain some statements about the Company's present situation, when taken as a whole, [they] constitute[] forward-looking statement[s] of the Company's goals and expectations." *In re Humphrey Hospitality Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 683 n.3 (D. Md. 2002).[14]  The statements were also accompanied by meaningful cautionary language that did not "essentially eliminate[] these risks," as Plaintiffs claim [at 26]; instead, BBBY discussed the risks and explained how it hoped to avoid them.

Fifth, numerous challenged statements are opinions:  expressions of Defendants' belief about the inventory-reduction program's prospects.  Even Plaintiffs' case citation [at 20] held that statements of views about whether a disclosed strategy could succeed were statements of opinion.  *Tanaskovic*, 2021 WL 211049, at *19.  And as explained above, those opinions are protected because Plaintiffs have not alleged any *facts* showing that Defendants knew in September/October that the inventory-reduction program would cannibalize sales or erode margins.  Plaintiffs have "simply conclud[ed] that Defendants had no reasonable basis for these beliefs," which "is insufficient."  *Id.* at *20; *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) (without allegations about what "information [was] in the issuer's possession at the time," plaintiff cannot show that issuer's opinions did not "fairly align" with that information).

Sixth, Plaintiffs have not shown that the October 9 Form 10-Q violated Regulation S-K.  As to Item 303, the Complaint contains no particularized allegations that, by October 9, Defendants *knew* that the inventory-reduction program was cannibalizing sales or eroding margins.  Moreover, Plaintiffs [at 23-24] do not cite any authority for the proposition that a one-

---

[14]    *See, e.g.*, Compl. ¶¶ 147 ("'*We continue* to make strategic pricing decisions . . . .  We believe that more effective pricing *will drive* both top line growth and profit improvement.'") (emphasis added); 152 ("'[W]e've also *continued* with some strategic pricing initiatives, which has helped benefit our margin.  And we have *more to come*.'") (emphasis added).

month period for a new business strategy can constitute a "trend" under Item 303.[15]  Nor have Plaintiffs shown a violation of Item 105; their Opposition [at 25] once again relies on unsupported allegations that Defendants knew in October that "promotions and markdowns would decimate margins and cannibalize revenues."  Plaintiffs have not alleged any facts showing that Defendants had such knowledge at any point, let alone before filing the 10-Q.

**B.       January 2020 Statements Not False or Misleading**

Plaintiffs' arguments about the January 2020 statements are similarly deficient.  First, they are inconsistent:  Plaintiffs charge [at 22] that those statements "concealed the full extent of the inventory management and cannibalization and margin problems," but also contend [at 21 n.23] that "Tritton admitted the inventory problems."  And Plaintiffs call the withdrawal of fiscal-year guidance a "rare and draconian step" [*id.* at 6], but nevertheless claim that such an attention-grabbing measure somehow concealed the "full extent" of BBBY's inventory issues.

At bottom, however, these arguments fail because, as with the September/October statements, the Complaint does not plead any *factual* information that Defendants had received by January that was inconsistent with their statements at that time and was not disclosed.  A claim that Defendants did not disclose "the full extent" of the problem cannot survive under the PSLRA unless Plaintiffs specify *what* additional information was available but was not disclosed – especially in light of Defendants' repeated warnings about "headwinds" and "pressures"

---

[15]       In *In re CPI Card Group Inc. Securities Litigation*, 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017), which involved a Securities Act claim *not* subject to the PSLRA's particularity standards, the alleged trend lasted *three to nine months* and did not involve the announcement of a new business strategy.  *Plumbers & Pipefitters National Pension Fund v. Davis*, 2020 WL 1877821, at *2-3, *8 (S.D.N.Y. Apr. 14, 2020), involved *factual* allegations of a *known* trend of inventory build-up:  the company had been warned by retailers and by its major shareholder and former chair; internal documents had confirmed pushing early orders on retailers and ignoring customers' credit limits and complaints; and the auditor had said the company lacked adequate controls on credit limits, contract management, and revenue recognition.

expected in the fourth quarter [*see* Br. at 25-26].[16]  And as discussed above, Plaintiffs' citations to Mr. Tritton's post-Class Period statements are irrelevant, because those statements were not "admissions" of prior misrepresentations or knowledge.[17]

### III.   **PLAINTIFFS HAVE NOT PLED A STRONG INFERENCE OF SCIENTER.**

In addition to failing to establish an actionable misrepresentation or omission, Plaintiffs' opposition brief does not plead a strong inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

#### A.   **No Evidence of Conscious Misbehavior or Recklessness**

Nothing in Plaintiffs' brief [at 29-38] establishes a strong inference that Defendants knew or recklessly disregarded that their public statements were false or misleading.

##### 1.   **No Strong Inference from Undescribed Reports**

Plaintiffs focus [at 29-33] on cases holding that access to or receipt of reports undermining public statements can create a strong inference of scienter.  But as explained above in section I.B, the complaints in those cases had pled *factual* allegations of *what* those reports had shown.  The Complaint here does not do so.  Plaintiffs thus have failed to plead any *facts* creating a strong inference of Defendants' conscious misbehavior or recklessness.  *See, e.g.*, *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416-17 (9th Cir. 2020) (no strong inference of scienter where CW did not plead *contents* of allegedly available information); *Maloney*, 2021 WL 517934, at *5 (dismissing allegations of scienter based on retailer's access to daily reports on

---

16      *See, e.g.*, *Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at *17 (W.D. Wash. Nov. 26, 2019) (rejecting allegation about failure to disclose "full extent" of problem where no pleading of "any specific facts showing" defendants' knowledge); *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *8 (S.D.N.Y. Mar. 26, 2019) (same).

17      Moreover, contrary to Plaintiffs' assertion [at 22 n.24], Mr. Tritton's calling BBBY's strategic transformation "solid" was inactionable puffery.  *See, e.g.*, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010) ("'solid and balanced growth'" is puffery).

sales and inventory, because "the complaint fails to specify *exactly what information* was contained in the report[s] or how said information contradicted Defendants' public statements, as is required to show scienter") (emphasis added; internal quotations omitted).  Plaintiffs also do not explain how a program launched on September 4, 2019 would have yielded sufficient adverse data by the end of that month to show that it would negatively affect BBBY's financial performance and render BBBY's early-October statements false or misleading.

### 2.    No Admissions of Scienter

Plaintiffs next contend [at 34-35] that Mr. Tritton "admitted" in 2020 that Defendants had known about revenue cannibalization and margin erosion before making the challenged statements.  As explained above in section I.C, however, none of Mr. Tritton's statements "admitted" anything of the sort, and none of them can support a strong inference of scienter.

### 3.    No Support from Discussions with Analysts

Nor do Plaintiffs' cited cases [at 35-37] support a strong inference of scienter based on Defendants' discussions with analysts.  In *Avaya*, the defendants had *denied* the current "existence of widespread and unusual discounting . . . in response to repeated questions about pricing by analysts."  564 F.3d at 269.  And *Roofer's* held only that executives' responses to analysts' questions "would have made [the speakers] *aware* of the importance of" the issue that the analysts were asking about.  2018 WL 3601229, at *21 (emphasis added); *see also Avaya*, 564 F.3d at 270 (analysts' "focused questions" suggest defendants' knowledge of issue).  But the Individual Defendants here did not deny, or claim ignorance of, the risk that the inventory-reduction program could harm future revenues and margins.  To the contrary, they acknowledged that risk in discussions with analysts and explained how they hoped to address it (*e.g.*, through JDA, Revionics, and a liquidator).  [*E.g.*, Compl. ¶¶ 62-63, 145, 160, 162]

15

Plaintiffs [at 36-37] also cannot escape the facts that BBBY took the purportedly unusual steps of withdrawing fiscal-year guidance in January 2020 and announcing preliminary results for the first two months of the fourth quarter in February.  Plaintiffs' effort [at 37 n.45] to distinguish Defendants' cases [Br. at 35, 39] as involving multiple releases of disappointing information is misguided.  Only a short period of time is at issue here, and BBBY acted as soon as results became available for the third quarter and the first two months of the fourth.

### 4.    No Support from "Critical Management Vacancies"

Plaintiffs' unsupported invocation [at 37] of "management vacancies" is equally unavailing.  First, those vacancies did not occur until mid-December 2019 [Compl. ¶¶ 91, 220] and thus are irrelevant to the September/October statements.  Second, as Defendants' Brief showed [at 36], the positions were not vacant; interim leads filled them [Compl. ¶ 91], and the Complaint does not allege that the interim leads were incompetent *and* known to be so.  Third, the existence of vacancies was publicly disclosed and unsurprising, as the market knew that a new CEO had arrived in November and was implementing his own plans.  [*Id*. ¶¶ 90, 91]

### 5.    No Support from CFO's Resignation

Nor does the resignation of BBBY's CFO support an inference of scienter (an allegation nowhere in the Complaint).  [Br. at 37-38]  Even if a resignation is allegedly tied to corporate underperformance, "pleading scienter requires more than pleading a link between bad news and an executive's resignation."  *In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 119 (3d Cir. 2018).  "Corporate resignations do not strengthen an inference of scienter, when . . . the allegations do not cogently suggest that the resignations resulted from the relevant executives' *knowing or reckless involvement* in a fraud."  *Id.* (emphasis added).  No such evidence exists here.

Contrary to Plaintiffs' assertion, this Court's *Hertz* decision (which the Third Circuit affirmed) did not focus only on the CFO, who had resigned "'months *before* Hertz discovered its

16

accounting was off.'" [Opp. at 38 n.47 (quoting *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at \*21 (D.N.J. Apr. 27, 2017)) (emphasis added)]  The Court also disregarded resignations that had occurred up to "seven weeks *after*" Hertz had announced adjustments to its prior financial statements.  2017 WL 1536223, at \*20-21.  And the Court based its ruling in part on a Ninth Circuit decision holding that, "'[w]here a resignation occurs slightly before *or after* the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of the restatement's issuance itself in order for a resignation to be strongly indicative of scienter.'"  *Id.* at \*20 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009)) (emphasis added).  Plaintiffs here have not pled any such facts about Ms. D'Elia, who resigned nearly three months after the Class Period ended [Compl. ¶¶ 26, 37].[18]

---

[18]    Plaintiffs' case citations [at 37-38] are inapposite.  The citation to *City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, 442 F. App'x 672, 679 (3d Cir. 2011), is to the *dissent*, not the majority's affirmance of dismissal.  And the dissenting judge found the CFO's resignation significant because the CFO had "forfeited $4,000,000 in stock options and, contrary to standard company practice, did not receive a severance package.  To say that this is not typical politely understates suspicious circumstances . . . ." *Id.*  Plaintiffs here plead no such atypical circumstances as to Ms. D'Elia.  The plaintiffs in *In re Valeant Pharmaceuticals, International Securities Litigation*, 2017 WL 1658822, at \*8 (D.N.J. Apr. 28, 2017), alleged executive and director departures as one of seven indicia of scienter, but court's scienter discussion did not mention the departures, *id.* at \*10.  *West Palm Beach Police Pension Fund v. DFC Global Corp.*, 2015 WL 3755218, at \*17 (E.D. Pa. June 16, 2015), held that, "[g]enerally, the resignation of key officers is *insufficient* to show scienter" (emphasis added); the court considered the resignations because *other* allegations showed scienter.  In *Roofer's*, this Court considered the resignation of a CFO who had resigned on *the same day* that the issuer announced an investigation into historical revenue-recognition practices.  2018 WL 3601229, at \*20.  Ms. D'Elia, in contrast, did not resign until nearly *three months after* BBBY's February 2020 disclosures.  [Compl. ¶ 26]  Moreover, because the *Roofer's* CFO's resignation was not alleged to have been involuntary, the Court accorded it only "some probative value" in light of the many other indicia of scienter.  2018 WL 3601229, at \*20.  The Complaint here does not allege that Ms. D'Elia's resignation was involuntary and does not establish any other indicia of scienter.

**B.**      **No Legally Cognizable Motive to Commit Securities Fraud**

Plaintiffs [at 38-40] cannot salvage their scienter allegations by pleading Defendants'

motives to commit fraud.  And while an absence of motive (including stock sales) does not

necessarily *defeat* a strong inference of scienter [Opp. at 38, 40 n.51], it does cut *against* that

inference.  *See, e.g.*, *Rahman v. Kid Brands, Inc.*, 2012 WL 12294490, at *15 (D.N.J. Oct. 17,

2012) ("lack of motive allegations . . . bolsters [a] finding of an overall lack of support necessary

to establish a strong inference of a culpable state of mind"), *aff'd*, 736 F.3d 237, 245 (3d Cir.

2013) ("It also is significant that [plaintiff] did not demonstrate that the individual defendants

had a motive for their wrongful conduct.").

**1.**      **No Motive from Alleged Desire to Please "Activists"**

Contrary to Plaintiffs' assertions [at 38-39], the Individual Defendants' alleged desire to

please the "Activist Investors" was not a motive to commit fraud.  As Defendants explained [Br.

at 37-38], "pleasing" the "activists" by improving BBBY's allegedly lackluster performance

would benefit *all* shareholders and thus does not constitute a legally cognizable motive.  *See,*

*e.g.*, *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 (3d Cir. 2004) (no cognizable motive

where all shareholders benefit equally).  Plaintiffs also do not explain how the Individual

Defendants rationally could have hoped to please the "activists" by launching a new program

that the Individual Defendants allegedly knew would cannibalize revenues and erode margins.

The Individual Defendants' alleged desire to preserve their jobs by pleasing the

"activists" also is not a legally cognizable motive because, as Defendants' Brief showed [at 37],

the desire to keep one's job applies to all corporate officers.  Plaintiffs do not cite a single case

for their argument.  And the cases that Defendants cited are not inapposite, as Plaintiffs contend

[at 39 n.49].  Those cases hold that an alleged motive to "maintain continued employment" or to

protect "executive positions" and compensation is not legally cognizable.  *In re Alpharma, Inc.*

18

*Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) (rejecting officers' alleged motive to "maintain continued employment"); *In re Digital Island*, 357 F.3d at 331 (rejecting defendants' alleged motive to protect "executive position[s]" and "executive compensation").  Moreover, Ms. Winston was only an interim CEO [Compl. ¶ 36], and Mr. Tritton did not arrive until November [*id.* ¶ 89], so they could not have had any motive to preserve their jobs in connection with the September/October statements.

### 2.    No Motive from Knowledge of Prior Effort to Reduce Inventory

Plaintiffs cannot establish scienter [at 39] based on the Individual Defendants' alleged knowledge that BBBY had previously tried and failed to reduce inventory.  The statement in *Cats v. Protection One, Inc.*, 2001 WL 34070630, at \*16 (C.D. Cal. June 4, 2001), that "evidence of past practice may indeed be probative of present practice" is inapposite, because, as Plaintiffs acknowledge, BBBY was embarking on a *new* program that was *different* from anything that BBBY had previously done.  [*E.g.*, Compl. ¶¶ 111, 121, 139(ii)(c), 144(iv); *see also* 10/2/19 Tr. at 4 ("the new promotional framework developed around the retail holiday calendar" was "bigger, bolder and beyond anything that we've done before") (Def. Ex. I)]

### 3.    No Motive from Desire to Increase Value of Stock and Compensation

The Individual Defendants' alleged motive to increase the value of their BBBY stock and compensation [Opp. at 39-40] also cannot support an inference of scienter.  Courts have universally rejected this alleged motive because it applies generally to all executives.  [Br. at 37-38]  The sole case that Plaintiffs cite [at 40] for their untenable argument – *Hertz*, 905 F.3d at 119 – does not discuss this issue at all and does not hold that "motive to inflate stock and maintain salaries . . . strengthen[s] scienter when supported by other allegations" [Opp. at 40].  Moreover, Mr. Tritton did not arrive until November [Compl. ¶ 89], so his alleged motive, even if it were viable, would not apply to the September/October statements.

19

C.    **No Holistic Showing of Scienter**

Despite Plaintiffs' protestations, the Complaint does nothing more than plead that Defendants mistakenly believed "they had their arms around the [inventory-reduction] Program" [Opp. at 21] – but does not plead any *facts* showing that Defendants *knew* they did not. Allegations of mere mismanagement are not actionable under the securities laws. *Hertz*, 905 F.3d at 117. And Plaintiffs' combined list [at 40] of allegations that "collectively demonstrate scienter" is no more convincing than are Plaintiffs' inadequate explanations of each listed item. As the Third Circuit noted, "zero plus zero equals zero." *City of Roseville*, 442 F. App'x at 675.

As Defendants' Brief explained [at 39-40], Plaintiffs' scienter theory does not make sense: it "depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the allegedly concealed] problem was revealed" by Defendants themselves, even though they had not "sought to profit from this scheme in the interim," *Nguyen*, 962 F.3d at 415. That theory does not meet *Tellabs*' cogency standard.[19]

### CONCLUSION

The Court should therefore dismiss the Complaint in its entirety and with prejudice.

Dated: March 15, 2021

*/s/ Edna D. Guerrasio*

Edna D. Guerrasio
Jonathan E. Richman (admitted *pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
eguerrasio@proskauer.com
jerichman@proskauer.com

*Attorneys for Defendants*

---

19    Because Plaintiffs have failed to establish a § 10(b) claim, their claim for control-person liability under § 20(a) also fails.

20

121855416v8