```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY

STEPHEN VITIELLO, et al.,           .
                                    .
        Plaintiffs,                 .
                                    .  Case No. 20-cv-04240
vs.                                 .
                                    .  Newark, New Jersey
BED BATH & BEYOND INC., et          .  June 2, 2022
al.,                                .
                                    .
        Defendants.                 .
```

TRANSCRIPT OF FAIRNESS HEARING
BEFORE THE HONORABLE MICHAEL A. HAMMER
UNITED STATES MAGISTRATE JUDGE

The rulings contained herein have been reviewed and revised in accordance with L. Civ. R. 52.1.

APPEARANCES (the parties appeared via teleconference):

For the Plaintiffs:     RICHARD LEVI ELEM, ESQ.
                        Law Offices of Jan Meyer &
                        Associates, P.C.
                        1029 Teaneck Road, 2nd Floor
                        Teaneck, NJ 07666
                        (201) 862-9500 X210
                        relem@janmeyerlaw.com

                        LAURENCE J. HASSON, ESQ.
                        Bernstein Liebhard, LLP
                        10 East 40th Street
                        New York, NY 10016
                        (212) 779-1414
                        Lhasson@bernlieb.com


Audio Operator:

Transcription Service:     KING TRANSCRIPTION SERVICES
                           3 South Corporate Drive, Suite 203
                           Riverdale, NJ  07457
                           (973) 237-6080


Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(APPEARANCES continued)

For the Plaintiffs:      STANLEY D BERNSTEIN, ESQ.
                         Bernstein Liebhard, LLP
                         10 East 40th Street
                         New York, NY 10016
                         (212) 779-1414


For the Defendants:      JONATHAN E. RICHMAN, ESQ.
                         Proskauer Rose LLP
                         Eleven Times Square
                         New York, New York  10036-8299
                         (212) 969-3448
                         Jerichman@proskauer.com

<u>I N D E X</u>

<u>Proceeding</u>                                                                <u>Page</u>

    Proceedings                                                        4

    The Court's Ruling                                               16

(Commencement of proceedings)

THE COURT: This is the matter of Stephen and June Vitiello versus Bed Bath & Beyond Inc., et al., Civil No. 20-4240. We're here today for the final fairness hearing in consideration of the application for final approval of the settlement, plan of allocation, certification of the class, as well as the application for award of attorneys' fees, reimbursement of expenses, and reimbursement of time for lead plaintiff Kavin Bakhda.

Can I have appearances, please, beginning with plaintiff --

(Simultaneous conversation)

MR. ELEM: Richard Elem of Law Offices of Jan Meyer & Associates PC, attorney for -- local counsel for lead plaintiff.

Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. HASSON: Laurence Hasson from Bernstein Liebhard, representing the lead plaintiff and additional named plaintiff Richard Lipka and the class.

THE COURT: All right. Thank you.

And then how about on defense? --

(Simultaneous conversation)

MALE SPEAKER: Got a couple of more for plaintiff.

THE COURT: Sorry about that.

MALE SPEAKER: That's okay --

(Simultaneous conversation)

THE COURT: All right. So I have Mr. Bernstein, I thought I was, like -- wait. I am missing something. Because I know Mr. Bernstein's on the plaintiff's side.

And Mr.--

MALE SPEAKER: -- yes, Your Honor.

THE COURT: Simon [phonetic]. Sorry.

MALE SPEAKER: That's all right.

THE COURT: All right.

And then for the defense.

MR. RICHMAN: For defendants, Jonathan Richman, Your Honor, from Proskauer Rose.

THE COURT: All right. Welcome, everybody. It's a pleasure to see everyone today.

So we're here on the application for final approval. I would note two things preliminarily. One is that the parties consented to my jurisdiction for purposes of considering the approval applications. Secondly, I would note that on -- I have the date in front of me -- forgive me -- I granted preliminary approval --

MALE SPEAKER: February 4th --

THE COURT: Thank you. I couldn't find that on the docket. Yes, there it is. February 4th, 2020, Docket

Entry 78.  And so we're here today for final approval as well as the other applications that I have articulated.

I would also note, at least as of the filing of the May 26th, 2022, reply brief, that there were no objections filed within the May 5, 2022, deadline for doing so, and one request to exclude.

Solely, though, for purpose of completeness of the record, let me ask, is there anyone appearing for this hearing who wishes to object to the proposed settlement, plan of allocation or attorneys' fees or certification?

All right.  The record will reflect that no one has appeared at today's hearing to object to same.

Let me also ask counsel, are you aware of any attempts to object or exclude since the filing of the May 26th reply?

MR. HASSON:  Your Honor, there have been -- we're not aware of any attempts for an objection.  However, as we filed with the Court this morning, just yesterday, we received an untimely request for exclusion.  That request, however, is invalid for reasons set forth in the letter, because it did not include any of the trading information required.

THE COURT:  Right.  Is this the -- a letter that was filed just today, Docket Entry 88?

MR. HASSON:  Correct, Your Honor.

THE COURT:  Okay.  I did not, I have to confess, because I had a settlement conference all morning -- give me five minutes to take a look at that.  Okay?  I just literally rolled into this from a settlement conference.  So we'll go off the record.  Give me five minutes to take a look at that.  All right?

(Pause in proceedings)

THE COURT:  All right.  We're back on the record.  I have reviewed a letter filed by Mr. Hassan today, Docket Entry 88, which brings to the Court's attention correspondence that he only received, it would appear on -- when was that, Mr. Hasson?

MR. HASSON:  Yesterday, Your Honor.

THE COURT:  Yesterday.  Yeah.  Which at Exhibit A, appears to be from a Jane Kristen F. Lopez [phonetic], dated May 24th, I'll JNDLA did not receive it for -- until May 31st, that says, per the letter that I received on May 23rd, 2022, I opine that I am not interested to be part of the class due to the demands of my profession.  It's imperative I be excluded from the deadline to request exclusion, as it's categorically stated in your letter that you did not receive my name and address from Apex Clear Corporation, until the week of May 12th, way past the May 5, 2022, deadline.

She then provides certain information for

exclusion, including her name, her address, phone number, email.  Number of shares, she simply says bare minimum. Price paid, she says she cannot recall and gives an answer in terms of date of transaction that does not provide anything like the date of transaction.

If I understand correctly, the plaintiff's position is that she should not be excluded from the class, not because of the May 5 deadline, which, of course, I might have an answer, given when she did receive the notice, but if I understand counsel's position, it's that it simply does not comply, really, in any respect with the provisions of the notice to the putative class.  Is that right?

MR. HASSON:  That's correct, Your Honor.

THE COURT:  In other words, the notice that the -- that the Court approved on February 4th and that the administrator mailed out provided, among other things, that to be excluded -- and this is at page 16 of the notice, paragraph 16 -- sorry -- paragraph 57, that in mid-paragraph, "A request for exclusion must include the following information:  Name, address, telephone number, email address if available, a statement that the potential class member wishes to request exclusion, the number of shares of common stock as of opening and trading on September 4, 2019, and purchase or those acquired through the close of trading on May 11, 2020; the price paid or value at receipt, if sold, of

the sales -- and if sold, rather, the sales price; the date of the transactions, essentially. And it provides a request for exclusion shall not be valid and in effect unless it provides all the information called for in this paragraph and is received within the time stated above or is otherwise accepted by the Court.

So let me ask this. Give me a little bit more, if you don't mind, on why she should be held to that, if she doesn't have the information, as opposed to just granting her request for exclusion? I'll agree with you, certainly, that that information is not there. But I don't know as well that in -- I could reasonably expect her to recall the price paid, if she deleted the application -- or the pertinent records.

MR. HASSON: Well, Your Honor, I should just add before I answer your question, that I did attempt to contact Ms. Lopez by both phone and email to see if we could get more information from her. So I just want to make that -- put that on the record.

THE COURT: Fair enough.

MR. HASSON: In response -- in response to your question, I -- my answer would simply be because we can't tell, based on the information that she does have here, that she's actually a class member. There's no --

THE COURT: Well, she got the notice, didn't she?

MR. HASSON: She did get the notice. That's true.

Of course, it's possible that there was a misfire or et cetera.  But no information has been provided here.

I don't personally have strong opinions about, you know, not including her on an exclusion list beyond that, other than we just don't have verifiable information to know that she is actually a class member here, beyond her receipt of the note.

THE COURT:  Fair enough.  If she's not actually a class member, then her request for exclusion is harmless, though, isn't it?  She wouldn't get relief anyway.

MR. HASSON:  Correct.

THE COURT:  So is there an objection, if I grant her exclusion request?  Is it going to imperil this settlement?  --

(Simultaneous conversation)

MR. RICHMAN:  Okay, yeah, well, from the defense point of view, Your Honor, this is obviously the issue that Mr. Hasson raised, which is we don't know whether she is a class member at all, and, as Your Honor said, if she isn't, well, no harm, no foul.

But from defense point of view, I guess there's a bigger issue, which is maybe more theoretical than practical in this case, but like every security settlement and maybe like many other kinds of settlements, there was -- or there is in this settlement a termination provision, which allows

defendants to terminate the settlement, depending on the magnitude of the opt-outs.

THE COURT:  Right.

MR. RICHMAN:  I suspect that her opt-out wouldn't trigger the blow provision.

THE COURT:  No, because at that point, you only have two opt-outs.

MR. RICHMAN:  Right.  Well -- but it's -- but we don't know how many shares she has.  Probably not a lot, but we don't know --

(Simultaneous conversation)

THE COURT:  That's a fair point.

MR. RICHMAN:  And also we -- both sides of the case work in this business all the time, and we are recycling orders that approved settlement or disapproved settlements. And it's a part of precedent too where courts have held that opt-outs that don't meet the requirements are invalid.  And we believe that it's not right and it's not helpful to have as potential precedent an order that says an opt-out that doesn't meet the requirements is valid.

THE COURT:  Okay.  Anybody else want to add anything?

I -- upon further consideration, I agree with Mr. Richman.  This isn't simply a "no harm, no foul" situation in terms of the paucity of information that

Ms. Lopez has provided or not provided, really.  Without providing the number of shares, with such scant information, simply saying "bare minimum," that could mean one share; it could mean five shares.  It could mean relative to the larger common stock of Bed Bath & Beyond at the time.  It could mean a lot of more than that.

And so such a paucity of information makes it very difficult to discern whether that opt-out would put parties at or near the tipping point where Bed Bath & Beyond would disclaim the settlement pursuant to the terms of the parties' settlement agreement.

To be clear, for purposes of the record, I am not denying Ms. Lopez's request to opt out for any reasons related to the May 25th, 2022, deadline.  But I think that counsel's concerns about the lack of information provided here make it impossible to measure the potential effect of her opting out in terms of the larger settlement and whether it goes forward.

I'll also agree with Mr. Richman, the terms for opting out are clear -- or clearly articulated in paragraph 57 of the notice that was sent out to the class.  And while I accept that Ms. Lopez received a notice on May 23, it's also apparent, then, that she had at least a fair opportunity to do her own due diligence to glean the information necessary to meet the requirements of

paragraph 57.  It's not as though she had a 12-hour turnaround time to provide the information, all of which, I would assume is researchable and obtainable, even if she hadn't maintained exact records in her possession.

Moreover, Mr. Hasson attempted to each out to her to run this issue further to ground.  She did not respond.

For those reasons, I am satisfied, then, that it's appropriate to deny her request for opt-out as not complying with the notice that was provided to her and the rest of the putative class, and so I am going to deny that request.

All right.  So we have gotten that addressed.

Other than Ms. Lopez, the only other opt-out was the one that was timely submitted.  Is that right?

MALE SPEAKER:  Correct.

THE COURT:  All right.  I should also, just as a housekeeping measure, but a necessary one, the notice that the defendants provided pursuant to paragraph 19 of my February 4, 2022, order, preliminary approval order, complies with the notice requirements of CAFA, specifically 28 U.S.C. § 1715(b).  In terms of the notices provided to the governmental entities that are specified in CAFA.  I know that from the declaration of Luiggy Segura, the vice president of securities class actions at the claims administrator, and, therefore, that requirement has been satisfied.

So I have fully reviewed and considered the briefing and declarations and exhibits that were filed in support of the applications.

Before I make my rulings, though, is there anything -- I'll start on plaintiff's side and then ask Mr. Richman, is there anything that plaintiff wishes to put on the record?

MR. HASSON:  Thank you, Your Honor.  The only thing I would just reiterate -- and I know we just discussed it at length -- is the lack of any objections here is a rare phenomenon and strongly demonstrates that the class overwhelmingly supports final approval on the fee request. So I'd just like to put that on the record.

Likewise, since this is the first time that fees have really come up, I just want to note that lead counsel undertook this case on a fully contingent basis and was able to achieve a very good result for the class in the face of substantial risks and formidable adversaries.

The one-third fee request, as we noted in our briefing, is consistent with awards made in similar cases in the Third Circuit, and likewise, the expenses that we have requested here, including the reimbursement for lead plaintiff's time, likewise are reasonable.  They fall far below what we put in the notice and were necessary to achieve the final results here.

So that's just what I would add, Your Honor. And, obviously, happy to address any questions you may have.

THE COURT: I appreciate that. I actually want to come back to one other issue that occurred to me as to Ms. Lopez. I just wanted put on the record.

I suppose theoretically I could adjourn today's proceedings to give Ms. Lopez an opportunity to provide additional information. But in my view, that would be manifestly unfair to the rest of the putative class. It would delay these proceedings. It would delay the parties' and the putative class's right to a full and final resolution and settlement of their respective rights. And so I just want the record to reflect further that this hearing was noticed in the notice and on the Court's docket for today. There was certainly nothing that -- well, there was nothing that required Ms. Lopez to appear today. There certainly was also nothing that precluded it. And, as I said, I don't think it would be appropriate or fair to adjourn these proceedings to follow up on that information that she failed to provide with pursuant to paragraph 57 of the notice.

Thank you for letting me get that out of the way.

Mr. Richman -- are there any other plaintiff's counsel who wish to be heard with regard to the motions?

Mr. Bernstein or --

(Simultaneous conversation)

THE COURT:  All right.

Mr. Richman, anything for you, sir?  I know it's not actually your application, but --

MR. RICHMAN:  No, I have nothing to add, Your Honor.

THE COURT:  All right.

So let me begin.

It's ironic actually that final approval hearings tend to be -- particularly ones that are as this one, that will -- where the Court is going to grant approval, tend to be one of those rare instances where the judge does a lot of the talking and the lawyers not so much.

So bear with me.

As I said, I have presided over this matter since its inception as the magistrate judge.  The parties, after extensive arms'-length negotiations -- and I am going to go into a little bit more of the procedural history, because I think it's relevant both to the approval application and the attorneys' fees application.  But the attorneys had a full two-day mediation in front of a very qualified JAMS mediator and came to terms to resolve this, at which point, they consented to my jurisdiction both for the preliminary approval hearing and today's hearing.

For the reasons that I am going to articulate, I am going to grant the application for final approval of the

settlement, the plan of allocation, and certification of the class.  And I am going to grant the application for attorneys' fees, reimbursement of expenses, and reimbursement of time for Kavin Bakhda as lead plaintiff.

By way of background, the amended complaint filed in this matter alleged that in September 2019, Bed Bath & Beyond, as defendant, as well as individual defendants, made misstatements of material fact concerning what came to be known as Bed Bath & Beyond's inventory reduction program, by, among other things, omitting key risks inherent in the program and issuing projections, that the amended complaint alleged, the defendants knew or should have known to be unreasonable.

Ultimately, the plaintiffs alleged, those risks came to pass, and Bed Bath & Beyond's stock fell precipitously, causing investors to lose sums of money. Again, those are allegations.  And as I will discuss shortly, the defendants would have been prepared to -- and had actually already started to vigorously defend and try to refute these allegations.

In any event, the plaintiffs brought a putative class action on behalf of all persons who bought or acquired Bed Bath & Beyond securities for the period of September 4, 2019, to February 11, 2020.  The amended complaint set forth two claims:  In Count 1, a violation of § 10(b) and

Rule 10b-5 of the 1934 Securities & Exchange Act, as well as in Count 2, a violation of § 20 of the 1934 Act.

The defense filed an extensive motion to dismiss, which the plaintiff opposed.  That motion was pending when the parties proceeded to mediation.  The parties held two full days of mediation with an experienced outside mediator at JAMS, which culminated in the settlement that is now before the Court.

Although, because the motion to dismiss, of course, under the PSLRA, triggered the automatic stay of discovery, there was not a formal discovery plan or pretrial scheduling order in place.  The record reflects that by the time the settlement was reached, lead counsel had done extensive due diligence, including, among other things, conducting a comprehensive investigation into the alleged wrongful acts that included reviewing Bed Bath & Beyond's SEC filings, public reports, and news articles; transcripts of Bed Bath & Beyond investor calls; interviews with Bed Bath & Beyond employees; and consultations with a damages expert.  That also included drafting the amended complaint and engaging in -- opposing the motion to dismiss, of course, and engaging in the negotiations with JAMS mediator Jed Melnick.

Once the parties made progress during the course of that mediation, that due diligence also included conducting confirmatory discovery to assess whether the settlement was

actually fair, and then preparing the settlement papers for the Court, which are extensive.

On February 4, 2022, I preliminarily approved the settlement under Federal Rule of Civil Procedure 23(e) and authorized the notice of the settlement to be disseminated to the putative class.

In preliminarily approving the proposed settlement, I concluded that the settlement was likely to earn final approval after giving the putative class notice and an opportunity to be heard.  I also found that it was much more likely than not that the class could and would be certified, whereupon the claims administrator sent out notice to the proposed class, as well as published a summary notice and collected data in terms of the request for exclusion.  And, as we have noted, to date, there have been absolutely no objections to the settlement and only one opt-out within the terms of the notice.  Of course, we have already addressed the issue of Ms. Jane Lopez.

As counsel are well familiar -- and I'll discuss in a moment -- it is incredibly rare for there to be such a positive response by the class in class action securities settlement.

Let me turn to the standards for final approval. Of course, it is well recognized in the law that, as a matter of public policy, settlement is heavily favored, particularly

in class action litigation in terms of their ability to not only settle disputes but provide final adjudication, final judgments, and to terminate otherwise extensive, protracted, expensive, and all too often unwieldy litigation.

Of course, the settlement approval is within the Court's discretion, but that is guided by several principles. One is Rule 23(e), which requires the Court to determine whether the proposed class action settlement is fair, reasonable, and adequate.  That requires the Court, under Rule 23(e)(2) to consider, among other things, whether the class representatives and counsel adequately represented the class, whether the proposal was negotiated at arms' length; whether the relief provided for the class is adequate when one considers the costs, risks, and delay of trial and appeal; the effectiveness of the proposed method to distribute relief to the class and to process class member claims; the proposed award of attorneys' fees and timing of payment; and any other agreements extant under Rule 23(e)(3); and whether the proposed settlement treats class members fairly and equitably relative to each other.

In addition to foregoing, there are the Girsh factors pursuant to the Third Circuit's decision in Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975).  These factors are the complexity, expense, and likely duration of litigation; the class's reaction to the settlement; what stage are the

proceedings in; and what amount of discovery has been completed at the time that the settlement is reached; the risk of establishing liability and damages; the risks of maintaining the class action through trial; the defendants' ability to withstand a greater judgment; the range of reasonableness of the settlement fund in light of the best possible recovery, but also in light of all of the attendant risks of litigation.

In addition to that, there are the _In re_ Prudential Insurance Company factors.  See 148 F.3d 283, 323 (3d Cir. 1998).  In sum, those require the Court to consider the extent to which the underlying substantive issues have been developed, as well as -- in turn, rather, the extent of discovery on the merits, and basically any other factor that may bear on an ability to make an informed assessment of the probable outcome of any trial on the merits of liability and damages as well as a comparison of results achieved by settlement for individual class or subclass members for other claimants; whether there was an opportunity for class members to opt out; whether the attorneys' fees are reasonable; and whether the procedure for processing individual claims is fair and reasonable.

For the reasons I will explain now, I am satisfied that the settlement is consistent with and satisfies both the Girsh and Prudential factors.

In this case, I start with whether lead counsel and Kavin Bakhda as lead plaintiff adequately represented the class. And I find that, in fact, they have. Here, the Court must consider, among other things, the qualifications, experience, and general ability of plaintiff's counsel to conduct the litigation; whether lead plaintiff's interests are sufficiently aligned with the putative class members; whether those interests conflict with those of the class.

Here, lead plaintiff's interests are certainly not in conflict with those of the class. Kavin Bakhda was interested principally in obtaining the largest recovery possible and, therefore, is aligned with the interests of the other class members. In fact, when Judge Arleo appointed him as lead plaintiff, she actually found that he had the largest financial interests of any lead plaintiff and, therefore, adequately represented the class's interest.

I also know that Mr. Bakhda has been, from his declaration, that he has communicated regularly with lead counsel, reviewed drafts of the pleadings, and participated in settlement discussions with lead counsel.

He also benefitted, of course, from the advice and knowledge of extremely experienced counsel who are very familiar with and well-versed in securities class actions. Bernstein Liebhard LLP is an extremely skilled firm in this field with a very well-established track record, and has

served as lead counsel in a number of significant class actions securities cases.  I know that as well from the Bernstein declaration, Exhibit 4 to the Hasson Declaration.

I am also satisfied that the settlement was negotiated at arms' length.  It was achieved only after negotiations between experienced counsel and a formal two-day mediation session with Jed Melnick at JAMS.  Moreover, counsel conducted due diligence in terms of the prediscovery investigation I discussed earlier, as well as confirmatory discovery to ensure the fairness and adequacy of the settlement.  I am therefore satisfied that the settlement achieved here is fair and reasonable and was negotiated at arms' length.

I am also satisfied that the relief provided for in the settlement is adequate.  In making this determination, the Court must consider the range of reasonableness that responsible, experienced attorneys could accept in view of any attendant risks.  This analysis must account for uncertainties in the law and uncertainties in the facts in any particular case, as well as the risks and costs in continuing the litigation as opposed to resolving it.

The Court must really consider the adequacy of the settlement in terms of whether it is reasonable and the best possible recovery, but also the risks of the case not resolving and heading towards trial.  So I must consider the

present value of damages that plaintiffs would likely recover if successful and then consider that against the risks of not prevailing in terms of assessing the overall fairness of the settlement.

Here, plaintiffs estimate that their maximum damages would be $300 million. But certainly the Court cannot consider that in isolation. I have to account for the numerous and vigorous arguments that defendants made and would continue to make in order to reduce damages. First, the defendants made clear in their motion to dismiss that they were well-prepared -- and I have every reason to believe would have continued -- to contest liability. They would argue that there was no fraud here, and, therefore, there can be no damages. I believe they also would have argued that the corrected disclosures contain information unrelated to the alleged fraud which would have to be offset from any damage figure. They may very well have argued that it was not any disclosures pursuant to the inventory reduction program that adversely affected the sales price of Bed Bath & Beyond shares, but that it may have been attributed to external factors, including COVID, that would have kept the Bed Bath & Beyond stock from recovering during the 90-day bounceback period under the PSLRA. They may have also emphasized, whether to the Court or to the trier of fact, that, in fact, on January 10th, 2020, the day after one of

the alleged disclosures, the stock actually recovered by approximately 8 percent.  There would have been a very long and uncertain litigation road ahead, even beyond the motion to dismiss, which the Court never addressed on the merits. There would have been formal discovery.  That would have been extremely protracted in this case, and with it, invariably, likely discovery disputes.  There would have been summary judgment motion practice.  There would have been a class certification motion that would have involved experts from both sides, as well as trial and appeal.

Easily, this matter would have taken more than three years to reach the end of the district court-level litigation path, particularly in view of the Court's current docket and the delays in trials that the Court has experienced because of COVID, both on the civil and the criminal side.

The arguments at defendants' disposal could have had the effect of entirely eliminating any risk of damages, had they succeeded in rebutting -- or refuting liability, or, based on an expert analysis that plaintiffs had completed, could have been reduced to just over half of the plaintiffs' estimate to somewhere in the area of $184 million.  In that regard, then, the $7 million settlement is approximately 2.3 percent of the $300 million having and 3.8 percent of the $184 million figure.  The average of that is 3.1 percent.

Cornerstone Research tracks and aggregates court-approved class action settlements in securities cases. According to Cornerstone, the mean 2021 settlement was $5.8 million, and the recovery was 4.5 percent of damages for cases settled during a pending motion to dismiss; i.e., when this case was settled.  That is reflected in the Cornerstone Research 2021 report, Exhibit 1 to the Hasson Declaration at page 14.

In this case, the settlement is for a slightly higher amount than that $5.8 million, whereas here, it's $7 million and only a slightly lower percentage of damages than the Cornerstone 2021 research would suggest.

It is also important to note that the 3.1 percentage recovery here is on par with percentage of damages recovered in other securities class action settlements, including in this district and circuit.  So, for example, in *In re* Cendant Corporation Litigation, 264 F.3d 201 at 241 (3d Cir. 2001), the Third Circuit noted that typical recoveries in securities class actions range from 1.6 to 14 percent of total cases, thereby putting 3.1 percent here well within the range of reasonableness.

I touched on this earlier, but I think it is important to recognize that, had this case proceeded to a trial on the merits, that would have involved very considerable risks, not the least of which is just the

inherent complexity and therefore unpredictability of securities class actions. And that weighs in favor of final approval.

Defendants could have won on the motion to dismiss. They could have succeeded in blocking the anticipated motion for class certification. They could have succeeded even conceivably on summary judgment. In fact, as counsel noted from the 2021 mirror report, Hasson Declaration, Exhibit 7, nearly 65 percent of securities class actions are dismissed at the pleadings stage.

Of course, this being a securities fraud case under § 10(b), scienter would have loomed large in terms of the challenges that plaintiffs would have faced. Indeed, whether it's a securities fraud case or any other case involving -- that requires proving some degree of intent, scienter may have been one of the more formidable challenges for the plaintiffs. Defendants likely would have argued that, first, not only were their challenge statements not materially false and misleading when made, for a variety of reasons, but that even if somehow they were, there was no intent, no fraudulent intent to do so. This Court is well familiar from its experience as a lawyer, that one of the most difficult issues to prove is intent or specific intent or even, as may have been the case here, extreme recklessness in doing so.

There also would have been the attendant risk that

the class may not have been certified for all potential class members.  There is no guarantee at all or, really, even way of predicting how the Court's rulings would have affected the class damages or the manner in which plaintiffs would have been able to present their case to the jury.

Invariably, this case would have been protracted, including discovery, and the production of discovery may have or may not have produced evidence supporting lead plaintiff's case.

Further, even had plaintiffs succeeded at the class certification stage, dispositive motion stage, and even at trial, it is certainly fair to allow for the possibility that that may have then, in turn, led to lengthy appellate litigation.  Therefore, all of the pretrial risks and risks of establishing liability strongly support the reasonableness of the settlement.

I have at least, to some extent, touched on the risk of establishing causation and damages at the trial, but I do think it is important to at least touch a little bit more on that.  Pursuant to the Supreme Court's decision in Dura Pharma v. Broudo, 544 U.S. 336, 343-346 (2005), lead plaintiff would to have show that the disclosure of the alleged securities violations caused the investors' losses as opposed to unrelated matters.  The Dura case has made proving loss causation, I think, a little bit more arduous, at least,

for plaintiffs and likely would have come down in this case to, had the plaintiffs survived the motion to dismiss, a proverbial battle of the experts.  Had even the plaintiffs been able to do that, they still would have had to have proven damages.  Their expert would likely have been subject to Daubert motion practice, and would have had to show that the corrected disclosures revealed that sort of information that would have affected the market, and also determined that whether any confounding news -- in other words, news not related to the alleged misstatements or alleged fraud released that same day -- whether that had an impact on the stock price and what degree that would offset the corrected disclosures.  Even had plaintiffs overcome that, there is no way of saying with any degree of confidence, that that would have guaranteed the class a better recovery than the $7 million settlement.  Those uncertainties also weigh in favor of final approval.

And then, of course, there's the inescapable fact that settlement eliminates the additional costs and delay of continued litigation.  As this Court has recognized in a number of cases -- see, e.g., Somogyi -- I hope I have pronounced that right -- v. Freedom Mortgage Corporation, 495 F. Supp. 3d 337 at 350 (D.N.J. 2020), "The parties are better off with the certainty of a prompt settlement and payment rather than the uncertainty of whether they will get any

recover at some future unknown date."

Could not have said it better myself.

The continued litigation of this action would certainly have been lengthy and costly without any guaranteed return for the investors.  By contrast, the settlement provides a prompt and predictable and final manner for the class to recover promptly and without any additional risk.

Therefore, I am satisfied that Federal Rule of Civil Procedure 23(e)(2)(C) and Girsh Factors 1, 4, 5, 8, and 9 are satisfied in support of final approval.

I am also satisfied that the proposed method for distributing relief is fair and effective.  JND Legal Administration is the claims administrator here.  They are well-experienced, and they are processing the claims under the guidance of lead counsel, as was established in the preliminary approval order.

JND will determine each claimant's -- including Mr. Bakhda's -- eligibility to participate in the settlement and calculate each claimant's respective recognized claim based on the plan of allocation.  Plaintiffs will be notified if there are any defects or conditions of ineligibility and will be given the chance to contest rejection to cure any deficiency.  Any claim disputes that cannot be resolved will be presented to the Court for determination.  The claims process is similar to that typically accepted and used in

securities class action settlements similar to this case. See, for example, Dartell v. Tibet Pharmaceuticals, 2017 WL 2815073 at page * 7 (D.N.J. June 29, 2017).

I am also satisfied that counsel have fairly and finally disclosed the existence of any other agreements under Rule 23(e)(2)(C)(iv) and Rule 23(e)(3). When counsel made the application for preliminary approval, counsel disclosed that there were conditions by which the defendants would be able to terminate the settlement if the class members who collectively purchased the specific number of shares of Bed Bath & Beyond common stock seek exclusion or opt out of the settlement. This is standard in securities class action settlements and does not affect the fairness of the settlement. In fact, I dare say, having presided over a number of these, at a minimum, these are more common in these settlements than not.

Also, lead counsel has fee agreements with local counsel, Jan Meyer & Associates, PC, which is to be expected where one brings in local counsel, as well as prior claims counsel. Those were disclosed to the Court at the time of the preliminary approval application, and I am satisfied for reasons I will discuss when I get into the attorneys' fees application, there was not billing for -- or duplicative billing for effort.

I am also satisfied that the settlement ensures

that class members are treated fairly and equitably relative to each other, as spelled out in the plan of allocation. Each authorized claimant, including Kavin Bakhda, will receive a distribution pursuant to the plan of allocation, and each will be subject to the same formula for distribution of the settlement on a pro rata basis. That is fair. It reimburses class members based upon the type and extent of their injuries. It provides for distribution of the net settlement fund among the authorized claimants on a pro rata basis, based upon their recognized loss attributable to the alleged fraud. Therefore, it treats all class members equitably, and that consideration supports approval.

Not that approval requires satisfaction of each Girsh factor, because it doesn't, the Third Circuit has made that clear in Cendant and in other cases, but to the extent that the other Girsh factors apply, I am satisfied that they support settlement here. One, of course, as we have discussed on a couple of occasions now is that fact that no party's objected to the settlement and there is only one recognized request for exclusion. It is well established that the putative class's reaction to the settlement is an important benchmark of the overall fairness and reasonableness of the settlement. Therefore, in this case, it strongly supports approval of the settlement.

Also, I am satisfied that Kavin Bakhda and lead

counsel had sufficient time, opportunity, and information to make a calculated, informed decision regarding settlement.  I have already addressed the fact that this case did not have formal discovery by operation of the automatic stay under the PSLRA, but as I also mentioned, lead counsel did a very significant amount of due diligence prior to engaging in or initiating the litigation, throughout the settlement process, including after the two-day mediation in terms of confirmatory due diligence.

Courts frequently approve settlements that are reached before formal discovery like this one.  See *In re Imprelis Herbicide Marketing Sales Practices*, 296 F.R.D. 351 (E.D. Pa. 2013).  See also Schuler v. Medicines Company, 2016 WL 3457218 at *7 (D.N.J. June 24, 2014).

In sum, for the reasons that I have already articulated I am well satisfied that lead counsel and lead plaintiff were in a position to make a rational assessment of the case before they made the final decision to settle it and, as I said, in the course of doing the post-mediation due diligence, to make sure that the settlement was fair.

In terms of the risks, the Court must also consider the risks of keeping the class intact -- well, first certifying the class and then keeping that class intact through the trial.  The motion for class certification itself would have been extensive.  It would have been

time-consuming.  It would have required experts and expert discovery on both sides.  Presumably, the defendants would have introduced their own expert testimony to attempt to rebut the presumption of reliance by, in turn, trying to argue, perhaps successfully, that Bed Bath & Beyond's stock price -- sorry -- Bed Bath & Beyond's stock price, whatever downturns it may have experienced during the relevant period, was not the result of the alleged fraud.  Therefore, one of the benefits of settlement now is it removes the risk of maintaining a class action status throughout trial.

The Court, under Girsh, also should consider the defendant's ability to withstand a greater judgment.  This factor, while certainly Bed Bath & Beyond's ability -- is able to withstand a greater judgment -- or that, rather, that there is no indication that Bed Bath & Beyond, the settlement was based on any inability by Bed Bath & Beyond to withstand greater judgment, it is hardly uncommon in any class action against a large corporation, that that defendant entity would be able to do so.  So certainly that fact alone does not weigh against the reasonableness of the settlement.  At worst, it is neutral.

Let me turn to the plan of allocation.  It need have "only a reasonable, rational, basis when created by competent and experienced counsel."  See Burns v. FalconStor Software, 2014 WL 12917621 at *6 (E.D.N.Y. 2014).  Here, I am

satisfied that the distribution plan is fair, reasonable, and adequate.  It is really in line with allocation plans in these sorts of cases in terms of reimbursing class members according to the type and extent of their injuries.  As a general proposition, courts consider such allocations to be fair and reasonable.

Here, counsel formulated the allocation plan as well with the help of a damages expert and in line with principles of loss causation.  The allocation plan recognizes differences in damages incurred by those who bought and, to the extent applicable, sold their shares at different prices and times during the class period, reflecting different damages due to the purchase and sales prices paid at the time and the amount of alleged artificial inflation in Bed Bath & Beyond common stock at the time of the purchase.  It also allots different damages depending on whether the class members held Bed Bath & Beyond shares at the time of one or both of the alleged corrected disclosures.  And, as I have already noted, the settlement fund will be distributed on a pro rata basis, depending on each class member's recognized losses.

For those reasons, then, I am satisfied that the settlement is fair, reasonable, and adequate under Rule 23(e).  I am satisfied that it meets both the Girsh and Prudential factors, and, therefore, will grant final

approval.

Before I do that, though, I have to final-certify the class, which I am going to do so now. I addressed to some extent, requirements for class certification under Rule 23(a) and Rule 23(b)(3) in the preliminary approval order. In fact, nothing has changed since the entry of that order to alter my conclusion that it is appropriate to grant final certification of the class for settlement purposes. Numerosity, of course, in this case, remains well above the 40 class-member threshold within the Third Circuit. As alleged in the amended complaint and the briefing in support of approval, throughout the class period, Bed Bath & Beyond common stock traded actively on Nasdaq, and those shares were purchased by thousands of investors. The idea of joinder of all of them is impracticable. The questions of law or fact under Rule 23(a)(2) are certainly common for all members of the class who purchased Bed Bath & Beyond common stock during the class period, and so the central questions of whether the defendants issued actionable misstatements and omissions regarding the program and whether the defendants acted with the required mental state or scienter are basically the same for all members of the class. Therefore, there are common questions of law and fact that warrant class treatment for settlement purposes.

Similarly, under Rule 23(a)(3), the lead

plaintiff's claims are typical of those of the class for settlement purposes. As is the case with other class members, the lead plaintiff purchased publicly traded Bed Bath & Beyond common stock during the class period and suffered, allegedly, damages based on the misrepresentations and omissions -- or alleged misrepresentations and omissions that were made by the defendants to the investing public.

I am also satisfied that Kavin Bakhda is an adequate representative as lead plaintiff. I say that in consideration of the qualifications, experience, and general abilities of plaintiff's counsel, which I have already addressed, and the fact that his interests are sufficiently aligned with the interests of the putative class members. There is no conflict of interest between him and the proposed class.

And so I turn to predominance and superiority. Predominance, of course, asks whether the proposed classes are sufficiently cohesive to warrant adjudication by representation. That is generally an easy answer in securities class action claims because the questions of law and fact that are common predominate over any individual questions for settlement purposes because the alleged fraudulent statements and omissions affect class members in the same manner.

And I think as well as fairly -- it is abundantly

clear that resolving this case as a class action is far superior in terms of time, efficiency, and resources compared to litigating thousands of individual cases where the expense for a single investor and the transactional cost to the Court in terms of time and judicial attention would likely exceed the losses of any one individual investor.

Let me turn now to the adequacy of the notice to the class under Rule 23 and due process.  I am satisfied that the requirement of "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," under Rule 23(c)(2) is satisfied.  The claims administrator mailed 75,552 notices to potential class members, as well as posted the Internet notice and proof of claim form on the claim administrator's website, along with a link for online claim filing and a list of important deadlines.  And also the claims administrator published summary notice in the "Wall Street Journal" and "Investor 's Business Daily" as well as on the "PR Newswire."  See Exhibit 3 to the Hasson Declaration, which is the Segura Declaration, paragraphs 12 through 16.  Therefore, the notice that was provided to the class complies with the preliminary approval order.

I am also satisfied that it included all of the information that is required by Rule 23(c)(2)(B) as well as the PSLRA and that it explained the nature of the action and

the claims asserted; it provided a clear definition of the class; it provided the amount of the settlement; it described the plan of allocation; it explained the settling parties' reasons for proposing the settlement; it clearly provided notice of the attorneys' fees and costs that would be sought, including requested reimbursement of time for lead plaintiff; it provided clear instruction in terms of how to opt out of the class and how to object; as well as the binding effect of a judgment on the class members.

I am satisfied, then, under all of those circumstances, that that readily complies with Rule 23(c)(2)(B)'s requirement of "best notice practicable under the circumstances."

For those reasons, I am satisfied that notice to the class satisfies due process and Rule 23. I will, therefore, grant lead plaintiff's motion for final approval of the settlement, for the plan of allocation, and certification of the class.

I turn now to the application for attorneys' fees, reimbursement of expenses, and reimbursement of time for lead plaintiff.

Before I go any further and just to give myself a moment to catch my breath, is there anything that either plaintiffs' counsel or defense counsel wants to put on the record before we get to the fees, expense reimbursement, and

Kavin Bakhda's reimbursement for time.  I know you touched on this earlier, but I just wanted to make sure.

MR. HASSON:  Thank you, Your Honor.  I think I said all that I wanted to say before.  Thank you.

THE COURT:  Anybody else?

Mr. Richman, anything for you?

MR. RICHMAN:  No, Your Honor.  I have learned not to touch this issue.

THE COURT:  The hard way?

(Simultaneous conversation)

MR. RICHMAN:  -- made that mistake.

THE COURT:  Pardon?

MR. RICHMAN:  I haven't made that mistake yet.

THE COURT:  Sometimes, I guess, discretion's the better part of valor.

Oh, look, I have caught my breath again.  So let's go.

I am going to grant the -- well, I should say, first, the applications here seek, one, an award to lead counsel on behalf of all plaintiffs' counsel of attorneys' fees of one-third of the settlement fund, specifically in the amount of $2,331,000; two, reimbursement of litigation expenses in the amount of $63,508.86; and then reimbursement of $5,000 to Kavin Bakhda as lead plaintiff for the time spent representing the class pursuant to 15 U.S.C.

§ 78u-4(a)(4).  For the reasons I will articulate, I am going to grant each of those applications.

I have already touched on, maybe even at the risk of belaboring, how well qualified lead counsel and additional plaintiffs' counsel are to undertake representation in this matter.  But I should also point out, they litigated this matter on a fully contingent basis and have received no compensation for their investigation, prosecution of the case or even reimbursement of expenses.  And that certainly is a factor that the Court used favorably in terms of granting the application.  And I will come back to that in a moment.

Here, I think, what is being proposed is essentially an award of attorneys' fees and expenses from that common fund, that $7 million fund.  The Third Circuit and the Supreme Court have long recognized that where by virtue of counsel's efforts, a common fund has been established for the benefit of the class, it is appropriate to compensate counsel from that common fund.  The Court made it clear in the Boeing v. Van Gemert case, 444 U.S. 472 at 478 (1980).  And a number of courts within this district, such as In re Par Pharma and In re Diet Drugs, have reiterated that principle.  It allows as well -- or prevents unjust enrichment of class members who benefit from the lawsuit without paying for its costs.

Courts have also recognized that, in addition to

providing just compensation, an award of attorneys' fees from a common fund encourages skilled counsel to undertake representation in such cases seeking redress for damages inflicted on entire classes of persons and undertaking risks in doing so -- rewards counsel for undertaking the risks in doing so.  See Gunter v. Ridgewood Energy, 223 F.3d 190, 198 (3d Cir. 2000).  If we use the percentage of common fund as the Supreme Court in the Blum case, Blum v. Stenson, 465 U.S. 886, 900 (1984), made clear is appropriate -- and I should also add it comports with the percentage recovery method.  It also comports with the PSLRA in that § 78u-4(a)(6) provides total attorneys' fees and expenses awarded by the Court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount recovered for the class.  But employing that and considering the Third Circuit's Gunter factors reinforces the reasonableness of the requested fee.

So in Gunter, the Third Circuit set forth seven factors for courts to consider in determining an appropriate fee award.  That includes, among other things, the size of the fund created; the number of people who will benefit from the fund; the presence or absence of substantial objections by members of the class to the settlement terms -- here, again, none; the skill and efficiency of the attorneys involved; the complexity and duration of litigation; the risk of nonpayment; the amount of time devoted to the case by

plaintiff's counsel; and awards in similar cases.  <u>Gunter</u>, 223 F.3d at 195 n.1.  In the <u>Prudential</u> case as well, the Third Circuit identified three additional factors for the Court to consider:  The value of the benefits accruing to class members as opposed -- by virtue of the efforts of class counsel, as opposed to, for example, government agencies conducting their own investigations; the percentage fee that would have been negotiated, had the case been subject to a private contingent fee arrangement when counsel was retained; and any so-called innovative terms of settlement.  148 F.3d at 336-40.

So let me start with the first <u>Gunter</u> factor.  That requires me to consider the fee request compared to the size of the fund created and the number of class members that may potentially benefit.  As we articulated earlier, the $7 million settlement is roughly 3.1 percent of the conservatively estimated damages.  I have already explained in the context of granting final approval of the settlement that this is within the range of approved recoveries in other class actions.  And, of course, as we said, there have been no objections to and only one valid request for exclusion from the settlement.  And certainly that factor -- that fact, rather, weighs in favor of approval, given that the notice to the class clearly informed them that counsel intended to apply for an award of attorneys' fees not to exceed 33 and

one-third of -- 33.3 percent of the settlement fund, plus expenses not to exceed $100,000. Such a low level of objection, as the Rite Aid court noted, is a rare phenomenon and certainly weighs strongly in favor of approval here.

I have already talked about the skill and qualifications of lead counsel, but it is also important to add that counsel here litigated the matter efficiently in moving this case forward. This is not a case that dragged out through discovery and dispositive motion practice for a period of years before reaching settlement. Counsel did significant due diligence before bringing the case, and in the run-up to mediation and then immediately after mediation, to bring this matter to this point with, really, a commendable efficiency, owing no doubt in part to their extensive experience and aptitude in litigating securities class actions.

It is also important to note that they did so against some of the preeminent counsel in defending class action securities fraud cases. Defendants were represented by the law firms of Proskauer Rose and Cleary Gottlieb, which the Court is well familiar with, and have demonstrated such, as in the motion to dismiss the ability to very skillfully advocate defenses and are willing to represent their clients with the utmost vigor. That lead counsel achieved this settlement for the class in the face of a formidable legal

opposition strongly counsels in favor of approval of the fee request.

I have discussed in the context of the Girsh factors the probable cost in terms of time and money of continued litigation, but it also favors lead counsel's requested fee.  That is because securities litigation is clearly fairly complex; it is expensive; much more often than not, it requires expert testimony on issues of damages and loss causation.  As my colleague Judge Goodman recognized in the In re Valeant Pharmaceuticals Securities Litigation case, "Securities litigation is tough stuff."  Absent the settlement, there would have been -- required a complex, expensive, and lengthy litigation involving experts, and it is sufficient to say, having already discussed this in the context of granting final approval for the settlement, that given the magnitude, expense, and complexity of these actions, counsel's fee request is reasonable.

As I mentioned earlier, counsel also took this case on a wholly contingent fee basis and invested an extensive amount of time and money to prosecute with the risk that there might be any -- might not be any compensation.  Courts have routinely recognized that undertaking the litigation in the face of such a risk may be a major consideration in granting an award of attorneys' fees.  See, e.g., In re Schering-Plough ERISA Litigation, 2012 WL 1964451 at *7

(D.N.J. May 31, 2012).

And then when one considers the dismissal rate at the "motion to dismiss" stage in PSLRA matters, those risks that counsel take on a contingent fee basis become all the more clear.

I am also satisfied, for the reasons that I have articulated and need not belabor, that counsel spent an extraordinary amount of time investigating and litigating the case, up to and including this point, and will do so in extending time assisting class members with the completion and submission of their proof of claim and release forms, essentially riding herd over the claims process and responding to class members' inquiries. None of that work will be the subject of a request for additional compensation.

All of those reasons persuade the Court that the fees sought here, the 33.3 percent of the $7 million is reasonable.

It also is well within range of fees that -- the courts have granted in comparable securities class actions within the Third Circuit. The list of such cases is legion. See, for example, Fernandez v. Knight Capital, 2015 WL 13901241 at *3 (July 6, 2015), 33 percent fee on a $14 million settlement; In re Merck, 2010 WL 547613, attorneys' fee percentage of 31.71 percent with a median value that turned out to be one-third. The list of cases is legion and,

fortunately, available for the interested reader on page 20 of Docket Entry 79. So I do not need to belabor that.

Let me turn to the Prudential factors. One, this was not a case, as so many others, that arose from a government investigation, either on the criminal, civil, or administrative side. There was no prosecution of any fraud case that helped produce testimony, admissions, or findings, or the underlying investigative results which gave plaintiffs' counsel a significant starting advantage in bringing their case to the fore. The value of the settlement is attributable to the effort undertaken by lead counsel, further underscoring the reasonableness of the requested fee.

As I have already noted, the fees that are sought here are completely consistent with typical fee awards in nonclass cases. A 33 percent contingent fee is much more the standard fare, at least in this district, than not. And, therefore, to the extent that that second Prudential factor applies, it supports granting the application.

The last Prudential factor is whether the settlement contains any "innovative terms." This settlement does not have any innovative terms; hardly, though, a knock on the reasonableness of the fee or on the settlement because the all-cash recovery secured for the class is clearly the best remedy for the injuries that they have allegedly suffered. Therefore, the lack of a "innovative term" does

not weigh -- is basically neutral.  I will leave it at that.

Finally -- well, maybe not finally, but the attorneys' fees for lead counsel were agreed upon by Kavin Bakhda at the outset of the litigation in a retainer agreement that he entered into with lead counsel.  See Bakhda Declaration, paragraph 15, which is Exhibit 2 to the Hasson Declaration.  When there is a fee agreed to by lead counsel at the outset of the litigation, courts have viewed that as presumptively reasonable in this district, and the Third Circuit made that clear in the Cendant case.

If I were to apply a lodestar crosscheck as a tool to ensure that the percentage approach represents a fair amount, that too would support the percentage approach.  It is in line with fee requests approved by the -- within the Third Circuit.  Of course, the familiar lodestar award is calculated by simple math:  Multiply the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for those services, given things such as geographical area, nature of the service provided, the skill required in that particular practice area, and the experience of the attorneys.

Performing the lodestar calculation here, which the Court did in anticipation of this hearing, confirms that the fee requested is reasonable.  Plaintiff's counsel as well as their paraprofessionals expended 1,249 hours prosecuting this

case, yielding a total lodestar of $1,063,657.50.  I have reviewed the Hasson Declaration, the Brian Calandra Declaration, and the Richard Elem Declaration, the amount of fees requested represents a relatively modest multiplier of 2.1 percent -- sorry -- 2.17 percent to plaintiff's counsel's lodestar.

I should -- that multiplier is well within the range of multipliers approved by courts in this case.  In fact, a general survey of cases within the Third Circuit over, say, the last 15 years or so, finds that courts often approve multipliers of 1 to 4 in common fund cases.

I should also note simply for purposes of the record, I have considered as well the rates that were provided relative to lead counsel's experience and track record of success in this area -- see Hasson Declaration Exhibits 4 through 6 -- and I am satisfied that those hourly rates are reasonable in light of the complexity of this area of litigation and their track record.

Therefore, I am satisfied that the lodestar crosscheck further supports the reasonableness of the fees.

I need not spend very much time on expenses.  I have reviewed them at $63,508.86.  It is well before the $100,000 cap that was provided for in the notice.

I have reviewed the Exhibit 2 of the Bernstein Declaration as well as the Hasson Declaration, Exhibit 4, to

reassure myself that the expenses were reasonably and necessarily incurred. And I am satisfied that they were necessary for the successful prosecution and resolution of the action. They are the type that are routinely charged to paying clients, and, therefore, they are appropriate.

Finally, but certainly not least, I am satisfied that Kavin Bakhda is entitled to reimbursement of his time spent representing the class under the PSLRA; specifically, 15 U.S.C. § 78u-4(a)(4). I know this is not -- because it's PSLRA case -- it's not an incentive award. But by analogy, were it one, $5,000 is very modest compared to awards in other sorts of class action cases for lead plaintiffs.

Here, though, we're under the PSLRA, and, therefore, the measure really is reimbursement of lead plaintiff for his time spent. I am satisfied that it is appropriate to award the amount of $5,000, as established in the Bakhda Declaration at paragraphs 8 to 12. Kavin Bakhda spent 20 hours litigating this case. That included communicating with lead counsel on issues in this matter, reviewing the amended complaint, consulting with counsel regarding the settlement negotiations and strategies of mediation, and, ultimately, approval of the settlement. Mr. Bakhda's hourly rate as Rikvin Capital's business development manager is 25 -- I am sorry -- $250. Accordingly $5,000 hardly strikes the Court as unreasonable, and, in

fact, I would note that in cases such as the Fernandez case, the Par Pharma case, and Schuler, similar amounts for lead plaintiff have been approved as being fair and reasonable.

Finally, the notice to the class informed putative class members that this application was to be made. And there have been no objections.

For all of those reasons, I am satisfied that it is appropriate to approve the application for attorneys' fees, the application for reimbursement of expenses, and $5,000 for lead plaintiff and, therefore, will enter the parties' form of order that grants the motion for final approval, motion for final class certification, and the other applications that I have just noted.

I have one question -- well, is there anything before I ask my question that counsel wants to raise with me or put on the record?

Anything? No? Okay.

So here's my question. I know that we -- if there are any disputes that come up during the claims adjudication process, the parties will make an application to the Court.

Might I humbly suggest that, as I have presided over the preliminary approval and the final approval, that the parties consider consenting to magistrate judge jurisdiction, really, for the remainder of the case? That's the only thing that would be left; right?

MR. HASSON:  Right.  Plaintiffs don't have a problem with that at all.

MR. RICHMAN:  And defendants consent as well.

THE COURT:  Great.

So can I ask counsel to -- I am going to need you to sign off again on the -- that same consent order.  It just basically at this point grants jurisdiction for the remainder.  Sign off and then send that in.  Okay?

One other question.  Did counsel give me a proposed form of order for these applications?  Or do you want to put one together --

(Simultaneous conversation)

MR. HASSON:  -- yes, Your Honor.

THE COURT:  You did?

MR. HASSON:  Yeah, in fact, we updated it with the reply.  It should be attached --

THE COURT:  Oh.

MR. HASSON:  -- as an exhibit to the reply.

THE COURT:  Okay --

(Simultaneous conversation)

THE COURT:  87.  Okay.  Just give me one second. I'd really rather just quick sign this in front of counsel.

MR. HASSON:  There's just one blank in there, Your Honor, which we left for, you know, your determination of the fees and expenses, so...

THE COURT:  See, you should have been more confident than that and just put it in there and then make me change it if I disagree.  But -- I am kidding.

All right.  Give me two minutes.  I am just going to print it up.

J, we can go off the record.

(Pause in proceedings)

THE COURT:  Okay.  So I have it in front of me.  So I am also -- as part of the order, we're going to -- I am including the appendix of selected settlement definitions.  Am I right?

MR. HASSON:  Yes, Your Honor.

THE COURT:  Okay.  All right.

So let me -- I have got basically, I think, two things here.  I have the proposed order and the judgment.  So I am going to cross out "proposed" -- I am on the proposed order approving class action settlement.  And I think at the bottom of page 2, I am also going to simply say, "And for the opinions set forth on the record during the final fairness hearing on June 2nd" -- actually, it should say on the record on June 2nd, 2022.  I went through all this -- consistent with what we did at the preliminary approval.

Okay.  So I want to make sure this is right.  So page 15, paragraph 22, the percentage is 33.3 percent.  That's 33 and a third.

And in the amount of -- what was it? -- 2.21 -- can somebody remind me?  2.133?

MR. HASSON:  It's 2.331.

THE COURT:  2.331.  Yup.  There it is.

2, 3, 3, 1.

And then paragraph 24, $5,000.

And then -- all right.  So that order is done.

Proposed judgment.  Good.  And that's done.

All right, gentlemen.  Anything else for plaintiff?  We'll get these on the docket -- it's a little late in the day, and I don't know if the docket -- the clerk's office will get this up, but if not today, it'll certainly hit tomorrow.  All right?

MR. HASSON:  Yeah, Your Honor, I just wanted to ask if you filled in the expense -- as well.  You didn't say it out loud.

THE COURT:  I am not sure I did.  Sorry for that.

What paragraph?  Attorneys' fees, check.

MR. HASSON:  It's in 22.

THE COURT:  Oh.  You know what I did?  --

(Simultaneous conversation)

MR. HASSON:  -- the 2.311 and the expenses?

THE COURT:  Bingo.  Sorry about that.

I really have no excuse for doing that.  I am really glad you pointed that out.

Okay.  Let me print that up, and we'll do clean page.  J?

THE COURT OFFICER:  Yes, sir.

THE COURT:  Is there a way to just -- give me two seconds, guys.  Sorry.

THE COURT OFFICER:  --

(Pause in proceedings)

THE COURT:  All right.  Let's try that again, so lead counsel is hereby awarded attorneys' fees in the amount of 33.3 percent of the settlement fund and expenses in the amount of -- what was it? -- 63 -- I got it.  6350886.  Right?

Am I right?  If I am wrong, somebody's got to unmute and tell me.  But I think -- I am looking at the brief.

MR. HASSON:  The 63 number is correct.  It just includes the $5,000 lead plaintiff award.  So.

THE COURT:  So, wait.  So it should be $58508?  Because there's a separate provision.

MR. HASSON:  -- 58, and then $5,000 in the --

(Simultaneous conversation)

THE COURT:  Okay.  Hold on.  Try that again.

33.3 percent -- and then it's 5850886 for expenses.  Right?

MR. HASSON:  Is that right?  It's paragraph 24 says

that the PSLRA award of blank -- $5,000 shall be paid out of the settlement fund.  It doesn't say it shall be paid out of the expenses.

This isn't my issue.  It's up to you.  I think the money is -- it's fungible where it comes from.  I just want to make sure it's accurate.

Your Honor, maybe we can do this and just submit a clean copy, then --

THE COURT:  Yeah, that's fine.

MR. HASSON:  And get it to you --

(Simultaneous conversation)

THE COURT:  It's such a little amount.  It's not going to affect my approval of the settlement.  So ... that's fine.

Why don't you guys do that, and then just me a conformed form of order.  All right?

MALE SPEAKER:  Terrific.

THE COURT:  And then I'll hold off, obviously, on entering the judgment, because I think the judgment should await entry of the order.  Right?  Great.

All right.  So get that to me in the next couple of days or so.  It shouldn't be too hard.

MR. HASSON:  Maybe in the next couple of minutes hopefully.  By tomorrow.

THE COURT:  We'll be here.

MR. HASSON:  Thanks so much.

THE COURT:  All right.  Thank you, Counsel.

Anything else for the record?  No?  All right.

Have a great day.  Thank you.

(Conclusion of proceedings)

Certification

I, SARA L. KERN, Transcriptionist, do hereby certify that the 58 pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

s/ *Sara L. Kern*                          5th of July, 2022
_____   _____
Signature of Approved Transcriber              Date


Sara L. Kern, CET**D-338
King Transcription Services
3 South Corporate Drive, Suite 203
Riverdale, NJ  07457
(973) 237-6080